UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANTHONY J. FERREIRA, as Administrator of the Estate of Patricia J. Ferreira, and as Guardian of the Estate and Person of Ryan C. Ferreira,<br>*Plaintiff,*<br>vs.<br>CITY OF EAST PROVIDENCE, et al.,<br>*Defendants.* | C.A. No. 05-73 S |
| ANTHONY J. FERREIRA, individually,<br>*Plaintiff,*<br>vs.<br>CITY OF EAST PROVIDENCE, et al.,<br>*Defendants.* | C.A. No. 05-75 S<br>(member case) |

**DEFENDANTS' PRETRIAL MEMORANDUM**

## I. INTRODUCTION

On October 10, 2001, Patricia Ferreira committed suicide while barricaded in her car and surrounded by East Providence Police officers. On behalf of the Estate of Patricia Ferreira, Anthony Ferreira brings a wrongful death claim for negligence, an unreasonable seizure claim pursuant to 42 U.S.C. § 1983 and Article I, Section VI of the Rhode Island Constitution, and a § 1983 due process claim against the City of East Providence and East Providence Police

Officers and their supervisors. On his own behalf, Anthony Ferreira seeks to recover based on claims of excessive force and false arrest stemming from his interaction with East Providence police officers on that same night.

## II. Facts To Be Proven in Defense

Patricia Ferreira was 28 years old on October 10, 2001, when she committed suicide while barricaded in her car on Brightridge Avenue in East Providence, Rhode Island. Her suicide was accomplished by a self-inflicted gunshot with a firearm legally registered to her. For approximately one hour beforehand, officers from the East Providence Police Department attempted to convince her not to commit suicide. As two officers talked to her, others formed a plan to save her, if needed, by rushing her vehicle, distracting her with two diversionary devices (informally known as "flashbangs"), breaking the windows in her car and securing her weapon. When it became a certainty that she was moments away from killing herself, the plan was initiated. Unfortunately, it was unsuccessful and Ms. Ferreira ended her life by pulling the trigger just as an officer broke the driver's side window and began to reach inside.

This tragic event was preceded by decedent's history of stormy relationships and in particular a domestic call by the police on that same day, involving her sometime boyfriend, John Sousa.

### A. Background Information

The overriding aspect of Patricia Ferreira's life in her last three (3) years was her stormy relationship with two ex-boyfriends, Joseph Traficante and John Sousa. Her interaction with these two individuals resulted in over 19 police-recorded contacts in those three (3) years, and

many more unrecorded police contacts. In addition, her family members and friends were also drawn into the web of arguments, restraining orders and complaints.

Patricia Ferreira's first stormy relationship was with an individual named Joseph Traficante. His father was a former police officer and he, himself, was a special reserve officer at one time for the East Providence Police Department. Unfortunately, his relationship with Patricia Ferreira was marked with her claims of abuse. Eventually, she helped the police to charge and successfully convict him of various offenses resulting in his incarceration. Patricia then began to date an individual named John Sousa. This relationship resulted in more calls to the police department.

On June 20, 1999, both Patricia and John Sousa complained to East Providence Police Officer Thomas Rush that Mr. Traficante had encountered and harassed them while they were in Laconia, New Hampshire, on a motorcycle trip. At the time, Ms. Ferreira had applied for and received restraining orders against Mr. Traficante in Rhode Island and Massachusetts. Ms. Ferreira and Mr. Sousa claimed that Mr. Traficante rode his motorcycle too close to them on the highways of New Hampshire. Mr. Traficante was not charged or arrested by the police.

Unfortunately by October 7, 1999, the relationship between Patricia Ferreira and Mr. Sousa had soured. Mr. Sousa contacted the East Providence Police and stated that he was worried that Ms. Ferreira was trying to blackmail him so he would not cancel a car insurance policy he had entered into for her vehicle. He did not make a formal complaint and no further investigation was undertaken.

Two days later, Mr. Sousa complained that Ms. Ferreira was making harassing phone calls to him. Officer Michael David listened to one of those calls. Approximately 30 minutes later, Officer David responded to Ms. Ferreira's apartment because she had called the station

complaining about harassing phone calls from Mr. Sousa. Officer David noted that both individuals had gun permits and were afraid that the other's complaint may result in their permit being revoked. Each did not make any formal charges against the other.

On May 25, 2000, Ms. Ferreira applied and received a restraining order against John Sousa. It was served by the East Providence Police Department. One week later, on June 2, 2000, she complained to the East Providence Police that Mr. Sousa was violating the order by driving past her house. She also acknowledged to Officer James Nelson that Mr. Sousa had filed and received a restraining order against her. In fact, the night before, Mr. Sousa had made a similar call complaining that Ms. Ferreira had violated his restraining order. Officer Nelson explained to Ms. Ferreira that driving past her house did not constitute a violation of the order.

On September 19, 2000, Corporal Jones of the East Providence Police Department received another complaint from Ms. Ferreira. This time she indicated that both ex-boyfriends, Mr. Traficante and Mr. Sousa, had settled their differences and teamed up to harass her. One hour later, after responding to this call, Corporal Jones was dispatched to the station because Mr. Traficante and Mr. Sousa were at the station complaining that they were being harassed by Ms. Ferreira. Mr. Traficante related that Ms. Ferreira attempted to drive into his lane of travel and yelled threats to him while doing so.

About one month later on October 21, 2000, Sergeant Rush was one of the responding officers concerning a complaint made at an eating establishment called "Walt's Roast Beef" by John Sousa against Ms. Ferreira. He claimed that Ms. Ferreira and her new boyfriend threw a white teddy bear at his vehicle and drove away. The bear had clothing made from one of his work shirts and an attached Christmas ornament that both he and Ms. Ferreira had bought when

they were a couple. He claimed that Ms. Ferreira had been driving by his house lately. Again, no charges resulted from his complaints.

Two days later (October 23, 2000), Mr. Sousa complained to Officer Tiernan of the East Providence Police that another teddy bear had been thrown at his vehicle. This one contained a t-shirt with Mr. Sousa's construction business emblem on it. Later that day, Mr. Sousa confronted Ms. Ferreira and her boyfriend. They began to argue. Ms. Ferreira's brother, (Anthony) arrived and also began to argue.

That same day, Ms. Ferreira phoned in a complaint to the East Providence Police Department against Mr. Sousa. Officer Tiernan's report of this complaint concludes as follows:

> This is a continuing problem between Mr. Sousa and Ms. Ferreira that has been going on for almost two years. Both sides are continually accusing each other of harassment and threats and each has been spoken to several times and advised they are acting like children.

Four days later (October 27, 2000) Patricia Ferreira appeared at the station complaining about Mr. Sousa. Again Officer Tiernan received the complaint. This time, Ms. Ferreira and Mr. Sousa were opposite each other in their vehicles at an intersection. Both waited for the other to go through. She complained that when she made the first move, Mr. Sousa threatened her by yelling that he should have used his vehicle to strike her. She also related her concern for the friendship of Mr. Sousa and Mr. Traficante who at one time, had restraining orders against each other.

Two days later, on October 29, 2000, Ms. Ferreira called the police to respond to a Dunkin Donut's parking lot in East Providence. Officer Tiernan responded. She complained that Mr. Traficante had arrived and after getting his coffee, "stuck his middle finger up at her." Twenty minutes later, Officer Tiernan was called again to that same location. This time Mr. Sousa complained that Anthony Ferreira was harassing him. A few days later on

November 1, 2000, Mr. Sousa applied for and received a restraining order against Ms. Ferreira.

On April 23, 2001, Ms. Ferreira alleged that Mr. Sousa was harassing her at work by making phone calls and driving by her place of employment. On May 3, 2001, two females, Michelle Destran and Kristen Braga, complained at the East Providence Police Station that Ms. Ferreira was harassing them because of their friendship with Mr. Sousa. They alleged that Ms. Ferreira was yelling at them, swearing at them and taking unwanted pictures of them.

**B. The Domestic Call**

Within a few months of the police's April 2001, contact with Ms. Ferreira, Ms. Ferreira and Mr. Sousa had patched things up and began to live together. Upon information and belief this occurred sometime in June of 2001. On October 10, 2001, Ms. Ferreira's brother, Anthony Ferreira, and their mother, Beverly Ferreira, appeared at the East Providence Police Station just before 6:00 P.M. with Patricia's eight-year-old son, Ryan. They complained that John Sousa and Patricia Ferreira were arguing again and Beverly Ferreira wanted to know if she could keep her grandson at her house. Captain Walter Barlow spoke with Ryan who told him that his mother and Mr. Sousa were throwing objects around the apartment and arguing. He told Captain Barlow that Mr. Sousa was throwing his mother and him out of the house. He told Captain Barlow that while Mr. Sousa and his mother were arguing, his mother told him to run down to his grandmother's house which was two (2) doors away. Captain Barlow dispatched a patrol car to the residence of John Sousa.

During this time, Anthony Ferreira also told Captain Barlow that Mr. Sousa had actually thrown his sister and Ryan out of the house a few days before. In fact, Ryan had lived with his grandmother and Anthony (who lived in an apartment in the same house) for the past two or three days and he had gone camping with Anthony. When they returned from the camping trip

Ms. Ferreira and John Sousa had patched up their relationship and picked up Ryan and took him back to Mr. Sousa's apartment.

The first officers to arrive at the apartment were Officer Steven Tiernan and Officer Michael David. Sergeant Rush also arrived on the scene a short time later. Officer Tiernan spoke with Ms. Ferreira and another individual who identified herself as Mr. Sousa's ex-wife. Officer David spoke with John Sousa. Both Mr. Sousa and Ms. Ferreira indicated in these separate conversations that there had been no physical altercation but that they had a verbal arguement. Both indicated that Mr. Sousa no longer wanted Ms. Ferreira living in his apartment. The officers will testify that there were no signs of a struggle, that neither party appeared to have any injuries and that although both individuals appeared to be upset and angry, they were not excessively distraught or afraid. Neither party appeared to be crying or to have been crying.

Mr. Sousa indicated that he had made arrangements for Ms. Ferreira to stay at another apartment beginning on the first of November. Ms. Ferreira agreed that it was not wise for her to stay at Mr. Sousa's apartment until November and eventually Mr. Sousa's ex-wife agreed to let Ms. Ferreira stay with her. Officer Tiernan and Officer David remained in the apartment while Ms. Ferreira removed some of her belongings and her son's clothes.

John Sousa also told the officers that he wanted Ms. Ferreira to remove her weapons because he was afraid she would accuse him of stealing them. Ms. Ferreira told the officers that she had retrieved her guns and would take them with her. After Ms. Ferreira left, the officers also cleared the scene.

**C. The Suicide**

At about 5:55 P.M., Anthony Ferreira left the police station for his home because he was hungry and he wanted something to eat. When he arrived at his home he saw between seven (7)

and ten (10) bags of clothing and he determined that his sister had dropped off the bags because they contained Ryan's clothes. He started to bring some of the clothing into his house when Patricia Ferreira arrived in her car. She began to take a few more bags of clothes out of the trunk of the car. According to his statements, John Sousa's ex-wife then drove to his house and stopped her car in the middle of the road. She handed Patricia a white piece of paper. In his statement he relates that after his sister read the paper she walked to the trunk of her car and removed two guns. He further states: "she had one gun in each hand and seemed calm. As she walking[,] and about to get into her car[,] she said she was going to kill herself. She wasn't actually saying it to me but it was loud enough for me to hear what she said."

Anthony Ferreira then approached his sister's car, saw that she had a "38 snub nose" pointed at her chest and a 9 mm on the right side of her lap. He told her that everything was going to be OK and simultaneously reached in the car and took the gun she had in her hand. He states that he backed away and placed the gun under one of the bags of clothes. However, his sister started to drive away and said to him, "I'll just use my other gun." Mr. Ferreira then called 911 and indicated that his sister was threatening to commit suicide. He told the operator that she had a gun.

Within minutes, a number of police cruisers responded to the area, parking their cruisers behind Ms. Ferreira's vehicle. Mr. Ferreira indicates that his sister became angry with him for calling the police. When Sergeant Hall arrived Anthony Ferreira was still near his sister's car. Sergeant Hall ordered him to move away from the vehicle. Mr. Ferreira, however, yelled out that he wanted all officers to leave. Instead of complying with the directions of Sergeant Hall, Anthony Ferreira draped his body across the windshield, blocking the officers' view of Ms. Ferreira. Sergeant Hall and Officer Tiernan tried to remove Mr. Ferreira from the windshield but

he resisted. Eventually, they removed him from the windshield and he began to fight with them near the driver's side door of Patricia's automobile. Sergeant Hall used his pepper spray but Mr. Ferreira still struggled with the officers. Officer Tiernan then sprayed Mr. Ferreira again and the two officers were able to bring him to the ground and place him in handcuffs. Mr. Ferreira, however, continued to struggle.

Meanwhile, Patricia Ferreira began to move her vehicle slowly up the street. At this time, John Sousa arrived. He was told by the officers not to go near the vehicle but proceeded toward it anyway. When the officers attempted to stop Mr. Sousa, he began to struggle with them and thus he was also placed in custody.

As Patricia's car moved forward (on Fenmoor Street), several officers in the street had to move out of her way. Several cruisers followed Ms. Ferreira's vehicle at a very slow pace up Fenmoor Avenue. She then turned right onto Warren Avenue and took another right onto Pawtucket Avenue. From that point, Ms. Ferreira made another right onto Brightridge Avenue.

By this time, numerous officers were had become involved. Sergeant Rush had assumed radio command of the incident and when Ms. Ferreira's vehicle turned onto Brightridge Avenue, a police officer with a transport van maneuvered his van so that it blocked the path of Ms. Ferreira's vehicle. Therefore, she came to a stop on the eastern curve of Brightridge Avenue just north of Intervale Street. The cruisers pulled up behind her and some in front of her car. Sergeant Rush will testify that when he exited his vehicle and took a position very close to Ms. Ferreira's car, he could see her sitting in the driver's seat with a handgun in her mouth.

When Sergeant Hall arrived, he resumed his conversation with Ms. Ferreira. He was approximately 10 to 15 feet away, perpendicular to the driver's window and under the cover of a box truck parked on the side of the street. He told her to put the gun down on the dashboard and

exit the vehicle. Captain Barlow, who had a professional relationship with Ms. Ferreira from her past problems, also arrived on scene and began to converse with Ms. Ferreira in an attempt to get her to put her weapon down and exit the vehicle.

Sergeant Rush meanwhile began to secure the perimeter and organize the officers who were in the direct line of fire or in dangerous cross-fire positions just in case the situation ever escalated to the point where the officers had to use deadly force. Sergeant Rush observed that there were residents who were now exiting their houses and coming to the scene. Therefore, he further directed some officers to clear the houses and the crowd.

Sergeant Hall then instructed Officer Kevin Feeney to bring the Special Response Team ("SRT") van to the scene. When the van arrived, Sergeant Rush directed Officer Feeney to arm himself with a shotgun loaded with non-lethal beanbag rounds. He instructed Officer Feeney that if Ms. Ferreira exited her vehicle with a weapon in her hand and if a determination was made that the weapon was in a location which would not threaten her or the officers, then Feeney was to shoot her with a beanbag round. All of the officers as well as Sergeant Hall and Captain Barlow were informed of this plan. As Sergeant Rush coordinated the scene, Captain Barlow and Sergeant Hall continued to verbally attempt to persuade Patricia to put the gun down and come out of the car.

Lieutenant Alister McGregor (now deceased), who was in charge of the special response team, arrived at the scene shortly thereafter. It was determined that "a hasty rescue" plan should be in place. A "hasty rescue" plan refers to an alternate plan which is in place and could be implemented if there were ever developing circumstances which do not allow for a more timely and slowly executed plan. This plan was to be executed only after it was determined that Ms.

Ferreira was moments away from committing suicide and nothing else could be done. The plan, in Sergeant Rush's words, was as follows:

> Lieutenant McGregor and I determined that we would use two, two man teams to approach the car. One team would consist of Feeney and I, with me deploying a flashbang diversionary device on the driver's side of Patricia Ferreira's car. Feeney and I would then make a speedy approach to the driver's door of Patricia Ferreira's door using a ballistic shield. The second team would consist of Lieutenant McGregor and Officer Michael David, who was to approach her on the passenger's side of the vehicle, using a ballistic shield and a flashbang diversionary device. When they reached the passenger's side, McGregor would throw the diversionary device through the glass window of the front window of the passenger door. Simultaneously Officer Feeney, utilizing a halogen tool, would break the operator's door window and grab the firearm away from Ms. Ferreira.

Sergeant Hall and Captain Barlow continued to try to converse with Ms. Ferreira. Captain Barlow will testify that Ms. Ferreira told him that "the world is all screwed up." She told him she feared that John Sousa would be arrested and have to go to jail. She told him that she was upset with her family for their refusal to accept her relationship with Mr. Sousa. She expressed concern over the humiliation she would face for being in this situation.

Captain Barlow and Sergeant Hall tried to reassure her that she would be protected. They discussed her family and the love that her family had for her. They told her that John Sousa would not go to jail and that there was hope for the future. Ms. Ferreira indicated at some point that she would rather die than be placed in a "mental institution."

All during this time, Ms. Ferreira on different occasions would place the gun in her mouth. She would also point it at her chest. When she placed the weapon in her mouth, Captain Barlow would request that she look at him. He would urge her not to do anything.

After approximately one hour, Ms. Ferreira reached into the backseat area and retrieved a cloth or towel. She placed the cloth on the upholstery on the back cushion of her seat and headrest. She opened her window and threw an American flag onto the hood of the car,

indicating that she did not want to get blood on it. She told Captain Barlow and Sergeant Hall to return to their vehicles. At some point, she turned up the radio and refused to look at the officers. She blessed herself with the Sign of the Cross and closed her eyes. At this point, the gun was not in her mouth. Captain Barlow felt that she was about to shoot herself and, with her eyes closed and the gun not at her face, it was the last and best opportunity for the police to try to save her life. Therefore, he signaled to Lieutenant McGregor to initiate the extraction plan.

The two, two-man teams approached the vehicle from either side. Sergeant Rush threw his flashbang device and it exploded in front of Ms. Ferreira's driver's side front wheel. Lieutenant McGregor threw his flashbang toward the right front passenger window. However, this flashbang device did not break the window and exploded to the right of Ms. Ferreira's car.

Officer Feeney ran to the driver's side window and swung at the window with a Halogan tool. His first strike did not break the window but his second strike did. He reached in, thinking at first to open the door but soon determined that it was best to get Ms. Ferreira's head away from the gun because she was then placing it to her mouth. Unfortunately, as he got his hands to the back of her head, Ms. Ferreira pulled the trigger and Officer Feeney was thrown to the ground. He immediately got up and reached into the car and took the handgun which was still in her hand and on her lap. Ms. Ferreira, however, unfortunately, was bleeding heavily from a head wound.

Ms. Ferreira was subsequently pronounced dead at the scene by the Rescue Unit.

It should be noted that a neighbor was filming the scene at an angle nearly perpendicular to the passenger side of the vehicle. Although defendants have an expert witness who will testify that the final moments on the tape are not captured accurately because the video copies were

somehow placed in slow motion with some frames missing, the video nonetheless presents an overall good recording of the scene.

## III. MEMORANDUM OF LAW

### A. Summary of Legal and Factual Defenses

As more fully described *infra*, the defendants will rely on a number of defenses to Ms. Ferreira constitutional claims that will be raised in a Rule 50 motion. First, defendants will argue that the undisputed facts do not, as a matter of law, give rise to an unlawful seizure in violation of Ms. Ferreira's constitutional rights. Based on the information, the officers possessed more than sufficient basis to restrict Ms. Ferreira's movements for her own safety and the safety of others. Second, defendants will argue that the evidence does not support the conclusion that the officers caused plaintiff's injury. That is, she died of a self-inflicted gunshot wound.

Defendants will also file a Rule 50 Motion on plaintiffs' other claims as well. Although grounded somewhat in the facts, it is anticipated that the facts material to the claims will not be disputed. First, as to Anthony's personal claims of false arrest and excessive force, it is undisputed that he did not follow the commands of the officers and began to struggle with them. Consequently, there was probable cause to arrest. The facts will also show that the amount of force used to subdue Anthony was reasonable in light of his actions. In addition, defendants also believe that the facts will demonstrate that they were not negligent either through their handling of the domestic call or the suicide incident. Defendants will present experts in this regard which will be more fully developed below.

Second, the defendants believe that the plaintiff will not be able to sustain his burden of proof regarding proximate cause for the death of Patricia Ferreira to sustain the additional claims

brought on the decedent's behalf. Plainly stated, it is rank speculation for anyone to determine that the actions of the police rather than the willful conduct and intent of the decedent caused her death. The defendants intend to call Dr. Joseph Penn, a psychiatrist, who will testify to a reasonable degree of psychiatric certainty that it is impossible to state that the decedent would not have committed suicide if the police employed any other tactics.

These arguments are more fully addressed below.

**B. As a Matter of Law, the Plaintiff Will Be Unable To Sustain His Constitutional Claims Regarding the Death of Patricia Ferreira.**

In Counts II, III and IV of Complaint, C.A. No. 05-75S, plaintiff seeks to maintain a claim on behalf of Patricia Ferreira under *§ 1983* and R.I. Constitution for her "unlawful seizure" and the alleged deprivation of her due process rights. Title 42, section 1983 provides a civil remedy for the deprivation of constitutional rights by anyone acting under the color of law. In Count II and IV, plaintiff specifically claims that his sister was "seized" in violation of her Fourth and Fourteenth Amendment rights by the conduct of the police officers in blockading her car on Brightridge Avenue. In Count III, plaintiff argues that the defendants deprived plaintiff of her right to life in violation of her due process rights. In the first instance, it is noteworthy that, "[w]ith minor exceptions not applicable here, Art. 1, § 6 of the Rhode Island Constitution is co-extensive with the Fourth Amendment of the United States Constitution." *Brousseau by & through Brousseau v. Town of Westerly by & through Perri, 11 F. Supp. 2d 177, 183 (D.R.I. 1998) citing Duquette v. Godbout, 471 A.2d 1359, 1361 (R.I. 1984).* The same holds true for alleged violation of Rhode Island's constitutional right to "due process" under Article I, § 2 of R.I. Constitution. *Jones v. Rhode Island, 724 F.Supp. 25 (D.R.I. 1989)(due process clause to Rhode Island constitution "clearly was to parallel the language of the U.S. Const., amend. 14.").*

Thus, because the protections afforded under R.I. Constitution and the U.S. Constitution are coterminous, the analysis under both constitutions are the same. *Id; State v. Davis, 105 R.I. 247, 252, 251 A.2d 394, 397 (1969).*

### ***1. The Defendants' Actions Did Not Amount To an Unlawful Seizure of Decedent.***

Plaintiff first seeks to recover for the alleged deprivation of her right to be free from unlawful seizure based, according to the Complaint, on the defendants surrounding decedent's vehicle. While the Fourth Amendment does grant citizens the right to be free from seizure, the protection of the Fourth Amendment does "not ... guarantee against all . . . seizures, but only against unreasonable . . . seizures." *U.S. v. Sharpe, 470 U.S. 675, 682 (1985).* At one time, "Fourth Amendment seizures of the person were analyzed in terms of arrest, and reasonable only if supported by probable cause." *United States v. King, 990 F.2d 1552, 1556 (10th Cir. 1993).* However, since the Supreme Court's pronouncement in *Terry v. Ohio, 392 U.S. 1, 20 (1967)*, Court have continually recognized other forms of limited seizure that require less than probable cause to satisfy Fourth Amendment guarantees. One such has been identified as a seizure in furtherance of police officer's "community caretaking" obligations.

Under well-settled case law, even absent criminal activity, police officers are not only "permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *King, 990 F.2d at 1560 quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973).* "In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Id See also Ahern v. O'Donnell, 109 F.3d 809, 817 (1st*

*Cir. 1997) (Police officers have probable cause to "seize" or detain an individual when circumstances warranting a reasonable belief that the person to be seized threatening serious harm to himself or others.).*

"Whether the seizure of a person by a police officer acting in his or her non-investigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference." *United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993) citing Brignoni-Ponce, 422 U.S. at 878; Terry, 392 U.S. at 21.* The Fifth Circuit has even gone as far as opining that, "[a]fter learning . . . that [the plaintiff] had a gun and was threatening suicide, 'it would have been poor police work indeed'" for the police not to have detained the plaintiff and search him for a weapon. *United States v. Wallace, 889 F.2d 580, 582 (5th Cir. 1989) (police "were entitled, if not obliged, to search his outer clothing for weapons").*

Defendants submit that the instant case is analogous and the interest in the officer's exercising their caretaking functions could not be more paramount. Plaintiff, Anthony Ferreira, called 911 seeking assistance and indicating that his sister had a weapon and threatened suicide. When the officers arrived at Mr. Ferreira's residence, Ms. Ferreira was in fact sitting in her car with a gun and refused to get out or turn over the weapon. In his Complaint, plaintiff alleges that even after repeated directions to "put the gun down" and get out of the car, decedent remained in the vehicle. In fact, during this time frame, Ms. Ferreira placed the muzzle of the gun in her mouth on several occasions. Under these circumstances, it cannot be argued that the police should have simply allowed her to drive off. Quite simply, the officers were confronted with a young woman who not only had threatened suicide but who was sitting with a gun in her mouth.

In applying the balancing test of weighing "the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference," the defendants submit that the only possible conclusion is that they acted reasonably in stopping decedent's vehicle and detaining her. *King, 990 F.2d at 1560.* In fact, in the words of the Fifth Circuit, it would have been "poor police work indeed" if they allowed decedent to leave knowing that she had a gun that she had placed in her mouth and threatened to commit suicide. Thus, as a matter of law, the defendants' actions do not amount to a violation of decedent's right to be free from unlawful seizure.

***2. There Is No Basis for the Claim that Defendants' Actions Amount to a Deprivation of Decedent's Due Process Right.***

In Count III of Complaint 05-73S, plaintiff further seeks to recover pursuant to *§ 1983* for the alleged deprivation of life without due process of law. In addressing this claim, it must first be recognized that the Constitution, in particular the due process clause, "limits the actions the states can take rather than mandating specified obligations." *Bradberry v. Pinellas County, 789 F.2d 1513, 1517-1518 (11th Cir. 1986) citing generally, Harris v. McRae, 448 U.S. 297, 318 (1980).* Thus, "[t]he Constitution, as opposed to local tort law, does not prohibit grossly negligent rescue attempts nor even the grossly negligent training of state officers." *Id.* Rather, it prohibits the governmental actors *themselves* from depriving an individual of life, liberty, or property without due process of law.

Accordingly, because the Due Process Clause acts as a check on the government, not on actions by private individuals, Courts have routinely held that the due process clause does not require the government to protect citizens against the violence of private individuals, even themselves. *DeShaney v. Winnebago Co. Dep't of Social Serv., 489 U.S. 189, 197 (1989). Bradberry, 789 F.2d at 1518.* In fact, the First Circuit recently held that "[t]he Supreme Court

has said that only in very rare situations will the state's failure to protect someone amount to a constitutional violation, even if the state's conduct is grossly negligent. The Court has cautioned that "the doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." *Rivera v. Rhode Island, 402 F.3d 27, 30-31 (1st Cir. 2005) quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).* The Eleventh Circuit summarized the limited reach of the due process clause by noting that "[a]lthough the state might be prohibited by the Due Process Clause from actively taking the life of a citizen through grossly negligent behavior, we do not believe that due process is implicated when the state fails to help someone already in danger. To hold otherwise, we would have to read into the Constitution the tort law principle that a rescue, once begun, must be carried out with due care. We decline to take such an extreme step." *Bradberry, 789 F.2d at 1517-1518.*

That having been said, the Courts have recognized two (2) exceptions from this general principle -- the "special relationship" and the state-created danger exceptions. The special relationship exception is a very limited exception that recognizes "an affirmative, constitutional duty to protect . . . when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." *Id. at 34*. *See DeShaney, 489 U.S. at 201-02; Hasenfus v. LaJeunesse, 175 F.3d 68, (1st Cir. 1999); Souza v. Pina, 53 F.3d 423, 426 (1st Cir. 1995); Sanford v. Stiles, 456 F.3d 298, 304 n. 4 (3rd Cir. 2006)* . "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* Thus, the First Circuit has recognized that this relationship, and thus a constitutional duty, may exist when the individual is incarcerated or is involuntarily committed to the custody of the state. *See Monahan v.*

Dorchester Counseling Ctr., Inc., *961 F.2d 987, 991-92 (1st Cir. 1992).*

The second exception to the DeShaney holding, the state created danger exception, is implicated when the state actors create the danger at issue or make the plaintiff more vulnerable to the dangers than they would have been had the officials not acted at all. DeShaney, *489 U.S. at 201;* See also Wells v. Walker, *852 F.2d 368, 370 (8th Cir. 1988) (no constitutional deprivation unless the state "affirmatively places [plaintiff] in a position of danger the [plaintiff] would not otherwise have been in").* As most recently noted by the First Circuit, the "state-created danger" exception to the DeShaney holding is available only where "[a] government employee, in the rare and exceptional case, affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance." Frances-Colon v. Ramirez, *107 F.3d 62, 64 (1st Cir. 1997) citing* Dwares v. City of New York, *985 F.2d 94, 96 (2d Cir. 1993) (due process implicated where complaint under § 1983 alleged that police assured skin-heads that they could attack protestors with impunity, thereby affirmatively increasing threat of harm to protestors) and* Ross v. U.S., *910 F.2d 1422, 1429-34 (7th Cir. 1990) (due process interest in life implicated where county officials prevented city officials from rescuing drowning boy, thereby affirmatively restricting source of aid).* However, as the First Circuit caution in Soto v. Flores, *103 F.3d 1056, 1064 (1st Cir. 1997)* and again in Rivera: "in a state creation of risk situation, where the ultimate harm is caused by a third party, 'courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action.'" Rivera, *402 F.3d at 36 quoting* Soto, *103 F.3d at 1064.*

In the area of failed suicide rescues, the Tenth Circuit in Christiansen v. City of Tulsa, *332 F.3d 1270, 1281 (10th Cir. 2003)* rejected the position that the police could be held liable for due process violation under either the special relationship or the state-created danger exception.

In that case, the police received a call by the decedent's wife reporting that decedent had a gun and was threatening to kill himself and his wife. The wife escaped the apartment with her infant child. When the police arrived, they evacuated the neighboring apartments and began talking to decedent. The police refused to allow the decedent's psychiatrist or family access to him or to grant his request for cigarettes. The officers, however, continually asked decedent to give up his weapons in exchange for the cigarettes and to come out and speak to them. The Court first rejected the family's claim that the officers had created a special relationship by quarantining decedent in the apartment. The Court specifically noted that the officers affirmatively encouraged the decedent to leave his apartment and thus did not restrain him from protecting himself. *Id. at 1280.* The Court also rejected the claim that officers were liable under the "state created danger" exception to *DeShaney.* The Court recognized that "the "danger" in question – [decedent's] exposure to a suicide attempt - existed prior to defendants' intervention. Thus, defendants cannot be liable under section 1983 for having "created" [decedent's] predicament." *Id. See also Sanford v. Stiles, 456 F.3d 298, 304 n. 4 (3rd Cir. 2006) (holding that a school guidance counselor was not liable to suicide victim under either the special relationship or state created danger exception).*

Defendants submit that the instant case similarly fails to support a finding either that there was a special relationship between the decedent and the officers or that the officers created or enhanced the danger to Patricia. In the first instance, far from having control over Patricia's actions such to render her unable to care for herself and thus amount to a "special relationship", the officers had no control over her actions in the car. "Despite police officers' ability to surround a suicidal person physically, they cannot control him or her." *Adams v. City of Fremont, 68 Cal. App. 4th 243, 278 (CA, 1st Appellate Dist., 1998). Cf. People of the State of*

*New York v. Spina, 713 N.Y.S.2d 394 (2000) (court held that defendant standing at the brink of Niagara Falls and threatening suicide with police around him was not in custody for purposes of Miranda).* The officers' actions were geared towards gaining such control by convincing her to exit the car and give up her gun so that she could not hurt herself. *Id. at 1280 (officers affirmatively encouraging the decedent to leave his apartment negated conclusion that a "special relationship" existed).* In addition, as in Christiansen, rather than defendants creating the danger to Patricia, the "danger" – [her] exposure to a suicide attempt - existed prior to defendants' intervention." *Id.*

Of course, even if plaintiff is able to demonstrate a special relationship between the defendants and the decedent or that the defendants played a role in the creation or enhancement of the danger, under a supposed state created danger theory, "there is a further and onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions must shock the conscience of the court." *Rivera, 402 F.3d 27, 35-36 citing Hasenfus, 175 F.3d at 73 (In a state created danger case, state behavior must be "conscience-shocking or outrageous"); see also Coyne v. Cronin, 386 F.3d 280, 287-288 (1st Cir. 2004) (using "shocks the conscience" as a catch-all term encompassing a range of state actor behavior); Soto, 103 F.3d at 1064 ("Not every negligent, or even willfully reckless, state action that renders a person more vulnerable to danger 'takes on the added character of [a] violation[] of the federal Constitution.'").* In order to meet this standard, "[t]he state action must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* "The Due Process clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or

property." Daniels v. Williams, *474 U.S. 327, 328 (1986)*. Nor is the Due Process clause "a guarantee against incorrect or ill-advised [government] decisions,'" *Christiansen, 332 F.3d at 1282 (family challenged police officer's decision to quarantine suicidal individual in his apartment, including their instruction to psychologist not to contact him)*. In the instant case, defendants submit that even if plaintiffs meet their burden of demonstrating either a special relationship or a state created danger, the defendants' conduct did not "demonstrate a degree of outrageousness . . . that is truly conscience shocking". Consequently, there is no basis to support plaintiff's *§ 1983* claim for the alleged deprivation of decedent's due process rights.

***3. Defendants Are Nevertheless Entitled to Qualified Immunity from the Instant Suit.***

Defendants further submit that they are nevertheless entitled to qualified immunity. It is well-settled that "[q]ualified immunity may exist even though in hindsight a court might determine that the action of the official violated the constitution." *Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) citing Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982); Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002) citing Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999) (applying qualified immunity to state law claims ).* Thus, even if it should ultimately be determined that decedent's constitutional right has been violated, the defendants are relieved from liability by the doctrine of qualified immunity.

The doctrine of qualified immunity emanates from the Supreme Court's pronouncements in *Harlow* where the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, 457 U.S. at 818.* The purpose behind granting officials such immunity is to

allow them to perform their duties and act in areas where clearly established rights are not implicated "with independence and without fear of consequence." *Id. at 819.* Officials, therefore, enjoy "an immunity from suit rather than a mere defense to liability [which] . . . is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).* “In the end, the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was "apparent" when undertaken. “ *Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).*

The First Circuit has prescribed the following "three-step algorithm" for determining if a party is entitled to qualified immunity:

> [C]onsider (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right. *Id.*

As more fully outlined above, plaintiff does not move beyond the first step of the algorithm because, even accepting the allegations as true, the defendants’ actions do not amount to a violation of plaintiff’s constitutional rights. First, applying the balancing test of weighing “the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference,” the defendants submit that the only possible conclusion is that they acted reasonably in stopping decedent’s vehicle and detaining her and thus can not be found to have seized her in violation of her constitutional rights. *King, 990 F.2d at 1560.* In addition, the facts do not support a finding that defendants had a special relationship with decedent or created the danger that led to her suicide. Accordingly, there is no basis to support plaintiff’s claim for the deprivation of

decedent's due process rights. Thus, because there is no basis to find that decedent suffered a constitutional deprivation, the defendants are entitled to qualified immunity.

Defendants submit that even if defendants' actions, if proven true, could be found to give rise to a constitutional deprivation, they are nevertheless entitled to qualified immunity because the rights claimed by plaintiff were not clearly established as a matter of law. *Smith v. Town of E. Haven, 2005 U.S. Dist. LEXIS 4544 (D. Conn. 2005)("because the undisputed facts show that [plaintiff] did not have a clearly established constitutional right to protection from private violence, the Individual Defendants are entitled to qualified immunity").* This is more fully briefed above.

Finally, even if the Court were to reach the third step of the algorithm, qualified immunity would still protect the officers from the instant suit. The third step involves applying a good faith test that allows questions of qualified immunity to be decided as a matter of law in appropriate cases. *Malachowski v. City of Keene, 787 F.2d 704, 714 (1st Cir. 1986).* This test requires viewing the official's actions from an objectively reasonable standpoint. The decisive question becomes whether another police officer, standing in the shoes of these defendants, would have concluded that their actions violated a clearly established statutory or constitutional right. *See Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992).* A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." *Cookish v. Powell, 945 F.2d 441, 443 (1st Cir. 1991).* The First Circuit has observed that the "qualified immunity standard 'gives ample room for mistaken judgments' by protecting' all but the plainly incompetent or those who knowingly violate the law.'" *Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991).* In the instant case, defendants submit that it can hardly be said that a reasonable officer standing

in these officers' shoes would believe that their actions violated decedent's clearly established constitutional rights.

**C. The State Law Negligence Claim for the Death of Ms. Ferreira.**

In Count I of plaintiff's Complaint, C.A. No. 05-73S, plaintiff seeks to maintain a claim for wrongful death under Rhode Island's Wrongful Death Statute, *R.I.G.L. § 10-7-1 et. seq*. Although plaintiff's Complaint only alleges facts from decedent's barricade in her car to support her wrongful death action, through deposition questions and filings by the plaintiff, it is anticipated that plaintiff will also attempt to rely on the officers' alleged negligence in not confiscating decedent's weapons when responding to the domestic call before the suicide attempt. To the extent such a claim is permitted,[1] defendants will address each.

***1. The Domestic Call.***

It is possible that Plaintiff will first allege that the officers were negligent in failing to remove Ms. Ferreira's weapons during the domestic call. Of course, in order to succeed on a claim for negligence emanating from this incident, plaintiff must first demonstrate that defendants breached a duty of care owed to decedent. However, in the first instance, in addition to the fact that plaintiff will not be able to show a special duty or egregious conduct such to overcome the public duty doctrine (see below), plaintiff cannot demonstrate the breach of any duty. In particular, it is first noteworthy that at the time, there was no law or legal basis permitting police officers to confiscate legally registered weapons. Rather, clear Fourth Amendment protections actually prohibited the police from confiscating weapons absent

[1] Defendants would submit that, as more fully outlined in defendants' Motion in Limine, there are two (2) basis for excluding testimony and claims surrounding the officers' response to the domestic call. First, plaintiff does not raise such allegations in his Complaint. Second, a reasonable juror could not conclude that that the failure to confiscate the weapons lead decedent to the "uncontrollable impulse", as required under Rhode Island law, to commit suicide. Defendants have filed a separate Motion in Limine seeking to exclude such testimony based on these two (2) grounds.

probable cause that a crime has been or is about to be committed. In the instant case, there is no dispute that decedent lawfully possessed the weapons. At the scene of the domestic dispute, therefore, there was no constitutional basis to seize the weapons. Moreover, even if there were a legal basis for the officers to confiscate the weapons, "[p]olice officers have the authority, but not the "duty" to enforce the law." *Adams v. City of Fremont, 68 Cal. App. 4th 243, 273 n 25 (CA, 1st Appellate Dist., 1998)*.

Based on questions during depositions and plaintiff's expert report, it is anticipated that rather than rely on constitutional authorization to support the seizure, plaintiff will attempt to rely on the East Providence Police Procedures, in particular General Order 2000-43, section 330.06 to support the position that officers should have/could have confiscated Patricia's weapons during the domestic call. Section 1.3(B)(4) of that Policy specifically referenced by plaintiff states:

> It is a priority for an officer to ascertain if the individual either possesses or otherwise has access to weapons when the officer has determined that the individual is mentally ill, in crisis, or is suicidal.

However, as more fully outlined in Defendants' Motion in Limine, the provision relied upon by plaintiff is actually irrelevant to the instant case. In particular, the section is entitled, **"Suicidal/Mentally Ill Persons."** The stated purpose of the policy is "to establish procedures for officers to follow when responding to calls for service regarding suicidal/mentally ill persons." *General Order 2000-43, section 330.06, Section 1.1*. Thus, the first problem with plaintiff's reliance on this policy is that at the time the officers were allegedly to have employed this provision and confiscate plaintiff's weapons, the officers were responding to a domestic call, not to a call of a suicidal/mentally ill person.

Despite this clear distinction, plaintiff proposes introducing the testimony of his expert who opines that under section 1.4(d)(3)[2] of General Order 2000-43, section 330.06, the officers were required to seize decedent's weapon during the domestic call. Of course the section relied on by plaintiff's expert is entitled "**Response to a Threat of Suicide**." There is no dispute that decedent did not threaten suicide while at the apartment. Rather, the threat of suicide came after she had left the residence and met with her brother. The section therefore, even if it does require the officers to confiscate weapons, does not apply to the instant case.

In addition, proper analysis of the section reveals that it is entirely consistent with defendants' position that they lacked a legal basis to seize the weapons from Patricia while at the apartment. In particular, as noted, the section directing the officers try to convince a suicidal individual to comply with their commands and seize the weapon, section 1.4(b)(3) is entitled "**Response to a Threat of Suicide.**" As outlined above, constitutional guarantees prohibit police officers from seizing lawfully possessed weapons unless the officer has probable cause to believe that a crime had been or was about to be committed. Rhode Island, being a common law state, recognizes suicide as a criminal act. *Clift v. Narragansett TV L.P., 688 A.2d 805, 808 (R.I. 1996) citing In re. Marlene B., 540 A.2d 1028 (R.I. 1988)*. Thus, when officers are responding to a threat of suicide they could possess probable cause to believe that a crime is about to be committed and thus justify the seizure of the weapons. In the instant case, as noted, there is no evidence that decedent was threatening suicide before she left the apartment with the weapons. As such there was no constitutional basis for the officers to seize the weapons and the policy provisions plaintiff seeks to introduce are irrelevant and misleading.

---

[2] The expert's report actually cites to "section 1.5(d)(3)". However, there is no such section and the quotation in the report parallels section 1.4(d)(3).

Moreover, it is clear from the language of the section that these provisions were intended to protect the police officers themselves from injury. In particular, the "Considerations" section of the policy speaks of "Suicide by Cop" incidents, *section (A)(2),* and that persons experiencing mental illness/suicidal thoughts may experience enormous amounts of physical strength, *section (B)(3)*. The policy directives regarding confiscating weapons from suicidal/mentally ill individuals, therefore, is geared towards protecting the officer.

Finally, defendants submit that even if the policy dealing with "Suicidal/Mentally Ill Persons" applied to the officers responding to the domestic call, there was no objective basis for the officers to invoke its provisions (even if constitutionally entitled). The officers who arrived at the scene will testify that they were very familiar with John Sousa and Patricia Ferreira and their rocky history. The officers will testify that it was clear to them that this was just another in the string of verbal arguments that the couple had engaged in over the years. As with the couple's past confrontations, on this particular day, there was no sign of a physical struggle. The furniture was not in disarray. The participants did not appear to be crying or have any injuries. In fact, both Ms. Ferreira and Mr. Sousa in separate conversations with the officers stated that there had been no physical altercation but that they had verbally argued. Under these circumstances, defendants contend that it would have been illegal to take custody of Ms. Ferreira's weapons.

Furthermore, despite multiple family member's contact with the police officers and plaintiff's current allegations to the contrary, the testimony will demonstrate that no one voiced concern over Ms. Ferreira retaining her weapons. In fact, her boyfriend, Mr. Sousa specifically asked that she take the weapons with her. Thus, there was simply no basis for the officers to have seized Ms. Ferreira's legally owned weapons.

As with all of plaintiff's claims, in the final analysis, as more fully outlined in their Motion in Limine and below, in Rhode Island, in order to be held liable the defendants' alleged negligent act of failing to seize the weapons, plaintiff must prove that the action brought about decedent's uncontrollable impulse to commit suicide. As more fully briefed below, cases of uncontrollable impulse typically "involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusations, false arrest or torture." *Logarta v. Gustafson, 998 F.Supp.998, 1005 (D. Wis 1998) (citations omitted)*. In the instant case, there is no allegation that the police officers failing to seize the weapons inflicted physical injury on Ms. Ferreira that led to an uncontrollable impulse. There are likewise no allegations that the police officers intentionally inflicted mental or emotional injury through wrongful accusation, false arrest or torture upon Ms. Ferreira when they did not confiscate her weapons. Accordingly, no reasonable jury could find that the police officers standing by as Ms. Ferreira left the home with her handguns brought about an uncontrollable impulse, delirium or insanity in Ms. Ferreira such to result in their liability for her suicide.

***2. The Suicide Incident.***

Plaintiff also alleges the officers are liable for the wrongful death of Patricia because they were negligent at the scene of her suicide thus causing her death. The plaintiff complains through his expert that the police were negligent at the scene of the suicide for a number of reasons. First, it is alleged that Sergeant Hall and Captain Barlow did not have any formal training as police negotiators or psychologists. Second, plaintiffs allege that the police should have called a trained psychologist or crisis intervention counselor to the scene. Finally, plaintiffs attack the tactical plan involving the use of flashbangs as being improper.

Of course, as with any wrongful death claim, plaintiff must establish that the defendants were negligent. To prevail on a claim of negligence under Rhode Island law, "a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." *Selwyn v. Ward, 879 A.2d 882, 886 (R.I. 2005) quoting Mills v. State Sales, Inc., 824 A.2d 461, 467-68 (R.I. 2003)*. Plaintiff's Complaint proceeds on the presumption that defendants owed decedent a duty of care. Defendants submit that they did not.

In *Adams v. City of Fremont, 68 Cal. App.4th 243, 80 Cal. Rptr. 2d 196 (CA. 1st Appellate Dist., 1998),* a wrongful death claim was brought against the city and police officer in relation to the defendants handling of the decedent's threatened suicide. After analyzing the requisite elements necessary to find a duty of care under California law, as well as the underlying policy elements, the *Adams* Court held that law enforcement officers responding to a crisis involving a person threatening suicide with a loaded firearm had no legal duty that would have exposed them to liability if their conduct failed to prevent the suicide from happening. *Id. at 276. See also Munoz v. City of Union City, 120 Cal. App. 4th 1077 (CA, 2d Div. 2004).*

The factors analyzed by the *Adams* and *Munoz* Courts include: "(1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability." *Adams, 68 Cal. App.4th at 268; Munoz, 120 Cal. App. 4th at 1094.*

Although the *Adams* found that all of the factors weighed in favor of finding that there was no duty, the Court took specific note of the fourth factor, that is the policy of preventing future harm, extent of burden to appellants and the consequences to the community. In addressing this element, the Court first noted that "police officers providing assistance at the scene of a threatened suicide must concern themselves with more than simply the safety of the suicidal person. Protection of the physical safety of the police officers and other third parties is paramount." *Id. at 271.* The Court thus concluded that imposing liability for the "negligent handling of a threatened suicide improperly elevates the interest in preserving the life of the person threatening suicide over the interests of public safety and the physical safety of the police officers." *Id. at 272.*

The Court further noted that such liability would also have the effect of making officers more tentative in their response to a crisis and could inhibit them from providing intervention at all thus resulting in the loss of "an important resource in dealing with threatened suicides." *Id. at 272-73.* The Court refused to "impose a duty that requires police officers to choose between refusing to offer assistance at the scene of a threatened suicide or assuming full responsibility for the suicidal individual's welfare. This choice discourages police officers from rendering assistance in these inherently unpredictable situations in which even highly trained mental health professionals cannot guarantee success." *Id. at 273.*

Under Rhode Island law, although "no clear-cut rule exists to determine whether a duty is in fact present in a particular case," the court has specifically adopted the same factors utilized by the California Courts in making a determination of whether such a duty exists under Rhode Island law. *Banks v. Bowen's Landing Corp., 522 A.2d 1222, 1225 (R.I. 1987) citing Thompson v. County of Alameda, 27 Cal.3d 741, 750, 614 P.2d 728, 732-33, 167 Cal.Rptr. 70, 74-75*

*(1980).*

In particular:

> In considering whether a duty exists, among the factors considered are (1) the forseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of [the] connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach. *Carroll v. Yeaw, 850 A.2d 90, 93 (R.I. 2004) quoting Banks v. Bowen's Wharf, 522 A.2d 1222, 1225 (R.I. 1987).*

Defendants thus submit that in light of the Rhode Island Supreme Court's adoption of California's standard, the analysis employed by the *Adams* Court is likewise the same under Rhode Island law. In particular, and, as found by *Adams* and *Munoz*, on balance "the relevant public policy considerations militate against imposing a legal duty on police officers." In addition to elevating the interest of the suicide victim over that of the officers and third parties present, imposing such a duty would likely be detrimental to the officers assisting the suicide victim because such threat of liability could inhibit them from providing intervention at all. Defendant thus submit that similar to the *Adams* and *Munoz* holdings, under Rhode Island law, police officers responding to a crisis involving a person threatening suicide with a loaded firearm had no legal duty that would expose them to liability.

Defendants would alternatively submit that to the extent any duty of care can be found at all that duty is premised on the defendants' duty to the public as a whole. As such, any claim of negligence based on the breach of this public duty is subject to the public duty doctrine. The public duty doctrine recognizes that the duty owed by governmental officials in the performance of their jobs is a duty to the public at large. *Orzechowski v. State, 485 A.2d 545, 549 (R.I. 1984).* It embodies the recognition that certain governmental activities engaged in by employees and officers "must be free from the threat of potential litigation." *Barratt v. Burlingham, 412 A.2d*

*1219, 1220 (R.I. 1985)*. This doctrine reflects the General Assembly's intent not "to impose liability upon the state for any and all acts or omissions of its employees and officers which might cause injury to persons." Calhoun v. City of Providence, *120 R.I. 619, 625, 390 A.2d 350, 353 (1978)*. Rather, as recently identified by the Rhode Island Supreme Court, the governmental entity is liable for injuries to individuals only: "(1) when the governmental entity owes a 'special duty' to the plaintiff, (2) when the alleged act or omission on the part of the governmental entity was egregious, or (3) when the governmental entity engaged in activities normally undertaken by private individuals or corporations." Schultz v. Foster-Glocester Reg'l Sch. Dist., *755 A.2d 153, 155 (R.I. 2000) (citations omitted).*

The defendants submit that facts of the instant case fail to support any of the exceptions to the public duty doctrine. Of course, there can be no dispute that the officers, in responding to a report of a suicide attempt by a person with a loaded weapon, were engaged in activities not normally undertaken by private individuals or corporations. Rather, they were clearly exercising their police functions. *Cf.* Martinelli v. Hopkins, *787 A.2d 1158, 1167 (R.I. 2001)*. Defendants submit that there is likewise little to no support to find that defendants actions fell under either the egregious conduct or special duty exception.

In attempting to overcome the immunity afforded to a governmental agency under egregious conduct exception to the public duty doctrine, it is not enough for a party to simply claim that the actions of the entity were "egregious." Rather, the Rhode Island Supreme Court has outlined specific standards that must be met. More specifically, a governmental entity engages in "egregious conduct" when it "has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation." Houle v. Galloway School Lines, Inc., *643 A.2d 822, 826 (R.I.1994) quoting* Verity v.

Danti, *585 A.2d 65, 67 (R.I.1991).* For the egregious conduct exception to apply, the following elements must be established:

> (1) [T]he state, in undertaking a discretionary action or in maintaining or failing to maintain the product of a discretionary action, created circumstances that forced a reasonably prudent person into a position of extreme peril;
>
> (2) the state, through its employees or agents capable of abating the danger, had actual or constructive knowledge of the perilous circumstances; and
>
> (3) the state, having been afforded a reasonable amount of time to eliminate the dangerous condition, failed to do so.

*Kashmanian v. Rongione, 712 A.2d 865, 868 (R.I. 1998) quoting Haley v. Town of Lincoln, 611 A.2d 845, 849 (R.I. 1992).*

Looking at each of these elements individually, it becomes clear the defendants' conduct, as a matter of law, did not rise to the level of egregious conduct. First and foremost, there is no basis to support the conclusion that the defendants "created" the circumstances that forced decedent into a position of peril. Decedent herself created the "perilous condition" by threatening suicide with a loaded gun. Moreover, as more fully developed in the Causation section of this Memorandum, there is no basis to conclude that the defendants had a reasonable basis or opportunity to eliminate the dangerous condition. Plaintiff thus will not be able to succeed on the egregious conduct exception to the public duty doctrine.

Defendants submit that the special duty doctrine likewise fails to offer plaintiff an avenue for redress. Under Rhode Island law, the special duty exception is applicable when there is a special relationship, separate from the duty running to the general public, between the injured party and the governmental entity. As reiterated by the Rhode Island Supreme Court, this standard requires the finding that: "(1) one or more city officials had some form of prior contact with or other knowledge about [the injured] or [his] situation before the alleged negligent act * *

* occurred, (2) city officials thereafter took some action directed toward [the injured] or [his] interests or failed to act in some way that was potentially injurious to [the injured's] person or property, and (3) [the] injury * * * was a reasonably foreseeable consequence of the city's action or inaction." *Schultz, 755 A.2d at 155. See also Kuzniar v. Keach, 709 A.2d 1050, 1054 (1998) and Quality Court Condominium Association v. Quality Hill Development Corp., 641 A.2d 746, 750 (R.I. 1994).*

In the instant case, in the first place, it cannot be said that the officer's had prior contact with decedent such to meet the first element of a special duty. Rather, responding to a citizen's call for assistance is "basic to police work and not 'special' to a particular individual." *Adams, 68 Ca. App. 4th at 279.* Although plaintiff may claim that the department's prior contact with decedent over her ongoing struggles with past boyfriends, there is no evidence that such prior contact involved any information about decedent's suicidal intentions. Moreover, it cannot be found that even if the officers had such knowledge, they then took any action potentially injurious to decedent. Rather, their actions in effectuating the "hasty plan" to obtain entry into the car and retrieve the weapon was intended to prevent such injury. Of course, it finally cannot be said that plaintiff's injury was a reasonable foreseeable consequence of their actions.

Even if plaintiff overcomes the hurdles created by the lack of duty and the public duty doctrine, defendants submit that the evidence in any event will not support a finding that defendants breached a standard of care to decedent. Defendants will present their own police practices expert, Mr. Ronald McCarthy. Mr. McCarthy will testify that the standard of care in Rhode Island does not require police departments to contact psychologists or psychiatrists during barricade suicide situations. Dr. Penn, defendant's psychiatrist expert, will confirm this testimony. Defendants' expert Mr. McCarthy will further testify that Sergeant Hall and Captain

Barlow conducted themselves professionally and proper in this circumstance. Sergeant Hall was the first to converse with Ms. Ferreira and so continued in that role. Captain Barlow knew Ms. Ferreira and as such was in a position to try to convince her to come out of the vehicle. On a number of occasions, these two officers convinced the decedent to put the gun down after she had placed it in her mouth.

Finally, Mr. McCarthy will testify that the "hasty plan" was perfectly reasonable under the circumstances. *Cf. Bayer v. City of Simi Valley, 43 Fed. Appx. 36, 38 (9th Cir. 2002) (It is reasonable for police, following four hours of armed standoff and failed negotiations, to use non-lethal force to extricate a subject who has shot at police and refuses to surrender).* Defendants believe that they will be able to demonstrate to the jury that the decedent was moments away from pulling the trigger. The plan of trying to approach her car, distract her with flashbang explosions and grab her weapon seemed to be the best way to save her life in this rapidly developing deadly situation. Defendants submit that plaintiff will be unable to establish there is a specific standard of care or set method of dealing with barricade suicide individuals who the police perceive are moments away from killing themselves. Defendants believe that there is no National standard in this regard and certainly no State standard. Their expert will confirm the reasonableness of their attempts to save Ms. Ferreira.

As outlined above, in order to succeed on a negligence claim plaintiff must also demonstrate a causal relationship between the alleged negligent conduct and decedent's injury. *Selwyn, 879 A.2d at 886.* The causal relationship standard, as it relates to suicides is more fully outlined below.

**D. Failure To Train and/or Supervise**

Although plaintiff does not specifically state a cause of action for failure to train and/or supervise, in the body of her Complaint, plaintiff alleges that the City and Chief Dias specifically failed to adequately train or supervise the police officers "relative to proper police procedures, practices and/or policies, resulting in the death of the decedent." *Complaint, paragraph 36.* To the extent plaintiff will nevertheless pursue a claim for such alleged inadequate training defendants offer the instant case law. Because plaintiff does not specifically state a cause of action for the alleged inadequate training and supervision, it is difficult to ascertain whether, if pursuing such a claim, he will seek to rely upon a state law or federal constitutional law claim. Defendants thus submit case law regarding both areas.

***1. Federal Constitutional Claim for Failure to Train or Supervise***

To the extent plaintiff is seeking to maintain a claim under *§ 1983* against the municipality and Chief Dias for failure to properly train, the burden on plaintiff is high. In fact, in *City of Canton v. Harris*, the United States Supreme Court held that there are only "limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *489 U.S. 378, 387 (1989).*

Of course, in order to maintain a claim against a municipality under *§ 1983,* the plaintiff must demonstrate in the first instance that it was an unlawful, unconstitutional policy, practice or custom that lead to the constitutional deprivation. *Monell vs. City of New York Department of Social Services, 436 US 658 (1978)*. In *City of Canton v. Harris 489 U.S. 378, 387 (1989),* the Supreme Court clarified the standard and held that the "policy" requirement limiting municipal liability in *§ 1983* cases under *Monell* can be satisfied in municipal "failure to train" cases only (1) where employees of a local government commit a constitutional violation (2) due to a lack of

training by municipal policy makers (3) who are "deliberately indifferent" to the need for the training and 4) it was this lack of training that caused the constitutional violation.

This standard thus first requires a constitutional event, *i.e.*, an underlying constitutional violation that the failure to train causes. Bad facts or a single outrageous event is insufficient. Some kind of wrong of constitutional dimension must be present. *Monell, 436 U.S. at 690-91.* In the instant case, as more fully outlined above, plaintiff has failed in the first instance to demonstrate a violation of decedent's constitutional rights. Thus, plaintiff's § 1983 claim against the municipality and Chief Dias will likewise fail. *City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"); Evans v. Avery, 100 F.3d 1033, 1039-40 (1st Cir. 1996)(where individual officers did violate plaintiff's constitutional rights in the course of a high speed pursuit, the City likewise could not be held liable for the alleged failure to monitor police pursuits and through its failure to supervise police officers involved in such pursuits).*

Even if plaintiff is successful in establishing a constitutional deprivation, plaintiff must demonstrate that the defendants were deliberately indifferent in the failure to train. In *City of Canton, 489 U.S. 378, 387 (1989),* the plaintiff had alleged that due to the inadequacy of police training, the City of Canton and its officials violated plaintiff's constitutional right to receive medical attention while in police custody. *Id. at 382*. After the jury ruled in the plaintiff's favor, the city made a motion for judgment notwithstanding the verdict, claiming that a municipality can only be found liable under § 1983 where the policy in place is itself unconstitutional. In

rejecting the city's narrow interpretation of § 1983, the Canton Court established the following standard for evaluating valid policies alleged to have been unconstitutionally applied:

> The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to **deliberate indifference** to the rights of persons with whom the police came into contact. . . . Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983 . . . . Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983. *Id. at 388-89 (emphasis added).*

Thus, for liability to stem from failure to train, the Plaintiff must show an actual policy of inadequate training, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id. at 390*. Plaintiff must also demonstrate that a municipality *deliberately* chose an inadequate training program. *Id. at 389*.

The “deliberate indifference” standard has been broken down into three elements:

> (1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation;
>
> (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and
>
> (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.

*Smith v. Town of E. Haven, 2005 U.S. Dist. LEXIS 4544 (D. Conn. 2005) citing Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003) (citations omitted).*

“Absent any showing of previous harm arising from this training policy, or any evidence of deliberation on the [defendants’] part there is no basis to support the conclusion that a

municipality actually chose a policy with deliberate indifference toward the constitutional rights of individuals." K v. City of S. Portland, *407 F. Supp. 2d 290, 297 (D. Me. 2006).*

Finally, as with all constitutional claims, plaintiff can only succeed on its failure to train claim under *§ 1983* if that failure is the cause or the "moving force" behind the underlying constitutional deprivation. *See* City of Canton, *489 U.S. at 388*. A governmental entity "'is only liable when it can be fairly said that the city itself is the wrongdoer." Collins v. City of Harker Heights, *503 U.S. 115, 122 (U.S. 1992).* The Supreme Court has employed an "actual causation" standard in claims against a municipality for the negligent training and supervision of government officials under *42 U.S.C. § 1983*. City of Canton, Ohio, *489 U.S. at 390*. That is, in order to maintain a *§ 1983* claim against a municipality, plaintiff must demonstrate that the claimed deficiency "actually causes injury." Id. The Supreme Court has described this burden as requiring a showing that "the identified deficiency in a city's training program . . . [is] closely related to the ultimate injury. . . Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" Id. *at 391.*

The determination of whether there is a causal link has been characterized as a legal conclusion rather than a function of objective fact. Britton, *901 F.Supp. at 444 (D. Mass 1995).* The Supreme Court has further tutored that in order to determine if a plaintiff has met this "rigorous standard" of causation, the Court should refer to state tort principles. Rodriguez-Cirilo v. Garcia, *C.A. No. 96-1306 (1st Cir., June 2, 1997);* Soto v. Carrasquillo, *878 F.Supp. 324, 331 (D. Puerto Rico 1995)*. As more fully outline *infra*, the causation standard in suicide cases under Rhode Island law require a finding that the defendants' actions led to the uncontrollable impulse to commit suicide. Clift v. Narragansett, *688 A.2d 805, 810 (R.I. 1996)*. Defendants submit that in the instant case, plaintiff will not be able to establish that the alleged failure to train was the

result of the City's or Chief's deliberate indifference or that, in any event that such failure to train caused plaintiff to suffer a constitutional deprivation.

### *2. State Law Claim for Failure to Train or Supervise.*

To the extent plaintiff is seeking to maintain a claim under state law for failure to train and/or supervise, defendants submit that the evidence at trial will also not support the claim. Under Rhode Island law, liability of an employer for negligent hiring and supervision "is premised on its failure to exercise reasonable care in selecting [and retaining] a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's Inc., 474 A.2d 436, 440 (R.I. 1984); Rivers v. Poisson, 761 A.2d 232, 235 (R.I. 2000).* What constitutes reasonable care depends on the risk of harm inherent in the employment. *Rivers, 761 A.2d at 235*. "The greater the risk of harm, the higher degree of care necessary to constitute ordinary care." *Welsh, 474 A.2d at 440*. Of course, "[f]orseeability is still a critical factor in determining whether a party or institution is negligent when acts of its employees or agents causes harm to others. *Fontaine v. Town of Foster, 1999 R.I. Super. LEXIS 51 (R.I. Super. Ct. 1999).*

In the instant case, defendants submit that the evidence will not support a finding that defendants were negligent in the training or supervision of its employees. Moreover, as more fully outlined below, even if plaintiff can establish such negligence, there is no support for the conclusion that such negligence was the proximate or actual cause of decedent injury. Absent such a causal link, plaintiff's claim for negligent training and/or supervision under state law, to the extent the Complaint contains such a claim, will fail.

**E. Plaintiff, in Any Event, Will Fail To Prove That Defendants' Actions Were the Proximate or Actual Cause of Patricia's Death.**

Underscoring this entire case, both the constitutional claims and state law negligence claims is the total lack of causal relationship between the defendants' actions and plaintiff's claimed injury. The plaintiff pulled the trigger that ended her life. While there is some reference in the plaintiff's expert report that this is a factual question, other than his likely inadmissible opinion in this regard, there is no factual support for the same. *Goebel v. Denver & Rio Grande Western R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000) ("it is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate").* In fact, the autopsy report specifically concludes that Patricia died from a self-inflicted gun shot wound.

It is first noteworthy that "[i]nquiries into causation in section 1983 claims should refer to state law tort principles." *Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989) citing Springer v. Seaman, 821 F.2d 871, 876-79 (1st Cir. 1987) ("inquiries into causation under § 1983 are cabined within common law tort principles") and Memphis Community School Dist. v. Stachura, 477 U.S. 299, 305-06 (1986) (noting that common-law principles control the issuance of damages under § 1983). See also Soto v. Carrasquillo, 878 F. Supp. 324, 331 (D.P.R. 1995).* Thus, the determination of whether the defendants' actions caused plaintiff's damages under *§ 1983* would employ the same standard as that employed in determining if the defendants' alleged negligence is the proximate and actual cause of plaintiff's injuries.

Under R.I. law, it is well-settled that "no liability can attach unless defendant's negligence was proximate rather than a remote cause, of plaintiff's injury." *Mullaney v. Goldman, 398 A.2d 1133, 1136 (R.I. 1979).* Thus, in addition to establishing that defendants breached the duty of care, the plaintiff must also provide proof that defendants' breach of their duty was the actual and

proximate cause of plaintiffs' injuries. Id.; *Welsh Mfg., Div. of Textron v. Pinkerton's Inc., 474 A.2d 436, 440 (R.I. 1984).*

Causation is typically established by competent proof that but for the negligence of defendant, harm to plaintiff would not have occurred. *Mullaney, 398 A.2d at 1136.* However, cases in which the claimed damage is the death of the individual by suicide involve a stricter standard. The reason is that suicide, historically a felony, was deemed to be a criminal act that terminated any causal connection between a defendant's negligence and the injury. *Clift v. Narragansett TV L.P., 688 A.2d 805, 810 (R.I. 1996).* That is due in part to the fact that "[a]n act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of death that immediately ensues. *Id. (citations omitted).* However, over time, that view changed and courts "came to recognize a right of recovery in certain limited factual instances." *Id*. These limited instances however embrace a higher standard in order to give due credence to the independent intervening act by the suicidal person.

This higher standard, embodied in the Restatement (Second) Torts § 455 (1965) and embraced by the Rhode Island Supreme Court recognizes liability for negligent conduct that "(1) brings about delirium or insanity in another and (2) if, while that condition of delirium or insanity continue[d] to exist, it prevent[ed] the affected person from realizing the nature of his or her condition or [made] it impossible for him or her to resist the suicidal impulse by depriving that person of the capacity to reasonably control his or her conduct and not carry out the suicidal impulse." *Id. See also, Restatement (Second) Torts § 455 (1965).* As outlined by the R.I. Supreme Court, the typical cases of uncontrollable impulse "involve the infliction of severe

physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusations, false arrest or torture." Id. *(citations omitted)*.

The theory behind this uncontrollable impulse rule:

> is that suicide breaks the chain of causation only if it was intentional; suicide resulting from delirium or an uncontrollable impulse created by the defendant's wrongful act preserves the chain of "direct causation". The flip side is that where suicide results from "a moderately intelligent power of choice, even though the choice is determined by a disordered mind", or by a "morbid" mind "unable to tolerate the pain, inconvenience and humiliation" of its particular condition, the suicide is 'a new and independent, efficient cause of the death that immediately ensues. *Logarta v. Gustafson, 998 F.Supp. 998, 1005 (D. Wis. 1998) (citations omitted).*

Of course, because assessing the cause link between defendants' conduct and plaintiff's suicide is beyond the capacity of an average juror and would amount to speculation, plaintiff must present expert testimony in support of this causal connection. *Estate of Joshua T. v. New Hampshire, 840 A.2d 768, 772 (N.H. 2003); In the Matter of the Claim of Nancy Musa, 276 A.D.2d 851, 852, 714 NYS 2d 545, 547 (NY 2000).* Defendants submit that plaintiff's proposed expert will fail to provide such testimony. Defendants will rely on the testimony of its own expert, Dr. Joseph Penn, a well qualified psychiatrist in Rhode Island. Without elaboration, he is expected to testify consistent with his report as follows:

> Based on my evaluation, review of available records, it is my professional opinion that at the present time, it is not possible to establish a causal relationship to a reasonable degree of medical certainty between the alleged incident on October 10, 2001 and the claim that the police department's access to mental health professionals would have prevented this suicide. It is also my opinion that even if a mental health professional had been called to the scene and had been able to speak with Ms. Ferreira, her family members or had consulted with/to the East Providence Police Department, there is no way of identifying to a reasonable degree of medical/psychiatric certainty that this would have prevented the unfortunate act of her completed suicide. **It is purely speculative to make determinations on what could have prevented her suicide in these circumstances.** It is also my opinion that there is no way that anyone could predict to a reasonable degree of professional certainty that if the police had employed other tactics that Ms. Ferreira would not have committed suicide. *(Emphasis added.)*

In fact, Dr. Penn's conclusions regarding the speculative nature of a contrary conclusion are consistent with case law that has specifically addressed claims for damages stemming from suicide. See Christiansen, *332 F.3d at 1283 (The psychiatrist's "statements regarding what might have happened had he been allowed to intervene are pure speculation").*

In *Logarta*, the court found that plaintiff had failed to prove an uncontrollable impulse because—

> [t]here are no allegations that [defendants] conduct or actions * * * inflicted upon Ronald severe physical injury, or the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture. There are no allegations that Ronald succumbed to an uncontrollable impulse, or a frenzy or delirium, which deprived him of his ability to recognize the nature and likely result of his actions. To the contrary, the complaint portrays a young man who calmly asked for a gun, proceeded to make his suicidal intentions known, selected a location, and then carried those intentions out to their tragic end after being reminded to "think about" what he was doing. There is simply nothing in the complaint from which the Court could conclude that the suicide resulted from anything other than "a moderately intelligent power of choice". *Logarta, 998 F.Supp. at 1005-1006.*

Consequently, defendants submit that plaintiff will not be able to meet his burden of demonstrating a causal relationship between the defendants' alleged negligent/unconstitutional conduct and Patricia's death. Rather, as in most suicides of this nature, it will always remain a mystery as to what caused the decedent's suicide and whether anything along the way could have prevented this tragic occurrence.

**F. The False Arrest and Excessive Force Claims of Anthony Ferreira**

In his Complaint, C.A. No. 05-75S, Plaintiff Anthony Ferreira seeks to maintain his own independent claims for the officers' alleged mistreatment of him on the day of his sister's suicide. Plaintiff specifically cites causes of action for false arrest, assault and battery, and excessive force under both state law and in violation of his constitutional rights. The facts giving rise to plaintiff's individual claims began when plaintiff, after calling the police and reporting his

sister's suicide threat and the fact that she had a weapon, draped himself over sister's vehicle when the police arrived. It is undisputed that plaintiff then refused to move when ordered by the officers to do so. The officers thus forcefully removed plaintiff and restrained him while they attempted to assist his sister.

***1. False Arrest Pursuant to 42 U.S.C. 1983 and State Law***

In Counts IV, V and VI of Complaint, C.A. No. 05-75S, plaintiff alleges that he was falsely arrested by the police officers on the scene and thus defendants are liable under both state law and for the alleged deprivation of plaintiff's federal and state constitutional right to be free from unreasonable seizure. Defendants respond that the facts which were presented to them provided ample support to arrest plaintiff. *Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004).*

First, it is well settled that "police officers who suspect criminal activity [can] make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers, 452 U.S. 692, 698 (1981).* Thus, an officer who possesses reasonable, articulable suspicion of criminal activity is justified in detaining an individual to confirm or dispel this suspicion. *U.S. v. Young, 105 F.3d 1, 6 (1st Cir. 1997). Rivera v. Murphy, 979 F.2d 259, 264 (1st Cir. 1992).* Whether a reasonable suspicion exists is treated as an objective inquiry: "the actual motive or thought process of the officer is not plumbed." *Whren v. United States, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996).* So the only pertinent "facts" are the information available to the officer at the time of the detainment. *Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004).*

While defendants submit that they need only establish reasonable suspicion to justify plaintiff's detention, defendants alternatively submit that there was nevertheless sufficient basis

to support a finding of probable cause.[3] In order to succeed on his claim of a Fourth Amendment, false arrest violation, plaintiff must demonstrate that it was clear at the time of the arrest that there was no probable cause for such arrest. *Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003) citing Beck v. Ohio, 379 U.S. 89, 91 (1964) (the Fourth Amendment requires that arrests be based on probable cause).* Similarly, the elements of a state law false arrest claim require the plaintiff to show "more than (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Rhode Island also requires a showing that the detention was "without legal justification." *Dyson v. Pawtucket et al., 670 A.2d 233, 239 (R.I. 1996), cert. denied, 517 U.S. 1192 (1996).* If an officer has probable cause to effectuate an arrest, there is legal justification for the arrest and plaintiff cannot succeed on a false arrest claim. *Winn v. Collins, 723 A.2d 798, 799 (R.I. 1998), citing Dyson, 670 A.2d at 239.*

"[P]robable cause exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution and prudence in the belief that the defendant is committing or has committed a crime." *Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985). See also Beck, 379 U.S. at 96.* This standard encompasses a "non-technical" analysis that requires examination of "the totality of the circumstances" known to the officer. *Rodriques v. Furtado, 950 F.2d 805, 816 n.7 (1st Cir. 1991) citing Illinois v. Gates, 462 U.S. 213, 230-31 (1983).* "[T]he Supreme Court has told us that probable cause means more than "bare suspicion" but less that what would be needed to "justify ... conviction." *Valente, 332 F.3d at 32 quoting Brinegar v. United States, 338 U.S. 160, 175 (1949).* Therefore, "probable cause need not be tantamount to proof beyond a

[3] In the instant case, the police made the discretionary decision not to charge plaintiff with a crime. This discretionary decision has no impact on whether there was nevertheless sufficient probable cause to support such a

reasonable doubt.... Probability is the touchstone." *U.S. v. Grant, 218 F.3d 72, 75 (1st Cir. 2000) quoting U.S. v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997).* "The probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." *U.S. v. Winchenbach, 197 F.3d 548, 556 (1st Cir. 1999).*

In the instant case, as noted, it is undisputed that when the police arrived at the scene, plaintiff draped himself over the front of his sister's car blocking the officer's view of Patricia. Knowing that Patricia was reported to have a weapon, the officers ordered plaintiff to get off the vehicle and back away. Plaintiff refused the officers commands. Plaintiff's actions placed everyone, including himself, his sister and the officers in harm's way. More specifically, knowing Ms. Ferreira possessed a weapon, Mr. Ferreira prevented the officers from seeing into the vehicle to monitor her actions. Under these circumstances, the officers certainly had probable cause to remove Mr. Ferreira from the scene, for his personal safety, for the safety of the officers, and in an attempt to save his sister. *Cf. Andrews v. Wilkins, 934 F.2d 1267, 1271 (D.C. Cir. 1991) (concluding that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort"); Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003)(manifestly reasonable to restrain suicide victim's family from entering the apartment and thus potentially being put in harms way); Compare City of Simi Valley v. Superior Court of Ventura County, 111 Cal. App. 4th 1077, 1085, 4 Cal. Rptr. 3d 468, 474 (CA 2003) .* Moreover, numerous witnesses will testify that when the officers attempted to remove plaintiff from the hood of the car, he struggled violently with the officers, thus further justifying the officer's detention of him and giving rise to probable cause to support an arrest.

---

charge.

***2. Excessive Force and Assault and Battery.***

Defendants submit that plaintiff's violent struggle with the officers nullifies his claim for assault and battery and excessive force. Rhode Island law states that battery is "an act that was intended to cause, and does cause, and offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault." *Fenwick v. Oberman, 847 A.2d 852, 855 (R.I. 2004) quoting Profitt v. Ricci, 463 A.2d 514, 517 (R.I. 1983)*. Meanwhile, there is a three-part test for excessive force claims under *§ 1983*. The plaintiff must show: (1) a significant injury; (2) resulting directly and only from the use of force that was clearly excessive to the need, and (3) the excessiveness of the force was objectively unreasonable. *Reese v. Anderson, 926 F.2d 494, 500 (5th Cir. 1991).* Plaintiff's claim that the officers used excessive force in the course of making an arrest is subject to the objective reasonableness standard governing the Fourth Amendment. *Graham v. Connor, 490 U.S. 386, 388 (1989)*.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight. When judging reasonableness, it must be factored in that "police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation." *Id. at 396*. In addition, this standard allows for evidence of what is known to the police officer at the time the force is applied. The knowledge of the police officer forms part of the "facts and circumstances attendant to the decision to use the particular degree of force." *See Senra v. Cunningham, 9 F.3d 168 (1st Cir. 1993)*.

With regard to plaintiff's excessive force claim, as noted, defendants will present a number of witnesses who will testify uniformly that Mr. Ferreira violently struggled with the

officers. To show that the police used excessive force in violation of the Fourth Amendment, plaintiff "must demonstrate that the police defendant[s'] actions were not objectively reasonable, viewed in light of the facts and circumstances confronting [them] without regard to [their] underlying intent or motivation." Bastien v. Goddard, *279 F.3d 10, 14 (1st Cir. 2002).* "The relevant circumstances include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. *quoting* Graham v. Connor, *490 U.S. 386, 396 (1989).* The objective reasonableness of the force used is also to be considered in light of the officers' obligation to "to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly-changing circumstances." Gaudreault v. Salem, *923 F.2d 203, 205 (1st Cir. 1990).*

Defendant will demonstrate that in the face of Mr. Ferreira's refusal to comply with the officer's commands, the threat posed, and Mr. Ferreira struggling with officer, the use of pepper spray and handcuffs were more than reasonable exercise of force. Alexis v. McDonald's Rests. of Mass., Inc., *67 F.3d 341, 352 (1st Cir. 1995) ("In the Fourth Amendment setting, a viable excessive force claim must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation."); Graham v. Connor, 490 U.S. 386 (1989) (With the right to arrest comes the right to use a reasonable degree of force to effect that arrest).*

Moreover, as found by the Tenth Circuit, an officer is more than justified in restraining an individual who may be put at risk by a third party's actions. Christiansen v. City of Tulsa, *332 F.3d 1270, 1283 (10th Cir. 2003)*. In Christiansen, the husband and sister of a suicide victim brought a § 1983 claim against police officers based, *inter alia*, on the officers restraining

them from entering an apartment after hearing a gunshot. In outright rejecting the survivors' excessive force claims as being "wholly without merit", the Court concluded that it was manifestly reasonable to restrain them from entering the apartment and thus potentially being put in harms way. *Id. citing Andrews v. Wilkins, 934 F.2d 1267, 1271 (D.C. Cir. 1991) (concluding that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort").*

### *3. Qualified Immunity.*

Defendants will also rely on the defense of qualified immunity, as more fully briefed *infra*, in defense of plaintiff's false arrest and excessive force claims.[4] In the first instance, even if it is ultimately determined that the officers lacked reasonable basis or probable cause to remove plaintiff from the hood of the car, it was not clearly established that such an action violated plaintiff's constitutional right. *Id.; Andrews, 934 F.2d at 1271.* Moreover, under the state of the law, i.e. cases finding that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort", *id.*, a reasonable officer would have believed that the decision to order plaintiff to move and attempting to effectuate his removal violated plaintiff's constitutional rights.

Qualified immunity also protects the officers from plaintiff's excessive force claim. It is well established "that, where appropriate, a police officer making an arrest has "'the right to use some degree of physical coercion or threat thereof to effect it.'" *Jennings v. Pare, 2005 U.S. Dist. LEXIS 18214, 15-16 (D.R.I. 2005) citations omitted.* The distinction between excessive force and permissible force turns on whether the level of force used was reasonable and the test is whether, under the circumstances confronting the defendant at the time that he acted, "no

objectively reasonable officer would have used" the same degree of force. *Isom v. Town of Warren, 360 F.3d 7, 12 (1st Cir. 2004); Napier v. Town of Windham, 187 F.3d 177, 183 (1st Cir. 1999) ("'The relevant inquiry [in excessive force cases] is whether no reasonable officer could have made the same choice under the circumstances.'" (internal quotation omitted)).* "In an excessive force case, unless it is obvious that the force used was excessive, the Court must look to prior case law to determine whether it was clearly established that the Constitution prohibited the type of conduct in which the officer engaged under the specific circumstances confronting the officer." *Jennings, 2005 U.S. Dist. LEXIS 18214, 15-16.* Defendant submits that not only is the law on the use of pepper spray not clearly established, *see i.e. Marier v. Town of Allenstown, 2003 DNH 172 (D.N.H. 2003) (citing cases),* but in any event a reasonable officer faced with plaintiff's violent struggle would nevertheless not believe that the level of force used to subdue plaintiff was in violation of plaintiff's constitutional rights. Accordingly, even if it is determined that the officers used excessive force in subduing plaintiff, the defendants are nevertheless entitled to qualified immunity for their actions.

## IV. ANTICIPATED MOTIONS IN LIMINE

Defendants propose to file two (2) Motions in Limine. One to exclude plaintiff's expert testimony as it relates to legal conclusions, statements of the law, and testimony outside his realm of expertise as well as the introduction of his expert report at trial. Defendants' second Motion in Limine seeks to exclude testimony and evidence relating to the defendants' alleged failure to confiscate decedent's weapons while responding to the domestic call.

---

[4] This qualified immunity defense applies with equal force to plaintiff's state and federal claims. *Hatch v. Town of Middletown, 311 F.3d 83, 89 (1st Cir. 2002) (Rhode Island's high court has "left little doubt that the [qualified immunity] defense exists for state officers under certain circumstances").*

## V. PROPOSED JURY INSTRUCTIONS

In light of the length of the proposed instructions, defendants shall submit their proposed jury instructions under separate cover.

## VI. PROBABLE LENGTH OF TRIAL

Defendants expect that the instant trial will take five (5) to eight (8) trial days.

## VII. ADDITIONAL MATTERS

As more fully addressed in Defendants' Motion in Limine, Defendants request a *Daubert* hearing, pursuant to Fed. R. Evid. 104(a), on the opinions expressed in the February 19, 2007, report of David M. Grossi, Plaintiff's identified expert in the field of law enforcement training and consultation regarding his capacity to testify and the basis for his opinion on the so-called "startle effect." In addition, plaintiffs' counsel has expressed an intent to introduce the February 19, 2007, expert report of Mr. Grossi at trial as an exhibit. For the reasons outlined in Defendants' Motion in Limine, defendants object to the same.

Defendants,
By their attorney,

*/s/ Marc DeSisto*

Marc DeSisto, Esq. (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax: (401) 272-9937
Email: marc@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that the within document has been electronically filed with the Court and is available for viewing and downloading from the ECF system.

*/s/ Marc DeSisto*

Marc DeSisto