— EXHIBIT A —

**David M. Grossi**
Law Enforcement Trainer and Consultant

9777 Alhambra Lane Bonita Springs, Florida 34135
Telephone: (239) 495-3018 Facsimile: (239) 495-1157
Email: GrossiDave@aol.com

February 19, 2007

V. Edward Formisano, Esq.
Sinapi, Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, Rhode Island 02920

**Re: Anthony Ferreira v. City of East Providence, Rhode Island**
**U.S.D.C. District of Rhode Island**
**Case No. CA 05-73-S**

Dear Mr. Formisano:

This amended report will serve to augment my initial preliminary report of May 26, 2005 in the above captioned matter. My up-to-date curriculum vitae which contains all my published material along with a separate notification pursuant to amended Federal Rule 26 of all cases where I have given testimony in either deposition or trial within the last four years are also attached hereto and made a part hereof. Since my initial report, I have reviewed additional documents and material. That additional material includes:

1. East Providence (RI) Police Department General Orders #2000-22 (*Authorized Force*), #2000-23 (*Progressive Use of Force*), #2000-24 (*Deadly Force*), #2000-35 (*OC Aerosol Spray*), and #2000-15 (*Chaplain Program*), #2000-41 (*Domestic Violence/Restraining Orders*), #2000-43 (*Suicidal/Mentally Ill Persons*), #2000-03 (*Code of Conduct*), #2000-04 (*Mission Statement*), #2000-05 (*Code of Ethics*), #2000-06 (*Arrest/Limits of Authority*), #2000-07 (*Written Directives*), #2004-02 (*Office of Professional Standards Complaint Procedure*), #2000-22 (*Use of Force Authority*), #2000-25 (*Use of Force Training*), #2000-40 (*Field Interview/Pat Down/Contact and Cover*), #2000-64 (*Transport of Prisoners*), #2000-66 (*Strip and Body Cavity Searches)*, #2000-73 (*Hostage/Barricaded Subject/Warrant Service Risk Assessment*), #2004-05 *(M/V Person Search Documentation*), #2000-60 (*Special Reaction Team*), #2000-61 (*Emergency Call-Back/Sworn Personnel*), #2000-11 (*Direction and Supervision*), #2000-13 (*Field Training and Evaluation Program*), and #2000-08 (*Job Task Analysis/Duties, various ranks*);

2. East Providence (RI) Police Department *"Oleoresin Capsicum In-Service Training Program"* Course Outline (January, 1998);

3. East Providence (RI) Police Department 9-1-1 Dispatch Log for 10/10/2001 (Call #01-38502);

4. Defendant Walter Barlow's Response to Plaintiff's Request for Production of Documents: (a) Diversionary Devices, (b) Walter Barlow's Crisis Negotiation Training Records and (c) East Providence (RI) Police Department Special Response Team (SRT) Training Records;

5. Depositions of Stephen Tiernan, Michael David, Thomas Rush, Walter Barlow, Stephen Enos, Stephen Hall, Kevin Feeney, Gary Dias, Edwin Sousa, John Sousa, Alexandra Walmsley, aka Irene Sousa, Raymond Blinn and Anthony Ferreira;

6. Defendant Walter Barlow's Response to the First Set of Interrogatories Propounded By Plaintiff, As Administrator and Guardian;

7. Rhode Island General Law Section 40.1.-5-7 (*Emergency Certification*);

8. Defendant Thomas Rush's Response to the First Set of Interrogatories Propounded By Plaintiff, As Administrator and Guardian;

9. Defendant Stephen Tiernan's Response to the First Set of Interrogatories Propounded By Plaintiff, As Administrator and Guardian;

10. Defendant Stephen Tiernan's Response to Plaintiff's First Set of Interrogatories;

11. Defendant Michael David's Supplemental Response to the First Set of Interrogatories Propounded By Plaintiff, As Administrator and Guardian;

12. Defendant City of East Providence's Partial Response to Preserve Objections to Plaintiff's First Request for Production of Documents;

13. Defendant Kevin Feeney's Response to the First Set of Interrogatories Propounded By Plaintiff, As Administrator and Guardian;

14. Defendant Kevin Feeney's Response to Plaintiff's First Set of Interrogatories;

15. Defendant Michael David's Supplemental Response to Plaintiff's First Set of Interrogatories;

16. Defendant City of East Providence's Supplemental Response to the First Request for Production of Documents By Plaintiff, As Administrator and Guardian;

17. Defendant City of East Providence's Second Supplemental [Third Partial] Response to Plaintiff's First Request for Production of Documents;

18. Defendant City of East Providence's Supplemental [Second Partial] Response to Plaintiff's First Request for Production of Documents;

19. Defendant City of East Providence's Partial Response to Preserve Objections to Plaintiff's First Request for Production of Documents;

20. Defendant City of East Providence's Request to Plaintiff Anthony Ferreira's First Set of Interrogatories;

21. Report from defense expert Dr. Joseph V. Penn, MD;

22. One-hundred twenty-seven (127) photographs of the scene, weapon, and autopsy of Ms. Patricia Ferreira;

23. East Providence (RI) SRT Training memoranda;

24. East Providence (RI) Police Department Domestic Violence/Restraining Orders Policy (Section 330.04);

25. TV news videotape (DVD format) of the incident;

26. Defendant City of East Providence's Second Partial and Complete Response to the Second Request for Production of Documents by Plaintiff, As Administrator and Guardian;

27. Initial and Supplemental Expert Reports from Mr. Ron McCarthy dated December 6, 2005 and January 3, 2006;

28. 11/20/2006 updates to General Orders #2006-01 (*SRT Operations*, Section 390.02), #2006-02 (*SRT Chemical Agents*, Section 390.02B), #2006-03 (*FTEP*, Section 230.03), #2006-04 (*Computer & E-Mail Policy*, Section 400.03A), #2006-05 (*Bias in Policing*, Section 330.15B), #2006-06 (*Domestic Violence/Restraining Orders*, Section 330.04), and #2006-07 (*Smoke Free Environment*, Section 250.07);

29. 1/17/2007 update to #2000-41 (*Domestic Violence/Restraining Orders*) Section 330.06).

Furthermore, on November 8, 2002, I conducted a site inspection of the locations where this incident occurred including the Brightridge Avenue address in East Providence, Rhode Island and the route driven by Ms. Patricia Ferreira. I also examined the 1995 Mazda 626 (interior and exterior) in which Ms. Ferreira was seated when this shooting occurred. In addition, I examined and function-checked the S&W 9mm semiautomatic pistol initially found used by Ms. Ferreira on October 10, 2001.

In that initial May 26, 2005 report, I formulated two opinions. The first opinion dealt with the actions of East Providence (RI) Police Department members Sergeant Thomas Rush, Officers Steven Tiernan and Officer Michael David at the scene of 44 Brightridge Avenue. **I opined that their conduct fell below the nationally accepted standard for handling domestic violence responses and as such constituted deliberate indifference to the safety of Ms. Patricia Ferreira.**

According to the sworn depositions of the three officers, they were never informed by Captain Barlow of three significant factors or concerns. #1: that the captain was contacting the State Division of Children, Youth and Families about the volatile situation at the Sousa/Ferreira residence; #2: that he was also concerned that both possessed firearms, and #3: that he was particularly concerned for the safety of Ms. Ferreira's son, Ryan. Captain Barlow during his sworn deposition, states he does not recall whether he conveyed this information to the officers, although he states he "probably" did. Captain Barlow did admit, however, that he knew Ms. Ferreira was taking medication for depression and was receiving professional counseling and that he may not have conveyed this information to his officers, either.

However, according to Mr. Anthony Ferreira, who was present in Captain Barlow's office when the captain spoke with Officer Tiernan via telephone from the Brightridge Avenue residence, the officers were indeed informed that the DCYF was being contacted and that the captain had very serious concerns about Ryan's safety due to the presence of firearms at the Brightridge Avenue location. The testimony of Mr. Ferreira appears to be very credible since he later swore under oath that his sister, Patricia, told him that the officers informed her of the fact that the Rhode Island DCYF was being notified and that they (DCYF) were going to "take Ryan away from her." She could only have known this information about the DCYF being notified from her contact with the officers at the scene that afternoon.

If however, one believes the officers when they testified that Captain Barlow did not inform them of this fact, Captain Barlow's conduct was contrary to the generally accepted police practice regarding domestic violence matters in not advising them that Ms. Ferreira's son, Ryan, told him that his mother and Mr. John Sousa had been throwing items around the house during the confrontation, or that Ryan had been directed to leave the residence for his own safety, that Ms. Ferreira was taking medication for depression and was under the care of a mental health professional. If the officers were apprised of the seriousness of the situation as Mr. Ferreira stated, coupled with their knowledge of the presence of firearms, and they still failed to fully investigate the matter, their conduct demonstrated a deliberate indifference to the safety and well-being of both parties (Ryan and Ms. Patricia Ferreira) in not conducting the thorough and complete investigation as required and as ordered by Captain Barlow. Again, Captain Barlow is vague on whether he conveyed this information to the officers although he testified that he believed the environment at the Sousa/Ferreira household was unsuitable for young Ryan.

Lastly, throughout the sworn deposition of Mr. John Sousa, he repeatedly testified that he pleaded with Officer Steven Tiernan, an officer that Mr. Sousa had both a personal and business relationship with, to not let Ms. Ferreira leave the residence with her firearms because she was "not in a good state of mind." He further corroborated the fact that Ms. Ferreira was upset, that she was crying and under a high degree of stress while the officers were present in the house.

Evidence of this crisis state of mind is further supported by Mr. John Sousa's ex-wife, Ms. Irene Sousa, aka Alexandra Walmsley, who was present at the home at the time of the officers' arrival. Ms. Walmsley testified during her November 29, 2006 sworn deposition that she not only observed Ms. Ferreira crying and upset, but warned the officers who arrived to not let Ms. Ferreira leave with her gun.

These facts support my expert opinion that Officers Stephen Tiernan, Michael David and Sergeant Thomas Rush as their superiors officer, were deliberately indifferent in their handling of this domestic violence call in allowing Ms. Ferreira to leave the Brightridge Avenue location with her firearms.

I also formulated a second opinion in that preliminary report: **That the conduct and actions of Lieutenant Allster McGregor and Sergeant Thomas Rush at the scene of Ms. Ferreira's death fell well below the nationally accepted standards for police tactical deployment and response and as such, constituted deliberate indifference to her safety and well-being.** The foundation for that opinion and the numerous tactical errors committed by the officers were initially outlined in detail in the May 26, 2005 report, and based on my review of this additional material as described on pages 1 and 2 of this addendum, will be expanded on in this addendum. The following opinions contained herein are based on review of the additional material.

**#3. The use of a distraction device (flash bang) was not appropriate for breaching an automobile window and as such, constituted a deliberate indifference to the safety and well-being of Ms. Ferreira.** Distraction devices have been an integral part of SWAT and tactical-type operations for many years. A *distraction device* is a canister containing a low explosive designed to produce light, heat and sound.

A *grenade* is a canister containing an explosive compound designed to eject projectiles (shrapnel or rubber ball) or emit gas. A distraction device is not a grenade, and I have attached authoritative references that support my expert opinion. From my review of the sworn depositions of SRT Sergeant Thomas Rush and SRT Officer Kevin Feeney, they knew what a flash bang distraction device was when they gave sworn testimony in August of 2006. However, it appears that both of these SRT members approached the scene where Ms. Ferreira ultimately met her death as a *street classroom* or *tactical learning environment*. From the documents submitted for review, it is my expert opinion that neither of these two officers or Lieutenant Alister McGregor understood the difference between a *grenade* and a *distraction* device.

Not only is this evident from their tactical errors at the scene, it is also apparent from the exhibits attached to Response No. 8 (*Diversionary Devices)* where "flash bangs" are repeatedly referred to as "grenades" within the East Providence (RI) Police Department.

It is also obvious, not only from their sworn testimony but from their poor planning and inept tactical performance that in spite of their training, these officers incorrectly assumed that the deployment of these flash bangs would break out the window/s of Ms. Ferreira's vehicle. The flash bangs did not and are not designed to breach automobile glass. As a trained and certified tactical commander, it is my expert opinion that the use of flash bang distraction devices to attempt a breach of the windows of Ms. Ferreira's vehicle constituted a deliberate indifference to her safety.

Both of these defendant officers, Sergeant Thomas Rush and Officer Kevin Feeney knew or should have known from their training that distraction devices are not grenades and are not meant to breach automobile glass, nor are they manufactured for this use. It is also noteworthy that the last notation on Response No. 8 (*Diversionary Devices*) carries the admonition:

> *"Flash-bang grenades/diversionary devices cannot take the place of well coordinated and preplanned actions against a suspect(s).*
>
> *The device itself is a limited tactical tool and must be used as such. Use it to your advantage, keeping in mind that it will not always solve all of your problems."*

Notwithstanding the fact that flash bangs are not grenades, or the fact that this "hasty" plan was neither well coordinated nor preplanned, it appears that the defendant officers depended on these devices to do just what they were warned they would not do...solve all their problems.

**#4. That the use of such distraction devices (flash bangs) may have caused an involuntary and unintentional discharge of the firearm held by Ms. Ferreira and as such constituted deliberate indifference.** Distraction devices (flash bangs), in addition to the bright flash of light and heat, emit a loud pitched sound between 169-175 decibels. It is well known among law enforcement professionals (tactical officers and firearms trainers) that unintentional discharges of semiautomatic pistols can result from several sources, most notably "sympathetic muscle contractions." Of these, *exertion of maximum strength, postural imbalance* and *startle effect* are the most common. I have not only taught and authored extensively on this issue, I have trained over 165,000 police officers in this area.

Startle effect results from either a sudden appearance or a loud noise. In other words, when a human being becomes startled, certain physiological reactions occur. The eyes will widen, the muscles of the body will contract and the hand will automatically form into a fist. Firearms trainers are taught the proper and safe way to hold a firearm to lessen the possibility of an involuntary discharge, i.e., the trigger finger off the trigger, outside the trigger guard, and/or held along side the frame. It should also be noted that two of these reflexive occurrences (postural imbalance and startle effect) are heightened by anxiety. Officers or other individuals who are operating under high-stress conditions will be affected by startle effect more than they would under more routine or low-stress situations.

Of particular significance is the fact that startle effect is in itself, an involuntary action. In other words, it is performed without the brain being consciously involved; or more precisely, it cannot be prevented. Indeed, Captain Barlow, in his sworn deposition testified under oath that Ms. Ferreira "looked up....startled" when the flash bang device detonated long side her car just seconds before Officer Kevin Feeney reached into the car to try and grab the gun away from her.

Over the course of the last decade, comprehensive firearms and tactical training have included the causes of unintentional or involuntary firearm discharges. Even Captain Barlow, the senior officer at the scene, testified that he has read about the phenomena known as startle effect, but has had no training through the East Providence (RI) Police Department on the concept. Likewise, both of the officers directly involved in the tactical operations of this situation, Sergeant Thomas Rush and Officer Kevin Feeney, have testified that they were not familiar with the term "startle effect" as it applies to involuntary or unintentional discharges.

Their admission to the fact is clear evidence that the East Providence (RI) Police Department has failed to train their officers, especially their SRT members, on this most important and critical tactical issue.

Virtually every officer involved in the hasty tactical plan to "rescue" Ms. Ferreira from herself has testified that they saw the weapon held in her hand with the barrel in her mouth. It has been stipulated by them that she may have been contemplating suicide by firearm. Surely, Lieutenant Alister McGregor, a seasoned police officer and SRT Commander, would have been trained in the field of involuntary or unintentional discharges.

However, whether he was or wasn't, we will never know because the lieutenant himself was fatally wounded during an East Providence (RI) Police SRT training incident that involved the negligent discharge of a firearm. However, be that as it may, it is incomprehensible that these officers would even consider, let alone deploy, not one, but two flash bang devices near or into the occupied vehicle of an individual admittedly under stress, holding a firearm in her mouth, with her finger on the trigger.

In my expert opinion, as a nationally certified firearms trainer and tactical commander, the deployment of distraction devices (flash bangs) in an effort to rescue a woman from herself who was seen holding a firearm to her mouth constituted deliberate indifference, and fell well below the nationally accepted standard of care for tactical response.

**#5. That the introduction of such an incendiary device into the interior of Ms. Ferreira's 1995 Mazda was dangerous and wholly inappropriate and as such constituted a deliberate indifference to her safety and well-being.** According to the National Tactical Officers Association and most other tactical training organizations, distraction devices (flash bangs) are designed primarily for use in high threat situations to disorient suspects, particularly in confined areas such as a bedroom or office. Most flash bangs consist of a cardboard or thin lightweight metal body with a striker release fuse similar to a military smoke device or grenade simulator. Pulling a small metal ring that is attached to a soft metal cotter pin arms the device. A long safety handle (called a "spoon") is held in place by the user's hand.

When the device is thrown in a baseball-type manner, the handle ("spoon") falls free, which activates a delay-igniting fuze. The main charge of the device then detonates within 1 to 1.5 seconds. Distraction devices (flash bangs) release heat and a bright flash of light from burning flash powder (via ports located on the body of the device) along with a loud pitched sound of between 169-175 decibels. The intent of the distraction device is to temporarily blind and/or disorient and confuse the occupants of a confined room or building so a tactical team can make a fast and immediate entry with a degree of safety. According to the Pawtucket (RI) Police Department's Special Response Team Student Handbook that was issued to all members of the East Providence (RI) Police SRT members who attended a program sponsored by the Pawtucket (RI) Police Department, distraction devices burn at approximately 2700 degrees F.

Due to the incendiary effect and nature of the detonation of the device, officers are warned and trained that deployment of such devices on combustible materials (clothing, newspaper or furniture stuffing) most likely will result in a fire.

According to the deposition testimony of Sergeant Thomas Rush among others, this hastily developed tactical plan, as conjured up by Lieutenant Alister McGregor, called for a flash bang distraction device to be thrown through the passenger side window of Ms. Ferreira's vehicle onto the front seat in an effort to distract her. Other officers would then break out the driver side window, reach through it try and grab the gun she had inserted into her mouth before she could pull the trigger.

Notwithstanding the fact that virtually all contemporary police training programs as well as the SRT training material reveals that a person can pull the trigger of a gun in about ½ second (faster than an officer could humanly break out an automobile window and reach in and grab a gun out of person's hand), distraction devices are not intended to nor will they break out automobile window glass. Furthermore, the dangers inherent in dropping an incendiary device that burns at 2700 degrees F. onto the front seat of an occupied automobile violates all standards for the deployment of such devices. Even the defense's tactical expert, Mr. Ron McCarthy in his initial report, attached a National Tactical Officers Association sample policy that admonishes officers to be aware that flash bangs "have the potential to ignite flammable materials." Captain Barlow, a former member of the SRT team for five years, even testified that he did not think the use of a flash bang distraction device to break out the side window of Ms. Ferreira's vehicle was appropriate.

As a certified and trained tactical commander and veteran firearms instructor, it is my opinion that the attempt to introduce an incendiary distraction device within close proximity to Ms. Ferreira or into the interior of her vehicle fell well below the nationally accepted standards for the use of such devices. Furthermore, since it has been shown that the defendant officers never trained, practiced or rehearsed this tactical procedure, it is also my opinion that this conduct displayed a deliberate indifference to the safety and well-being of Ms. Ferreira.

**#6. That the use of the SWAT-type tactics to seize Ms. Ferreira fell outside the scope and responsibilities of the East Providence (RI) Police Department Special Response Team (SRT) and as such constituted deliberate indifference to the safety and well being of Ms. Ferreira.** Special Weapons and Tactics (SWAT), Emergency Reaction Teams (ERT), Special Response Teams (SRT) and/or Emergency Services Units (ESU) have been in existence for well over two decades.

These teams were primarily developed by police departments for use against heavily armed barricaded suspects, snipers or hostage-takers. Generally, these teams of officers are equipped with special tools and are trained to deploy devices needed to aid them in the performance of their tasks. These tools may consist of precision rifles, ballistic shields or body bunkers, breaching implements (Haligan Entry Tools), an assortment of explosives for gaining entry into fortified locations, as well as distraction devices such as "flash bangs."

Page 3 of the Raid/Special Response Team (R/SRT) Organizational Structure lists the twelve (12) tasks and responsibilities of an SRT. Those responsibilities include high-risk warrant service, counter-sniper duties, security during insertion of intelligence gathering equipment and hostage rescue operations. Nowhere in the 4-page Organizational Order or the accompanying 8-page Operations Order does it identify the mission of the SRT to "rescue" suicidal subjects from themselves.

Indeed, the records indicate that negotiations were under way between Captain Barlow and Ms. Ferreira. The area was somewhat contained. Sergeant Rush testified under oath that Ms. Ferreira did not and was not directly threatening anyone with her firearm. This fact was confirmed by Captain Barlow who testified during his sworn deposition on January 23, 2007 that Ms. Ferreira never made any threatening gestures with the gun to any of the officers present at the scene that day.

The concepts of police crisis negotiations, particularly when the subject is not posing a direct or overt threat to any person, is to recognize that time is on the side of the police negotiator. Retired Detroit (MI) Police Sergeant Evan Marshall writes: "the only reason to assault a location is when the suspect starts to seriously injure or kill hostages. He continues, "Don't rush into anything you might live to regret." In my expert opinion, as a trained tactical commander, Lieutenant McGregor and Sergeant Thomas Rush, as the on-scene tactical supervisors, committed several tactical errors.

They developed a poor, hasty, unrehearsed tactical plan that fell outside the scope and mission of the East Providence (RI) Police Department's SRT. They rushed into action with a group of officers who had never trained nor rehearsed for this type of mission and they improperly deployed equipment that probably caused or contributed to the death of Ms. Patricia Ferreira.

**#7. That the East Providence (RI) Police Department Special Response Team (SRT) failed to train for and rehearse their hastily prepared tactical plan (pursuant to established protocol) before implementing it and as such, constituted deliberate indifference to the safety of Ms. Ferreira.** The Rhode Island Municipal Police Academy Advanced S.W.A.T. Course lesson plan dated April 12-16, 1999 from the training program attended by Lieutenant McGregor and members of the SRT states, in part on page 1:

> *"No tactical solution is without risk of failure. The decision to implement a tactical solution is never an easy or safe one. Training and rehearsal are a necessity."* (Underscore added.)

Page 5 of that lesson plan contains a list of bullet points explaining why tactical operations fail. At the top of that list is "poor planning" followed closely by "bad equipment selection" and "untested equipment." Sergeant Thomas Rush, in his sworn deposition of August 3, 2006, testified that he and Lieutenant McGregor devised what they referred to as a "hasty" plan to rescue Ms. Ferreira.

He further testified that the SRT did not have "a long time to plan this out" and furthermore testified that when "we were done" the plan "could be implemented." No rehearsal of this plan was ever discussed and none ever took place.

The facts of this case are clear. First, Lieutenant McGregor and Sergeant Rush participated in an untested and unrehearsed plan to breach Patricia Ferreira's vehicle by use of "flash bang" distraction devices, tools that the sergeant acknowledges only "make a very loud bang...and a bright flash." Indeed, any adequately trained tactical officer knows that a "flash bang" distraction device will not and is not designed to break out automobile window glass. In fact, the record is clear that neither the "flash bang" device that Sergeant Rush threw nor the device that Lieutenant McGregor threw broke out any windows of Ms. Ferreira's vehicle. The device only did what it was manufactured and designed to do; it made a loud noise and emitted heat and a bright flash.

Second, Officer Feeney, a member of the SRT, had never trained or rehearsed breaching an automobile window with a Haligan Entry Tool; however, he opted to take this tool and repeatedly tried to smash out the driver side window of Ms. Ferreira's Mazda 626 sedan albeit with eventual success. He admits he did not take "full swings" with the tool because he thought the window would just collapse with the "touch" of the tool. He didn't know how much force was needed to break out this window because he never trained with this particular piece of equipment against this type of barrier.

Haligan Entry Tools, which were developed for law enforcement and fire/rescue personnel, are specially designed to breach or force entry into buildings by compromising locked doors, punching holes in drywall, breaking door hinges and in certain cases, when punch tools are not available, shattering windshield glass. However, as the training axiom on page 1 of the Rhode Island Municipal Police Academy Advanced S.W.A.T. Course outline indicates, both *training and rehearsal are a necessity.*

Officer Kevin Feeney admitted in his sworn deposition of August 31, 2006; "we learned...that a flash bang would not break a window" and the Haligan Entry Tool would not immediately break out automobile glass. While his candor might be refreshing at some other less tragic event, the scenes of in-progress tactical events are not the proper forum for "learning" as Officer Feeney described it.

As a trained and certified police tactical commander, it is my expert opinion within a reasonable degree of law enforcement certainty that had the East Providence (RI) Police Department Special Response Team (SRT) trained with their equipment and rehearsed their plan as their training material mandates, they would have known to not venture out on this tragic "rescue" attempt with inappropriate and untested equipment. As such, their conduct showed a conscious disregard of the consequences of their actions and their failure to train and rehearse constituted a deliberate indifference to the safety of Ms. Ferreira.

**#8. That Captain Walter Barlow violated all established standards of Hostage Negotiation protocol by participating directly in this tactical event because of his past personal relationship with Ms. Patricia Ferreira.** Sergeant Stephen Hall testified under oath during his September 14, 2006 sworn deposition that it was understood among the members of the East Providence (RI) Police Department that Captain Barlow had a past personal relationship with the Ferreira family. While Captain Barlow during his sworn deposition disputed and denied he had a past personal relationship with Ms. Ferreira, Mr. Anthony Ferreira, the brother of Ms. Patricia Ferreira, corroborated this past personal relationship between the captain and his sister, and described it as being both personal (Ms. Ferreira was a long standing acquaintance) and professional (he states she was a past police informant). Captain Barlow denies any knowledge of Ms. Ferreira being an informant for the East Providence (RI) Police Department but did acknowledge that as a lieutenant, he played a role in an investigation of one of his department's former officers (Joseph Traficante) with whom Ms. Ferreira was romantically involved with and who might be called as a witness. Mr. Ferreira went on to say the relationship between the captain and his sister had soured to hatred over the years. The documents submitted for review indicated that Captain Barlow, while off-duty and on his own time, was personally visited by the family of Ms. Ferreira, and after conferring with them, dispatched a two-officer team to the Brightridge Avenue address to investigate a domestic dispute between Patricia and Mr. Sousa.

He then initiated telephone contact with the officers at that address and ordered them to conduct a "thorough investigation" of the matter. Mr. Anthony Ferreira recalled the conversation being fairly straight forward; i.e., the a young boy (Ryan) may be in jeopardy and guns are involved. He stated the captain told the officers when they reported in from the scene that they found no evidence of broken or thrown items inside the house, to "keep looking until you [find something whereby you] can make an arrest." Eventually, Captain Barlow responded to the Fenmoor Avenue scene, not as the over-all commander of the original domestic violence incident involving Ms. Ferreira and Mr. John Sousa, nor in his capacity as a personal acquaintance of the family during the time Ms. Ferreira was a witness in the prosecution of one of his subordinates, but this time as the agency's chief crisis negotiator.

These facts are not only born out by the documents submitted for review, they are described in detail in the numerous sworn depositions of the parties and are also described in the report prepared by the defense expert, Mr. Ron McCarthy.

Protocol established by the Federal Bureau of Investigation's Critical Incident Response Group, Crisis Management Unit calls for crisis or hostage negotiators to remain non-judgmental and focus on active listening skills rather than emotionally charged dialogue. Contemporary crisis negotiation requires that negotiators control their behavior and emotions and listen *dispassionately*. Guidelines for dealing with persons in crisis call for negotiators to avoid judgments, preaching or other styles that convey disapproval. Managing depressed individuals requires time and negotiators are advised to expect a slow response. In fact, one of the guidelines suggested in the text, Crisis Negotiations, the bible for police crisis negotiators, even suggests that negotiators "stall for time" when dealing with suicidal individuals.

It is clear from my review of the material in this case, that Captain Barlow disregarded this axiom and abandoned all concepts of modern crisis negotiations and instead focused on loud, profane language and the favor Ms. Ferreira apparently owed him for "straightening out her life" by convicting her past boyfriend, the former officer, Joseph Traficante. Mr. Anthony Ferreira, a witness to the incident, during his sworn deposition, testified that he overheard Captain Barlow yelling and swearing at Ms. Ferreira during the negotiations.

Contemporary crisis negotiations emphasizes that negotiators should avoid lecturing and evaluating subjects and focus instead on problem-solving. Concepts such as offering encouragement, emotion labeling and effective pauses rather than reinforcing the feeling of helplessness, as expressed by Ms. Ferreira, are the benchmarks of successful negotiations.

Defense expert McCarthy described Captain Barlow as the "primary decision-maker in deciding to activate a tactical intervention." There are several long-accepted standards of crisis negotiations. First and foremost is *time*. A negotiator's most important ally in virtually every situation is time. Most experts agree that as long as time passes without harm coming to persons involved, negotiators are making progress. Captain Barlow clearly violated this most important fact.

In my expert opinion, Captain Barlow, as a personal acquaintance of the family who was reportedly familiar with Ms. Patricia Ferreira both personally and professionally, and one whose relationship with Ms. Ferreira had apparently soured over the years, did not act in an objective manner when he decided to engage in an unproductive monologue of yelling, begging and pleading. Indeed, he should have turned over primary duties to another, more objective negotiator. For Walter Barlow to remain in the position of primary negotiator when he had a personal involvement in this family crisis and with Ms. Ferreira personally, and continue to fill the role of "primary decision-maker on when to activate a tactical response" violated all tenets of crisis negotiation.

Next, in my opinion, Captain Barlow rushed to terminate negotiations and instead opted for a tactical resolution too quickly when his efforts to convince Ms. Ferreira to end her potentially self-destructive behavior failed. Contemporary crisis negotiation protocol dictates that tactical commanders should *not* be in a rush to implement a tactical resolution to persons in crisis unless the loss of life appears imminent. Experts agree that when it seems as if nothing is happening because a subject is not negotiating, this may not really be the case. Noted Crisis Negotiator Bruce A. Wind, from the Seattle (WA) Police Department states "during these quiet times, many things occur that will eventually lead to a peaceful resolution."

Experienced crisis negotiators refer to these quiet intervals as periods of *dynamic inactivity*. Mr. Wind states: *"the passing of time works for the police in many ways and only means that a resolution is closer at hand. Field commanders should keep in mind that patience is a virtue"* in all crisis negotiations. Based on the foregoing, it is my expert opinion that Captain Barlow was deliberately indifferent to the safety of Ms. Ferreira when he turned over control of the incident to SRT Lieutenant McGregor. Indeed, no harm had come to Ms. Ferreira nor was any overt threat of physical harm made to any officer.

Thirdly, it should also be pointed out that nowhere in the material provided by the City of East Providence in response to the Plaintiff's Request for Documents does a certification exist that confirms or proves that Captain Walter Barlow was trained as a Crisis Negotiator at the time of this incident. In his sworn deposition, the captain states that he was appointed to the position of "hostage negotiator" by a "department personnel order" but has been unable to produce, after countless demands for production, any legitimate certificate indicating that he received any formalized training as a professional crisis negotiator prior to October of 2001. The only evidence of any certification in Captain Barlow's personnel file of any training in this specialty is from April, 2003 and April, 2005. Absent proof of any legitimate training or record of certification by either the East Providence (RI) Police Department or some other nationally recognized authority, other than a "department order" it is unconscionable that they would permit this officer to assume the role of primary decision-maker (or negotiator) in this matter, especially given the emotional state of Ms. Patricia Ferreira. If indeed accurate, such conduct is clear evidence of deliberate indifference by the East Providence (RI) Police Department to the welfare and safety of Ms. Ferreira.

It is also my opinion that had Captain Barlow turned over negotiations to another trained crisis negotiator, one who was more detached and objective and who might have been willing to take more time to engage Ms. Ferreira in active listening skills in a calm detached dialogue, Ms. Ferreira may have responded in a more rational manner. It is also my opinion that had such proper protocol been followed, the hasty plan to "rescue" Ms. Ferreira from herself would have been re-evaluated and probably abandoned

Lastly, defense expert McCarthy opines on page 8 of his December 6, 2005 report that he is unaware of any system in the United States that utilizes the services of mental health counselors in crisis negotiations. However, a 1993 study of 300 police agencies that have crisis negotiation teams reveals that almost 40 percent use mental health counselors as an integral part of that team.

In fact, that same study reported that agencies who do use mental health counselors *"reported a higher incidence of situations ending through negotiated surrender and fewer incidents ending in a tactical resolution than departments not using mental health counselors."* Mr. McCarthy's assertion that civilian mental health counselors only become involved after an armed, mentally disturbed person is disarmed is patently wrong.

Indeed, the authors of <u>Crisis Negotiations</u> document many examples of how mental health counselors are used by progressive police agencies to not only "suggest negotiating techniques" to the police negotiator, but also assess the mental state of the subject. In some cases, they are actually cross-trained by the agency to function as the primary or secondary negotiator. I have referenced authoritative texts to support my opinions.

**#9. The East Providence (RI) Police Department failed to train their officers in the proper procedures when responding to calls for service regarding mentally ill/suicidal persons.** From my review of the sworn depositions of the involved defendant officers, it is clear that the officers within that agency either were not trained in the policies and procedures regarding persons who are in crisis, suicidal or mentally ill (General Order #2000-43, Section 1.2) or they chose to ignore this policy.

It is also apparent that there are two policies within the East Providence (RI) Police Department regarding the confiscation of deadly weapons (pursuant to General Order #2000-43) from persons in crisis, one *written*, and another that is *practiced or followed on the street.*

East Providence (RI) Police Department General Order #2000-43, 1.2 states:

> *"Often times, police officers, due to the dynamic nature of their role, may be called to intervene in suicide or mental illness crisis situations. Since these situations can be volatile, escalate, and erupt into grave circumstances, interaction with individuals in such a state requires a tactful and sensitive approach. <u>The main goal is to get psychiatric assistance for the subject, if needed, and in the safest manner possible."</u>* (Underscore added).

It continues:

> *"The East Providence Police Department has established procedural guidelines for officers to follow in order to perpetuate this main goal. <u>Officers shall adhere to these procedures at all times</u>."* (Underscore added.)

From my review of the material provided, it is clear that the failure by the City of East Providence, more specifically, the East Providence (RI) Police Department, to educate and train their officers in this policy on how to handle domestic violence incidents constituted a deliberate indifference to the safety of Ms. Patricia Ferreira. Indeed, had Walter Barlow disseminated all the information he received from Mr. Anthony Ferreira, Ms. Beverly Ferreira, and young Ryan Ferreira, more specifically that Ms. Ferreira was on medication for depression, that she had been under a doctor's supervision and had been receiving counseling, that Ryan had been sent to his grandparents house for his own safety, that the Rhode Island Division of Children, Youth and Families was being notified by the captain, and that property had reportedly been broken, clothes thrown onto the lawn and that Ms. Ferreira had no house to sleep in, the officers themselves testified that they might have deemed that Ms. Ferreira was "in crisis" and taken more immediate action regarding her firearms.

When coupled with the fact that Sergeant Rush, according to his statement, overheard Ms. Ferreira state that "her life was a mess," that "her family would not let her into their house" and that she "wanted her guns" it is obvious that Ms. Ferreira was in a crisis situation and that suicide may be a possibility.

Clearly, had the command personnel, first-line supervisors and line officers collectively been educated regarding the "established procedural guidelines" of the East Providence (RI) Police Department to perpetuate the "main goal" of getting "psychiatric assistance" to Ms. Ferreira, and implemented the emergency certification procedures outlined within the Rhode Island General Law, Section 40.1-5-7 (a) (1) (which any police officer is authorized to do based on their personal observations) and delivered Ms. Ferreira to an appropriate facility, it is my expert opinion, that this firearm incident at Brightridge and Intervale Avenues would never have occurred.

Rhode Island General Law, Section 40.1-5-7 (a) (1) states, in part:

> *"If an examination (by a physician) is not possible because of the emergency nature of the case.....the applicant on the basis of his or her observation may determine....that emergency certification is necessary. In the event that no physician is available....a police officer who believes the person to be in need of immediate care and treatment.....may make the application for emergency certification to a facility."*

Next, East Providence (RI) Police Department General Order #2000-43, 1.3.A. states in part:

> *"Police officers most commonly encounter suicidal/mentally ill persons in a state of depression, manic depression (also known as bipolar disorder), and/or psychosis (delusions, hallucinations)."*

The policy continues under 1.3 B-4:

> *"It is a priority for an officer to ascertain if the individual either possesses or otherwise has access to weapons when the officer has determined that the individual is mentally ill, in crisis, or is suicidal."*

The policy continues under 1.5 D-3:

> *"Officers shall talk the subject into compliance and seize the subject's weapon."*

From my review of the sworn depositions of the defendant officers, it is clear that there is a lot of confusion regarding these laws and policies and a distinct difference in what the officers believe they are *supposed* to do and what they *actually* do on the street. For example, Officer Stephen Tiernan, one of the two officers who responded to the 44 Brightridge Avenue address on October 10, 2001, stated that he only makes it a priority to ascertain if weapons are involved and presumably confiscates them pursuant to #2000-43 only if a crime has been committed with that weapon; and he plainly admitted in that same sworn deposition that he knew that Patricia Ferreira was in possession of at least one firearm.

Officer Michael David, in his sworn deposition stated that he only makes it a point to seize weapons pursuant to General Order #2000-43 at the scene of an arrest and only when the arrested person is the one who possesses the firearm. He states he is not aware of any East Providence (RI) Police Department officer who has ever followed General Order #2000-43 or talked a person who is in crisis into surrendering a weapon. However, he admitted that when he responded to Patricia Ferreira's address, she was "agitated, angry," and "upset" and indeed "may have been in crisis", yet he did not think to secure her guns.

Walter Barlow in his sworn deposition stated that if Patricia Ferreira made the statement that her "life was a mess" while in the presence of Sergeant Rush, that this statement could be evidence that she was indeed, in crisis, as referenced in General Order #2000-43.

Sergeant Stephen Hall responded in kind when asked if he personally adheres to the policy of attempting to secure personal weapons from persons who are in crisis, yet he admitted that other officers in the department have, as a matter of caution, taken weapons from scenes where people have mentioned suicide or appeared to be mentally ill.

Sergeant Thomas Rush, when deposed, stated that he has a different interpretation of General Order #2000-43. He stated that he takes weapons from individuals if an arrest has been made, but added that if a restraining order is known to exist, he would also implement the seizure protocol.

Captain Barlow during his sworn deposition stated he doesn't know if General Order #2000-43 authorizes officers to secure weapons from suicidal, mentally ill, or persons in crisis or not; but that officers "can do it" as long as they can articulate "the reasons why" they are doing it. He went on to state that to his knowledge, officers of the East Providence (RI) Police Department in fact do secure weapons from persons in crisis as a matter of "custom" and "practice" and that this custom and practice was in effect on October 10, 2001.

Only Officer Kevin Feeney testified that he adheres to the letter of the policy and will secure (and has in fact secured) weapons for safe-keeping when responding to the scene involving a subject who appears to be in crisis; and he states that he is aware of other officers who have acted in kind.

Regarding General Order #2000-43, retired Chief of Police Gary Dias testified that when he enacted this policy in March of 2000, his intent was that the policy would enable officers to make a determination that if a person appears to be mentally ill or in crisis, they would be *permitted* and even *expected* to take firearms away from those subjects. He testified that Section D-3 1.5 of General Order #2000-43 was authored to cover situations when there is *no evidence of a crime*, yet a person *appears to be in crisis*, his officers should suggest that one or more of the parties voluntarily surrender their weapons. This policy was in fact followed by Lieutenant Stephen Enos, a 25-year veteran of the agency with regard to Mr. Anthony Ferreira's firearms following Ms. Patricia Ferreira's death.

According to Mr. Ferreira's sworn deposition, shortly after the death of his sister, Ms. Patricia Ferreira, the lieutenant approached him at the headquarters of the East Providence (RI) Police Department and asked if he would voluntarily surrender his firearms. Indeed, the weapons were kept for safe-keeping for two months. Lieutenant Enos, during his sworn deposition on November 1, 2006, testified that it is indeed the policy of the East Providence (RI) Police Department that when officers become aware of firearms possessed by domestic violence participants, as a "public safety concern" the agency will always "error on the side of caution" and "grab the guns."

He testified that the agency has in fact, done just that "many times." He further went on to describe a procedure that if firearms for any reason are not taken at the time of the officers' arrival to a domestic violence call, East Providence officers have actually gone to court afterwards, obtained a court order, and returned to the residence to seize the weapons.

The lieutenant went on to testify that in his opinion, the fact that Ms. Patricia Ferreira and Mr. John Sousa even had firearms was a "recipe for disaster" and that neither Ms. Ferreira nor Mr. Sousa, because of their history of violence, should have had firearms. He further testified that, based on the volume of calls the agency handled at their residence, the issue of them possessing firearms was going to "present a problem" for the police department.

From the facts of this case, it would appear that none of the principle law enforcement officers in this case, (Captain Barlow, Sergeant Rush, Officers David or Tiernan), had received any training on this policy, nor understood the purpose or intent of General Order #2000-43 as outlined by Lieutenant Enos. All failed to follow the policy with regard to ensuring that Patricia Ferreira temporarily surrender her firearms when she was departing the Brightridge Avenue address, as expressed more fully in Opinion #1 of my May 26, 2005 initial report. In spite of this policy being in effect for over 18 months, it is clearly apparent from a review of the sworn depositions of the involved officers, that only Lieutenant Stephen Enos and Officer Kevin Feeney were aware of both the purpose and the intent of this policy. Unfortunately, neither was present at the Brightridge Avenue residence on October 10, 2001.

Next, when Captain Barlow spoke with Officer Stephen Tiernan while he and Officer Michael David were at the Brightridge Avenue address and ordered him to conduct a "thorough investigation," he may have failed to provide them the necessary background information to conduct that investigation such as Ms. Ferreira's past mental history of counseling, the fact that she was taking medication for depression, that her son, Ryan, was "upset" and that he (Barlow) felt the environment at the house was "unsuitable" for the lad. Furthermore, in spite of the fact that Barlow may have failed to provide that information, the "thorough investigation" (as ordered by him) still should have included researching the past history between Ms. Ferreira and Mr. John Sousa. Had Officer Tiernan conducted a "thorough investigation" during his 40 minutes at the scene, he would have undoubtedly learned of the domestic assault affidavit filed by Mr. Sousa in Rhode Island District Court on May 18, 2000 which alleged the following:

> *"Patty has been harassing and stalking me. She has a permit to carry (a weapon) and has told me she is suicidal and if it comes to the point that she is going to take her own life, she is coming for me first."*

Armed with this information, any reasonable police officer would have confiscated these weapons; especially after being ordered to conduct a "thorough investigation" and most reasonable police officers would have "erred on the side of caution" and secured Ms. Ferreira's firearms before her departure from the Brightridge Avenue address. A simple telephone call to either his agency or the Court Clerk during those 40 minutes on the scene would have undoubtedly alerted Officer Tiernan to this affidavit.

Finally, Sergeant Rush's urgency to go to lunch resulted in a failure to supervise his two officers during the 40 minutes they "stood by" the Brightridge Avenue address. As a first and second-line supervisor for over 12 years, I can testify that his 3-minute visit to the scene did not meet the requirements of field supervision by any standards. As stated above, had a complete and thorough investigation been conducted by either of these two officers, this overt threat to Mr. Sousa by Ms. Ferreira would have undoubtedly been discovered. Any reasonable police officer conducting an investigation into domestic violence would have followed proper protocol that would have included the seizure of Ms. Ferreira's weapons based on this past allegation of suicidal behavior on the part of Ms. Ferreira and the apparent threat to the life of Mr. John Sousa.

If Mr. Sousa's sworn testimony of October 19, 2006 is accurate, not only did Sergeant Rush fail to supervise his two subordinate officers, but he failed to recognize that Ms. Ferreira was angry, visibly upset and in an apparent and obvious state of crisis, a condition that would warrant the seizure, or at the very least, attempt to gain Ms. Ferreira's compliance in surrendering her firearms temporarily until the domestic matter could be investigated further.

It is my opinion that the City of East Providence, more specifically the East Providence (RI) Police Department, was deliberately indifferent to the safety of Ms. Ferreira in that they failed to adequately train their officers on the policy for handling domestic violence matters, Rhode Island General Law Section 40.1-5-7 and General Orders #2000-41 and #2000-43.

Had they done so and had Sergeant Thomas Rush properly supervised his two officers, this tragic event would have been avoided. Evidence of this deliberate indifference is clearly demonstrated when one reads the language of General Order #2000-41 regarding Domestic Violence. Indeed, Section 1.3, Paragraph A states:

> *"The domestic violence call is one of the most difficult calls to which a police officer must respond. The sensitive and complex nature of family violence requires that the responding officer(s) be both <u>impartial</u> and <u>alert.</u>* (Underscore added). *The safety of the alleged victim must always be a priority in both apparent and less apparent cases of domestic violence."*

The evidence is clear that neither Officer Michael David nor Officer Stephen Tiernan, nor their supervisor, Sergeant Thomas Rush, were impartial or alert regarding the safety or the needs of Ms. Patricia Ferreira. The sworn depositions of both Mr. John Sousa and Ms. Irene Sousa aka Alexandra Walmsley both indicate that the officers had an apathetical demeanor during their 40 minutes at the Sousa/Ferreira home and that both ignored their repeated warnings to not allow Ms. Ferreira to leave with firearms. Surely the "safety" of the "victim" was not a priority to Sergeant Rush who felt his dinner appointment was more important than supervising his officers during this domestic violence call. It is my expert opinion that all three officers (Rush, Tiernan and David) violated both the intent and letter of Rhode Island General Law 12-29-3(A) which states, in part:

> *"The primary duty of law enforcement officers when responding to a domestic violence situation is to.......protect the victim."*

Clearly, all three were negligent in the performance of their duties to protect Ms. Patricia Ferreira.

Paragraph C of that same Section warns officers that they must:

> *"Always anticipate the unexpected in domestic violence calls."*

It goes on to remind officers that:

> *"Family violence is usually characterized by....intense emotion and buttressed by a longstanding pattern of threats and intimidation.*
>
> *"What may initially appear to be a 'minor dispute' may escalate into a 'physically dangerous conflict.'"*

Indeed, every officer involved in this incident has testified that they were very aware of the longstanding pattern of violence between Mr. John Sousa and Ms. Patricia Ferreira and had responded to this address numerous times. However, rather than use this knowledge as a reason to "conduct a thorough investigation" as ordered by their supervisor, Captain Barlow, they used it an excuse to ignore the basic tenets of domestic violence investigations and also used it as a reason to vacate the residence as quickly as possible. Officers David and Tiernan clearly viewed this call, one of many that have occurred at this residence, as another one of the "minor disputes" between Mr. Sousa and Ms. Ferreira, and in doing so, permitted this situation to escalate into a "physically dangerous conflict." This conduct in not following this written protocol clearly demonstrated a deliberate indifference to the safety of Ms. Ferreira, who by all accounts was in crisis, distressed and upset. By allowing her to remove at least one deadly weapon from the home with the full knowledge that she was a victim of this a longstanding pattern of violence, or not make an emergency certification pursuant to RIGL Section 40.1-5-7, set the stage for the tragic events that ultimately and predictably followed.

In my opinion, this complete lack of training by the East Providence (RI) Police Department on the policies relating to matters of domestic violence and the provisions of RIGL Section 40.1-5-7 constituted deliberate indifference to the safety and well-being of Ms. Patricia Ferreira. In support of this opinion, I offer the following. Chief of Police Gary Dias, in his sworn deposition of September 13, 2006, testified that he was "not sure if any training was mandated" by the agency on General Order #2000-43 (procedures for handling suicidal or mentally ill persons) and that he had no recollection of any training members of his department received with respect to this policy. He went on to say "if they (the officers) were given a copy (of the policy) either they or a supervisor signed off on them receiving a copy." Regarding training of General Order #2000-43 or any new policy, the chief testified that ordinarily the training consisted of "an hour or two hours or four hours" where other policies in addition to the specific policy, would also be discussed.

Regarding the two officers who responded to the Ferreira/Sousa address on October 10, 2001, Officer Stephen Tiernan testified during his sworn deposition of August 28, 2006, that he could not remember any training provided by the department with respect to calls where someone may be suicidal as outlined in General Order #2000-43. Officer Michael David, during his sworn deposition of August 30, 2006, testified that he could not recall any training related to General Order #2000-41, Domestic Violence, or removing weapons from persons who may be in crisis, mentally ill or suicidal. When asked specifically about any training on this policy, Officer David twice stated that he could not recall any. While Officer David stated he was in fact familiar with the policy, he stated that his training consisted only of a review of it during his initial field training from 1999 when he rode with a senior officer and was asked if he "understood" it.

It is commonly understood by most police training experts that the inadequacy of police training may serve as the basis for Section 1983 actions only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This concept of deliberate indifference has been taught by this author for years in training programs conducted around the country. To establish liability, plaintiffs must show that the training program at issue is inadequate to the tasks that officers must perform, that the inadequacy is the result of the municipality's deliberate indifference, and that the inadequacy is *closely related to* or *actually caused* the plaintiff's injury. I would submit that in this captioned case, all three burdens have been met. The East Providence (RI) Police Department, through testimony of the chief of police, admits it failed to train their officers in the necessary procedures for dealing with persons in crisis; that they were deliberately indifferent to the needs of their 48,000+ citizens who may be in crisis at any given time such as Ms. Ferreira; and that this inadequate training at the very least is closely related to if not the direct cause of Ms. Ferreira's fatal injury of October 10, 2001 by the discharge of the firearm she was permitted to leave the Brightridge Avenue residence with.

Even if the training the agency did provide on either General Order #2000-41 or General Order #2000-43, which by the police chief's own admission may have only consisted of a one, two or four hour session, in my expert opinion as a certified law enforcement trainer, it did not meet the standard for adequate training as it pertains to dealing with persons who may be mentally ill, suicidal or in crisis.

**#10. It is highly probable that Officer Kevin Feeney inadvertently caused the discharge of Ms. Ferreira's pistol.** Officer Feeney in his initial report filed on the date of this incident, stated that he reached into the car and "grabbed Patty by the back of the head with both hands." He further stated in that report that "immediately upon getting [his] hands on her head, [he] felt it jerk back...and heard a pop" which he determined to be a gunshot. The semiautomatic pistol that Ms. Ferreira was holding in her mouth was found in a state of stoppage known as a "failure to eject" when it was retrieved from the hands of Officer Kevin Feeney outside of Ms. Ferreira's vehicle.

In other words, the spent casing from the fired round did not fully eject from the weapon's ejection port located on the side of the frame directly above the trigger. As described in my May 26, 2005 initial report, as a certified police firearms instructor, I am intimately familiar with this type of stoppage and have intentionally caused it many times in range training scenarios by placing my hand on the slide of the weapon during firing.

Even the defense expert, Ron McCarthy acknowledges that "something impeded the weapon from cycling" thereby preventing the weapon from ejecting the spent casing of the round that killed Ms. Ferreira. Officer Feeney testified during his sworn deposition that the gun fired simultaneously as he was reaching into the car and while his hands were touching her head. He also testified that he understands how this stoppage is caused, i.e., something did not allow the casing to eject; yet denies that his hands ever touched either Ms. Ferreira's hands or the firearm at the instant the gun discharged.

In my expert opinion, as a trained and certified firearms instructor, the dynamics of this situation were such that it is highly probable that Officer Feeney either knocked, grabbed or otherwise made contact with either Ms. Ferreira's hands and/or the firearm while reaching for Ms. Ferreira's head, thereby blocking the ejection port and causing the failure to eject stoppage; and that this conduct by him constituted a deliberate indifference to the safety of Ms. Ferreira. This opinion is rendered with the caveat that neither the amateur videotape nor the TV news videotape clearly captured the actions of the officers who were positioned at the driver's side of Ms. Ferreira's 1995 Mazda sedan that day.

I am prepared to testify to all of the above under oath should the need arise.

My standard fee schedule, current curriculum vitae (which documents my formal education, professional training and published material) are attached and made a part hereto.

Lastly, pursuant to amended Federal Rule 26, I have attached an updated history of all my prior expert testimony in either deposition or trial for the previous four years.

Let me attempt to list the published documents, written material and research manuals that I used to assist me in formulating these additional opinions. Some of the foregoing may also serve as potential exhibits to summarize or support my opinions at trial.

Please bear in mind, this list is not intended to be all inclusive, for much of the information was gained collectively through over 5,000 hours of professional training, formal education and over 20 years of sworn full-time, professional police experience in patrol, investigative, administrative, training and tactical command management positions up through the ranks. However, the following is a representative list of some of the material used which will serve to document my opinions.

References

Grossi, David M., "Involuntary Discharges: A Training Concern", The Police Marksman magazine, March/April, 1993 and reprinted by and in the Institut fur Sportwissenschaften magazine, (Frankfurt, Germany, October, 2004).

Grossi, David M., "Legal Survival: Involuntary Discharges", published in The Use of Force Update, November/December, 2001 and reprinted by and in the Institut fur Sportwissenschaften magazine, (Frankfurt, Germany, October, 2004).

Law Enforcement Television Network (LETN), Dr. Roger Enoka, Ph.D "Roll Call Training: Involuntary Discharges" videotape.

Marshall, Evan, "The Barricaded Gunman," The Police Marksman, March/April, 1981.

McMains, Michael, J. and Wayman C. Mullins, Crisis Negotiations: Managing Critical Incidents and Hostage Situations in Law Enforcement and Corrections, 2nd ed., Anderson Publishing Co., (2001).

Noesner, Gary, W. and Mike Webster, Crisis Intervention: Using Active Listening Skills in Negotiations", FBI Law Enforcement Bulletin, August, 1997.

North Central Technical College, Red Man Training Division, Non-Lethal Weapons Instructor Manual, "*Distraction Devices*".

Pawtucket (RI) Police Department Special Response Team Flash Bang/Distraction Device Student Handbook.

Raid/Special Response Team Organizational Structure and Operations Order.

Rhode Island Municipal Police Academy *"Advanced S.W.A.T. Course"*, Lesson Plan, April 12-16, 1999.

Rhode Island General Law, Section 40.1-5-7 (a) (1), *Emergency Certifications.*

University of Arizona, "Involuntary Discharges" videotape featuring Dr. Roger Enoka, Ph.D.

Wind, Bruce, A. "A Guide To Crisis Negotiations", 'Lectric Law Library, October, 1995.

Respectfully submitted,

David M. Grossi

Attachments: As stated