ADULT, ADOLESCENT AND CHILD PSYCHIATRY
FORENSIC PSYCHIATRY

BY APPOINTMENT

LLOYD FRANKLIN PRICE, M.D.
152 HOLDENWOOD ROAD
CONCORD, MA 01742

Telephone (978) 369-1869

EXHIBIT A

February 28, 2007

V. Edward Formisano, Esq.
Sinapi, Formisano and Company
100 Midway Place, Suite 1
Cranston, R.I. 02920-5707

**Re: Anthony Ferreira the City of East Providence, Rhode Island, et.al.**

**United States District Court District of Rhode Island Case #: CA05-73-F**

Dear Attorney Formisano:

Enclosed please find in compliance with Federal Rule of Civil Procedure (26)(2)(B) my report in the above referenced matter.

Accompanying this report as separate documents are copies of my up-to-date Curriculum Vitae referencing my training and qualifications as well as a listing of all cases in which I have testified as an expert at trial and/or deposition within the proceeding four years.

I. **Exhibits to be Used:** None.

II. **All Publications within the Preceding 10 Years:** None.

III. **Compensation to be paid for the Review and Testimony:** $400 per hour.

IV. **All Opinions to be Expressed and Reasons and Basis Therefore:**

All opinions are held to a reasonable degree of medical certainty, based upon my knowledge, training, experience and review of the below described documents:

1. Expert Reports: Dr. Joseph Penn, 9/22/06 and Mr. David Gossi, 11/9/02 and 2/19/07.

2. Officer Statements: Officers Stephen Tiernan, Kevin Feeney and Michael David; Sergeants Thomas Rush and Stephen Hall, Captain Walter Barlow and Detective Corporal Lawrence Skelton.

3. Statements from other individuals: Anthony Ferreira, Beverly Leforte, Darlene Anctcil, Beverly Ferreira and Michael Desmarais.

4. Tape of incident of 10/10/01.

5. Complaint filed in above entitled manner.

6. Deposition Transcripts of Sergeant Raymond Blinn, Lieutenant Stephen Enos, Officer Michael David, Officer Stephen Tiernan, Sergeant Thomas Rush, Mr. Gary Dias, Officer Kevin Feeney, Sergeant Stephen Hall, Ms. Magtalena Picot , Ms. Alexandra Walmsley, Mr. John Sousa, Mr. Edwin Sousa, III, Mr. Anthony Ferreira and Captain Walter Barlow.

7. Work Records of Ms. Ferreira from Action One Mortgage.

8. General medical records of Ms. Ferreria from Dr. Rocha from 1989 to 9/20/01, including consultations from Drs. Corrao and Dr. Epstein.

9. Death Certificate and Autopsy Report of Ms. Patricia Ferreria.

10. Rhode Island General Law Sec. 40.1-5-7 regarding emergency certification.

11. East Providence Police Department General Order 2000-43 referring to suicidal and/or mentally ill individuals, Order 2000-41 referring to domestic violence situations and Order 2000-73 referring to hostage/barricaded situations.

12. Multiple police incident reports from 1997 to 2/11/06 in reference to Patricia Ferreira and/or Tony Sousa. Police log for 10/10/01.

13. Document entitled, "Response 10 SRT Training."

In addition to the opinions described below, I would reserve the right to express additional opinions in response to testimony offered by experts for the defendants.

**I. Ms. Ferreira clearly met the definition of an individual in crisis, at the time of the initial police visit to her residence:**

The definition of a crisis situation involves an individual's being involved in and/or contemplating events of potential life altering consequence and, given its nature, is frequently associated with distress or other symptomatology.

Ms. Ferreira's situation amply demonstrates these aspects of a crisis situation:

1. Mr. Sousa testified in his deposition that he had broken up with Ms. Ferreira and he had demanded that she leave the house where she lived with her son.

2. As a result of the above, Ms. Ferreira was left with no permanent place to live. As reported by Mr. Sousa in his deposition, she noted at this time that neither he nor her family wanted her.

3. As a consequence of the above, Ms. Ferreira was uncertain and concerned about whether she would continue to have access to her son, Ryan, who had been living with them. This anxiety was compounded by her knowledge that her family had spoken with Captain Barlow, who had called DCYF requesting an investigation. In his deposition, Mr. Tony Ferreira testified to her stating that "DCYF's going to take Ryan," information which she could have only acquired from the police officers on the scene.

4. Ms. Ferreira had not only a verbal altercation, which was common, but a physical altercation with Mr. Sousa, who reported in his deposition that she had thrown a phone at him and placed a hand upon his chest. Clothing was also reported as having been thrown out of the house during this altercation.

Various witnesses on the scene testified as to Ms. Ferreira's emotional state: Sergeant Rush described her as agitated, Officer David as angry and Ms. Walmsley as crying. She herself described her life as "a mess," and appeared to feel helpless in the face of her situation.

Consistent with these reports, were the concerns expressed by both Mr. Sousa and Mrs. Walmsley, who testified in their respective depositions that they had told the police officers on the scene, not to allow Ms. Ferreira to leave with her guns.

5. On 9/22/01, Ms. Ferreira was started on Celexa, an antidepressant, during an office visit with Dr. Rocha. In responding to or filling out a checklist, she acknowledged that she was "severely depressed," and that her life was not satisfying. In contrast to other visits, in which she denied having

considered suicide, she did not respond to a question regarding whether she had considered suicide.

6. As testified to in his statement, Mr. Desmarias, Ms. Ferreira's ex-boyfriend, had seen and spent time with her on the Friday before the event. He noted that she seemed depressed, had been crying hysterically and when asked to "promise me she wouldn't do anything," she stated, "she could not promise me anything."

7. Mr. Anthony Ferreira also testified in his deposition having been told by his sister that, "The guy from work that was helping me got fired." Although the significance and role of this particular individual remains to be elucidated, it is clear that Ms. Ferreira had perceived him as a support, no longer available to her.

II. **Had Ms. Ferreira been provided with crisis intervention services, as was imperative and required given both her mental state and situation described above, it is probable that she would not have died.**

1. Crisis evaluation, intervention and treatment is a well-recognized standard of care for individuals in crisis and is available in most systems of care.

Such an approach includes a comprehensive assessment of patient's current state including risk factors such as significant depression and/or suicidal ideation. Inquiry regarding access to weapons is an integral part of such assessments, as is formulation of a plan such as having any weapons secured by family members an intervention which greatly increases the safety of a patient. Interventions frequently also include active collaboration with family members and/or significant others to assess their ability to be supportive and, as appropriate, to enlist their support. Disposition plans specifically address issues of safety and the consequent formulation of an appropriate safety plan.

Depending upon the results of such an evaluation, possible dispositions include inpatient hospitalization, residential short term treatment, admission to a crisis stabilization unit or intensive outpatient treatment sometimes combined with a day care program.

Most suicidal crises are limited in time and are responsive to intervention and the above care, when properly applied is more often than not successful in the prevention of suicide.

2. Additionally, Ms. Ferreira's prognosis for a positive outcome was also increased by the following factors:

a. She had no prior history of either self-injurious behavior or suicide attempts.

b. She was a young female with no family history of suicide.

c. There was no known history of psychiatric hospitalization or emergency psychiatric evaluation.

d. Ms. Ferreira was not an individual with a history of chronic ongoing suicidal ideation, intent or plan, nor did she appear to have a pre-occupation with death or dying or did she make any "final arrangements" prior to the events.

e. Ms. Ferreira was neither psychotic nor under the influence of alcohol and/or drugs, factors which increase both impulsivity and risk.

f. Ms. Ferreira was clearly ambivalent about suicide and was clearly, through her behavior and statements, looking for help and a sense of hope and relief from pain rather than dying, increasing the efficacy of appropriate intervention.

There are many examples of this ambivalence, including a number of striking comments to others representing "cries for help," for example her comment to her former boyfriend that she "could not promise anything," her lack of response during her medical visit to a question regarding suicide, her statement that she wanted to leave with her guns, or her comment, before leaving the house related by Mr. Sousa in his deposition that, "If you think I ruined you life last time, watch what happens now."

Ms. Ferreira's continuing ambivalence about suicide was manifested by her having reportedly been ready to leave the car in response to Mr. Sousa and the extended period of time during the police standoff during which she did not injure herself.

**III. Had the police removed Ms. Ferreira's handguns, it is probable that she would not have died, whether by intentional act, e.g. suicide or unintentional discharge of her weapon due to "startle effect."**

1. The presence and availability of handguns greatly increases the risk of self-harm to an individual in crisis and/or contemplating suicide, whether ambivalent as Ms. Ferreira clearly was or not. This is due to the availability of a highly lethal means of suicide which can be used impulsively and without planning. This presence became even more critical as Ms. Ferreira's mental status worsened and her sense of hopelessness and desperation increased as did her risk of suicide. Removal of such weapons or access to them significantly diminishes risk.

2. The removal of her firearms, in addition to removing a lethal means of suicide and therefore significantly lowering risk, would have been a concrete indication to Ms. Ferreira that others were concerned about her, an intervention which would have reinforced her wish to continue living by decreasing feelings that her situation was hopeless and that nobody cared.

3. In addition to the above, a lack of access to firearms would have thwarted Ms. Ferreira's contemplated plan for suicide by gun.

All previously noted behaviors related to the threat of suicide involved the potential use of a gun, as opposed to other means. Examples include episodes testified to by Mr. Sousa when, at times of disruption in their relationship, Ms. Ferreira when upset would call with her gun cocked"[1] and her having stated that if she and her son were attacked by "chemicals," referring to a possible war, she would kill both herself and her son, presumably with guns on hand.

As with many individuals, Ms. Ferreira's potential plan involved a specific means of suicide, dictated by her particular issues, mental makeup and message which she meant to send through her potential suicide. Removal of her guns as noted above, would have both thwarted this plan and in so doing, significantly lowered her risk.

## IV. The police conduct during the barricade situation was a substantial contributing cause to Ms. Ferreira's death.

1. Ms. Ferreira had already been traumatized by witnessing the violent arrests of both her brother and John Souza.

2. During this episode, Ms. Ferreira was described as looking frightened, alternately laughing and crying and smiling at the officers on the scene. She also appeared fearful, overwhelmed and anxious at times and agitated.

---

[1] She invariably responded positively when Mr. Souza appeared and took her gun.

3. Corresponding to this deterioration in her emotional state, Ms. Ferreira's sense of helplessness, desperation and limited options increased.

4. All of the above were substantially contributed to by police actions on the scene: the failure to listen in a calm, detached and non judgmental manner, the conveying of admonishments and demands instead of empathic listening, e.g. "you owe me a favor," "don't you dare do this," and the use of emotionally charged dialogue such as loud and profane speech and the providing of a large audience, rather than a quiet, private and contained space and the provision of more time.

This deterioration in Ms. Ferreira's state directly and significantly increased her risk of death whether by intentional act, e.g. suicide or unintentional discharge of her weapon, e.g. "startle effect."

Sincerely,

Lloyd F. Price, M.D., Diplomate of the American Board of Psychiatry and Neurology in Psychiatry, Child and Adolescent Psychiatry and Forensic Psychiatry.

LFP/kea

Enclosures:
As stated above