UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANTHONY J. FERREIRA, as Administrator of the Estate of Patricia J. Ferreira, and as Guardian of the Estate and Person of Ryan C. Ferreira,<br>*Plaintiff,*<br>vs.<br>CITY OF EAST PROVIDENCE, et al.,<br>*Defendants.* | C.A. No. 05-73 S |
| ANTHONY J. FERREIRA, individually,<br>*Plaintiff,*<br>vs.<br>CITY OF EAST PROVIDENCE, et al.,<br>*Defendants.* | C.A. No. 05-75 S<br>(member case) |

## DEFENDANTS'[1] MOTION FOR SUMMARY JUDGMENT

Now come Defendants and hereby move for the entry of summary judgment. In support thereof, defendants rely upon the Memorandum of Law and Rule 56(a) Statement of Undisputed Facts, attached and incorporated herein.

[1] Namely, Kevin J. Fitzgerald, in his official capacity as Treasurer of the City of East Providence, Kevin M. Feeney, Stephen J. Hall, Stephen E. Tiernan, and Michael A. David, Walter H. Barlow, Jr., Thomas J. Rush, and Gary Dias.

Defendants,
By their attorney,

*/s/ Marc DeSisto*

Marc DeSisto, Esq. (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax: (401) 272-9937
Email: marc@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that the within document has been electronically filed with the Court on March 22, 2007, and is available for viewing and downloading from the ECF system.

*/s/ Marc DeSisto*

Marc DeSisto

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANTHONY J. FERREIRA, as Administrator of the Estate of Patricia J. Ferreira, and as Guardian of the Estate and Person of Ryan C. Ferreira, *Plaintiff,* vs. CITY OF EAST PROVIDENCE, et al., *Defendants.* | C.A. No. 05-73 S |
| ANTHONY J. FERREIRA, individually, *Plaintiff,* vs. CITY OF EAST PROVIDENCE, et al., *Defendants.* | C.A. No. 05-75 S (member case) |

**DEFENDANTS'[1] MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On October 10, 2001, Patricia Ferreira committed suicide while barricaded in her car and surrounded by East Providence Police officers. On behalf of the Estate of Patricia Ferreira, Anthony Ferreira brings a wrongful death claim for negligence, an unreasonable seizure claim pursuant to 42 U.S.C. § 1983 and Article I, Section VI of the Rhode Island Constitution, and a

[1] Namely, Kevin J. Fitzgerald, in his official capacity as Treasurer of the City of East Providence, Kevin M. Feeney, Stephen J. Hall, Stephen E. Tiernan, and Michael A. David, Walter H. Barlow, Jr., Thomas J. Rush, and Gary Dias.

§ 1983 due process claim against the City of East Providence and East Providence Police Officers and their supervisors. On his own behalf, Anthony Ferreira seeks to recover based on claims of excessive force and false arrest stemming from his interaction with East Providence police officers on that same night. Defendants hereby move for the entry of summary judgment on all counts and submit that, as a matter of law, the undisputed facts fail to support plaintiff's claims.

## II. Background Facts

Patricia Ferreira was 28 years old on October 10, 2001, when she committed suicide while barricaded in her car on Brightridge Avenue in East Providence, Rhode Island. Her suicide was accomplished by a self-inflicted gunshot with a firearm legally registered to her. For approximately one hour beforehand, officers from the East Providence Police Department attempted to convince her not to commit suicide. As two officers talked to her, others formed a plan to save her, if needed, by rushing her vehicle, distracting her with two diversionary devices (informally known as "flashbangs"), breaking the windows in her car and securing her weapon. When it became a certainty that she was moments away from killing herself, the plan was initiated. Unfortunately, it was unsuccessful and Ms. Ferreira ended her life by pulling the trigger just as an officer broke the rear driver's side window and began to reach inside.

This tragic event was preceded by decedent's three-year history of stormy relationships with boyfriends. During that three-year period, the police recorded over 19 recorded contacts and had many more unrecorded police contacts involving complaints by decedent and/or her current and past boyfriend of harassment. Such harassment varied from driving past each other's house, throwing teddy bears on each other's car, and swearing at each other.

On October 10, 2001, decedent and her on again/off again boyfriend of over two (2) years were living together but once again experiencing problems. Ms. Ferreira's brother, Anthony Ferreira, and their mother, Beverly Ferreira, appeared at the East Providence Police Station just before 6:00 P.M. on the night of October 10, 2001, with Patricia's eight-year-old son, Ryan. They complained that John Sousa and Patricia Ferreira were arguing again and Beverly Ferreira wanted to know if she could keep her grandson at her house. Captain Walter Barlow spoke with Ryan who told him that his mother and Mr. Sousa were throwing objects around the apartment and arguing. He told Captain Barlow that Mr. Sousa was forcing his mother and him out of the house. He told Captain Barlow that while Mr. Sousa and his mother were arguing, his mother told him to run down to his grandmother's house which was two (2) doors away. Captain Barlow dispatched a patrol car to the residence of John Sousa.

During this time, Anthony Ferreira also told Captain Barlow that Mr. Sousa had actually thrown his sister and Ryan out of the house a few days before. In fact, Ryan had lived with his grandmother and Anthony (who lived in an apartment in the same house) for the past two or three days and he had gone camping with Anthony. When they returned from the camping trip, Ms. Ferreira and John Sousa had patched up their relationship and picked up Ryan and took him back to Mr. Sousa's house.

The first officers to arrive at the apartment were Officer Steven Tiernan and Officer Michael David. Sergeant Rush also arrived on the scene a short time later. Officer Tiernan spoke with Ms. Ferreira and another individual who identified herself as Mr. Sousa's ex-wife, Irene Sousa. Officer David spoke with John Sousa. Both Mr. Sousa and Ms. Ferreira indicated in these separate conversations that there had been no physical altercation but that they had a verbal argument. Both indicated that Mr. Sousa no longer wanted Ms. Ferreira living in his

apartment. The officers will testify that there were no signs of a struggle, that neither party appeared to have any injuries and that although both individuals appeared to be upset and angry, they were not excessively distraught or afraid. Neither party appeared to be crying or to have been crying.

Mr. Sousa indicated that he had made arrangements for Ms. Ferreira to stay at another apartment beginning on the first of November. Ms. Ferreira agreed that it was not wise for her to stay at Mr. Sousa's apartment until November and Irene Sousa agreed to let Ms. Ferreira stay with her. Officer Tiernan and Officer David remained in the apartment while Ms. Ferreira removed some of her belongings and her son's clothes.

John Sousa also told the officers that he wanted Ms. Ferreira to remove her weapons because he was afraid she would accuse him of stealing them. Ms. Ferreira told the officers that she had retrieved her guns and would take them with her. During discovery, Mr. Sousa testified that he told the officers at his house that Ms. Ferreira should not be allowed to leave with her guns. The officers deny ever being warned about Ms. Ferreira keeping her guns. After Ms. Ferreira left, the officers also cleared the scene.

At about 5:55 P.M., Anthony Ferreira left his mother and nephew at the police station for his home because he was hungry and he wanted something to eat. When he arrived home he saw between seven (7) and ten (10) bags of clothing and he determined that his sister had dropped off the bags because they contained Ryan's clothes. He started to bring some of the clothing into his house when Patricia Ferreira arrived in her car. She began to take a few more bags of clothes out of the trunk of the car. According to his statements, John Sousa's ex-wife then drove to his house and stopped her car in the middle of the road. She handed Patricia a white piece of paper. In his statement, he relates that after his sister read the paper she walked to the trunk of her car

and removed two guns. He further states: “she had one gun in each hand and seemed calm. As she walking[,] and about to get into her car[,] she said she was going to kill herself. She wasn’t actually saying it to me but it was loud enough for me to hear what she said.”

Anthony Ferreira then approached his sister’s car, saw that she had a “38 snub nose” pointed at her chest and a 9 mm on the right side of her lap. He told her that everything was going to be OK and simultaneously reached in the car and took the gun she had in her hand. He states that he backed away and placed the gun under one of the bags of clothes. However, his sister started to drive away and said to him, “I’ll just use my other gun.” Mr. Ferreira then called 911 and reported that his sister was threatening to commit suicide. He told the operator that she had a gun.

Within minutes, a number of police cruisers responded to the area, parking their cruisers behind Ms. Ferreira’s vehicle. Mr. Ferreira indicates that his sister became angry with him for calling the police. When Sergeant Hall arrived Anthony Ferreira was still near his sister’s car. Sergeant Hall ordered him to move away from the vehicle. Mr. Ferreira, however, yelled out that he wanted all officers to leave. Instead of complying with the directions of Sergeant Hall, Anthony Ferreira draped his body across the windshield, blocking the officers’ view of Ms. Ferreira. Sergeant Hall and Officer Tiernan tried to remove Mr. Ferreira from the windshield but he resisted. Eventually, they removed him from the windshield and he began to fight with them near the driver’s side door of Patricia’s automobile. Sergeant Hall used his pepper spray but Mr. Ferreira still struggled with the officers. Officer Tiernan then sprayed Mr. Ferreira again and the two officers were able to bring him to the ground and place him in handcuffs. Mr. Ferreira, however, continued to struggle.

Meanwhile, Patricia Ferreira began to move her vehicle slowly up the street. At this time, John Sousa arrived. He was told by the officers not to go near the vehicle but proceeded toward it anyway. When the officers attempted to stop Mr. Sousa, he began to struggle with them and thus he was also placed in custody.

As Patricia's car moved forward (on Fenmoor Street), several officers in the street had to move out of her way. Several cruisers followed Ms. Ferreira's vehicle at a very slow pace up Fenmoor Avenue. She then turned right onto Warren Avenue and took another right onto Pawtucket Avenue. From that point, Ms. Ferreira made another right onto Brightridge Avenue.

By this time, numerous officers had become involved. Sergeant Rush had assumed radio command of the incident and when Ms. Ferreira's vehicle turned onto Brightridge Avenue, a police officer with a transport van maneuvered his van so that it blocked the path of Ms. Ferreira's vehicle. Therefore, she came to a stop on the eastern curve of Brightridge Avenue just north of Intervale Street. The cruisers pulled up behind her and some in front of her car. Sergeant Rush will testify that when he exited his vehicle and took a position very close to Ms. Ferreira's car, he could see her sitting in the driver's seat with a handgun in her mouth.

When Sergeant Hall arrived, he resumed his conversation with Ms. Ferreira. He was approximately 10 to 15 feet away, perpendicular to the driver's window and under the cover of a box truck parked on the side of the street. He told her to put the gun down on the dashboard and exit the vehicle. Captain Barlow, who had a professional relationship with Ms. Ferreira from her past problems, also arrived on scene and began to converse with Ms. Ferreira in an attempt to get her to put her weapon down and exit the vehicle.

Sergeant Rush meanwhile began to secure the perimeter and organize the officers who were in the direct line of fire or in dangerous cross-fire positions just in case the situation ever

escalated to the point where the officers had to use deadly force. Sergeant Rush observed that there were residents who were now exiting their houses and coming to the scene. Therefore, he further directed some officers to clear the houses and the crowd.

Sergeant Hall then instructed Officer Kevin Feeney to bring the Special Response Team ("SRT") van to the scene. When the van arrived, Sergeant Rush directed Officer Feeney to arm himself with a shotgun loaded with non-lethal beanbag rounds. He instructed Officer Feeney that if Ms. Ferreira exited her vehicle with a weapon in her hand and if a determination was made that the weapon was in a location which would not threaten her or the officers, then Feeney was to shoot her with a beanbag round. All of the officers as well as Sergeant Hall and Captain Barlow were informed of this plan. As Sergeant Rush coordinated the scene, Captain Barlow and Sergeant Hall continued to verbally attempt to persuade Patricia to put the gun down and come out of the car.

Lieutenant Alister McGregor (now deceased), who was in charge of the special response team, arrived at the scene shortly thereafter. It was determined that "a hasty rescue" plan should be in place. A "hasty rescue" plan refers to an alternate plan which is in place and could be implemented if there were ever developing circumstances which do not allow for a more timely and slowly executed plan. This plan was to be executed only after it was determined that Ms. Ferreira was moments away from committing suicide and nothing else could be done. The plan, in Sergeant Rush's words, was as follows:

> Lieutenant McGregor and I determined that we would use two, two man teams to approach the car. One team would consist of Feeney and I, with me deploying a flashbang diversionary device on the driver's side of Patricia Ferreira's car. Feeney and I would then make a speedy approach to the driver's door of Patricia Ferreira's door using a ballistic shield. The second team would consist of Lieutenant McGregor and Officer Michael David, who was to approach her on the passenger's side of the vehicle, using a ballistic shield and a flashbang diversionary device. When they reached the passenger's side, McGregor would throw the diversionary device through the glass window of the

front window of the passenger door. Simultaneously Officer Feeney, utilizing a halogen tool, would break the operator's door window and grab the firearm away from Ms. Ferreira.

Sergeant Hall and Captain Barlow continued to try to converse with Ms. Ferreira. Captain Barlow will testify that Ms. Ferreira told him that "the world is all screwed up." She told him she feared that John Sousa would be arrested and have to go to jail. She told him that she was upset with her family for their refusal to accept her relationship with Mr. Sousa. She expressed concern over the humiliation she would face for being in this situation.

Captain Barlow and Sergeant Hall tried to reassure her that she would be protected. They discussed her family and the love that her family had for her. They told her that John Sousa would not go to jail and that there was hope for the future. Ms. Ferreira indicated at some point that she would rather die than be placed in a "mental institution."

All during this time, Ms. Ferreira on different occasions would place the gun in her mouth. She would also point it at her chest. When she placed the weapon in her mouth, Captain Barlow would request that she look at him. He would urge her not to do anything.

After approximately one hour, Ms. Ferreira reached into the backseat area and retrieved a cloth or towel. She placed the cloth on the upholstery on the back cushion of her seat and headrest. She opened her window and threw an American flag onto the hood of the car, indicating that she did not want to get blood on it. She told Captain Barlow and Sergeant Hall to return to their vehicles. At some point, she turned up the radio and refused to look at the officers. She blessed herself with the Sign of the Cross and closed her eyes. At this point, the gun was not in her mouth. Captain Barlow felt that she was about to shoot herself and, with her eyes closed and the gun not at her face, it was the last and best opportunity for the police to try to save her life. Therefore, he signaled to Lieutenant McGregor to initiate the extraction plan.

The two, two-man teams approached the vehicle from either side. Sergeant Rush threw his flashbang device and it exploded in front of Ms. Ferreira's driver's side front wheel. Lieutenant McGregor threw his flashbang toward the right front passenger window. However, this flashbang device did not break the window and exploded to the right of Ms. Ferreira's car.

Officer Feeney ran to the driver's side window and swung at the window with a Halogan tool. His first strike did not break the window but his second strike did. He reached in, thinking at first to open the door but soon determined that it was best to get Ms. Ferreira's head away from the gun because she was then placing it to her mouth. Unfortunately, as he got his hands to the back of her head, Ms. Ferreira pulled the trigger and Officer Feeney was thrown to the ground. He immediately got up and reached into the car and took the handgun which was still in her hand and on her lap. Ms. Ferreira, however, unfortunately, was bleeding heavily from a head wound.

Ms. Ferreira was subsequently pronounced dead at the scene by the Rescue Unit.

It should be noted that a neighbor was filming the scene at an angle nearly perpendicular to the passenger side of the vehicle. Although defendants have an expert witness who will testify that the final moments on the tape are not captured accurately because the video copies were somehow placed in slow motion with some frames missing, the video nonetheless presents an overall good recording of the scene.

## III. Standard of Review

Under the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* In reviewing a motion, the

Court must view the evidence in the light most favorable to the nonmoving party. *Morrissey v. Boston Five Cents Savings Bank, F.S.B., 54 F.3d 27, 31 (1st Cir. 1995).* However, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleadings, but . . . must set forth the specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).* "A fact is 'material' if it potentially could affect the suit's outcome. An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Cortes-Iriszarry v. Corporacion Insular DeSeguros, 111 F.3d 184, 187 (1st Cir. 1997) (citations omitted).*

Accordingly, the purpose of summary judgment is to permit the court "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required" on the claims being examined. *Wynne v. Tufts Univ. School of Medicine, 976 F.2d 791, 793-94 (1st Cir. 1992) cert. denied 113 S.Ct. 1845 (1993).* The mandates of Rule 56(c) requires entry of summary judgment "upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).* "The test is whether or not, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Wilson v. Moreau, 440 F. Supp. 2d 81, 91 (D.R.I. 2006) citing DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).*

## IV. MEMORANDUM OF LAW

### A. As a Matter of Law, Summary Judgment Should Enter on the Constitutional Claims regarding the Death of Patricia Ferreira.

In Counts II, III and IV of Complaint, C.A. No. 05-75S, plaintiff seeks to maintain a claim on behalf of Patricia Ferreira under *§ 1983* and R.I. Constitution for her "unlawful seizure" and the alleged deprivation of her due process rights. Title 42, section 1983 provides a civil remedy for the deprivation of constitutional rights by anyone acting under the color of law. In Count II and IV, plaintiff specifically claims that his sister was "seized" in violation of her Fourth and Fourteenth Amendment rights by the conduct of the police officers in blockading her car on Brightridge Avenue. In Count III, plaintiff argues that the defendants deprived plaintiff of her right to life in violation of her due process rights. In the first instance, it is noteworthy that, "[w]ith minor exceptions not applicable here, Art. 1, § 6 of the Rhode Island Constitution is co-extensive with the Fourth Amendment of the United States Constitution." *Brousseau by & through Brousseau v. Town of Westerly by & through Perri, 11 F. Supp. 2d 177, 183 (D.R.I. 1998) citing Duquette v. Godbout, 471 A.2d 1359, 1361 (R.I. 1984).* The same holds true for alleged violation of Rhode Island's constitutional right to "due process" under Article I, § 2 of R.I. Constitution. *Jones v. Rhode Island, 724 F.Supp. 25 (D.R.I. 1989)(due process clause to Rhode Island constitution "clearly was to parallel the language of the U.S. Const., amend. 14.").* Thus, because the protections afforded under R.I. Constitution and the U.S. Constitution are coterminous, the analysis under both constitutions are the same. *Id; State v. Davis, 105 R.I. 247, 252, 251 A.2d 394, 397 (1969).*

### *1. The Defendants' Actions Did Not Amount To an Unlawful Seizure of Decedent.*

Plaintiff first seeks to recover for the alleged deprivation of her right to be free from unlawful seizure based, according to the Complaint, on the defendants surrounding decedent's vehicle. While the Fourth Amendment does grant citizens the right to be free from seizure, the protection of the Fourth Amendment does "not ... guarantee against all . . . seizures, but only against unreasonable . . . seizures." *U.S. v. Sharpe, 470 U.S. 675, 682 (1985).* At one time, "Fourth Amendment seizures of the person were analyzed in terms of arrest, and reasonable only if supported by probable cause." *United States v. King, 990 F.2d 1552, 1556 (10th Cir. 1993)*. However, since the Supreme Court's pronouncement in *Terry v. Ohio, 392 U.S. 1, 20 (1967)*, Court have continually recognized other forms of limited seizure that require less than probable cause to satisfy Fourth Amendment guarantees. One such has been identified as a seizure in furtherance of police officer's "community caretaking" obligations.

Under well-settled case law, even absent criminal activity, police officers are not only "permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *King, 990 F.2d at 1560 quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973).* "In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Id See also Ahern v. O'Donnell, 109 F.3d 809, 817 (1st Cir. 1997) (Police officers have probable cause to "seize" or detain an individual when circumstances warranting a reasonable belief that the person to be seized threatening serious harm to himself or others.).*

"Whether the seizure of a person by a police officer acting in his or her non-investigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference." *United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993) citing Brignoni-Ponce, 422 U.S. at 878; Terry, 392 U.S. at 21.* The Fifth Circuit has even gone as far as opining that, "[a]fter learning . . . that [the plaintiff] had a gun and was threatening suicide, 'it would have been poor police work indeed'" for the police not to have detained the plaintiff and search him for a weapon. *United States v. Wallace, 889 F.2d 580, 582 (5th Cir. 1989) (police "were entitled, if not obliged, to search his outer clothing for weapons").*

Defendants submit that the instant case is analogous and the interest in the officers' exercising their caretaking functions could not be more paramount. It is undisputed that plaintiff, Anthony Ferreira, called 911 seeking assistance and indicating that his sister had a weapon and threatened suicide. It is further undisputed that when the officers arrived at Mr. Ferreira's residence, Ms. Ferreira was in fact sitting in her car with a gun and refused to get out or turn over the weapon. In his Complaint, plaintiff specifically alleges that even after repeated directions to "put the gun down" and get out of the car, decedent remained in the vehicle. In fact, during this time frame, Ms. Ferreira placed the muzzle of the gun in her mouth on several occasions. Under these circumstances, it cannot be argued that the police should have simply allowed her to drive off. Quite simply, the officers were confronted with a young woman who not only had threatened suicide but who was sitting with a gun in her mouth.

In applying the balancing test of weighing "the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in

being free from arbitrary government interference," the defendants submit that the only possible conclusion is that they acted reasonably in stopping decedent's vehicle and detaining her. *King, 990 F.2d at 1560.* In fact, in the words of the Fifth Circuit, it would have been "poor police work indeed" if they allowed decedent to leave knowing that she had a gun that she had placed in her mouth and threatened to commit suicide.

Thus, as a matter of law, the defendants' actions do not amount to a violation of decedent's right to be free from unlawful seizure and summary judgment should enter in favor of the defendants on Counts II and IV of Complaint, C.A. No. 05-75S.

### *2. There Is No Basis for the Claim that Defendants' Actions Amount to a Deprivation of Decedent's Due Process Right.*

In Count III of Complaint 05-73S, plaintiff further seeks to recover pursuant to *§ 1983* for the alleged deprivation of life without due process of law. In addressing this claim, it must first be recognized that the Constitution, in particular the due process clause, "limits the actions the states can take rather than mandating specified obligations." *Bradberry v. Pinellas County, 789 F.2d 1513, 1517-1518 (11th Cir. 1986) citing generally, Harris v. McRae, 448 U.S. 297, 318 (1980).* Thus, "[t]he Constitution, as opposed to local tort law, does not prohibit grossly negligent rescue attempts nor even the grossly negligent training of state officers." *Id.* Rather, it prohibits the governmental actors *themselves* from depriving an individual of life, liberty, or property without due process of law.

Accordingly, because the Due Process Clause acts as a check on the government, not on actions by private individuals, Courts have routinely held that the due process clause does not require the government to protect citizens against the violence of private individuals, even themselves. *DeShaney v. Winnebago Co. Dep't of Social Serv., 489 U.S. 189, 197 (1989). Bradberry, 789 F.2d at 1518.* In fact, the First Circuit recently held that "[t]he Supreme Court

has said that only in very rare situations will the state's failure to protect someone amount to a constitutional violation, even if the state's conduct is grossly negligent. The Court has cautioned that "the doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." *Rivera v. Rhode Island, 402 F.3d 27, 30-31 (1st Cir. 2005) quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).* The Eleventh Circuit summarized the limited reach of the due process clause by noting that—

> [a]lthough the state might be prohibited by the Due Process Clause from actively taking the life of a citizen through grossly negligent behavior, we do not believe that due process is implicated when the state fails to help someone already in danger. To hold otherwise, we would have to read into the Constitution the tort law principle that a rescue, once begun, must be carried out with due care. We decline to take such an extreme step. *Bradberry, 789 F.2d at 1517-1518.*

That having been said, the Courts have recognized two (2) exceptions from this general principle -- the "special relationship" and the state-created danger exceptions. The special relationship exception is a very limited exception that recognizes "an affirmative, constitutional duty to protect . . . when the state 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs.'" *Id. at 34. See DeShaney, 489 U.S. at 201-02; Hasenfus v. LaJeunesse, 175 F.3d 68, (1st Cir. 1999); Souza v. Pina, 53 F.3d 423, 426 (1st Cir. 1995); Sanford v. Stiles, 456 F.3d 298, 304 n. 4 (3rd Cir. 2006)* . "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* Thus, the First Circuit has recognized that this relationship, and thus a constitutional duty, may exist when the individual is incarcerated or is involuntarily committed to the custody of the state. *See Monahan v. Dorchester Counseling Ctr., Inc., 961 F.2d 987, 991-92 (1st Cir. 1992).*

The second exception to the *DeShaney* holding, the state-created danger exception, is

implicated when the state actors create the danger at issue or make the plaintiff more vulnerable to the dangers than they would have been had the officials not acted at all. *DeShaney, 489 U.S. at 201; See also Wells v. Walker, 852 F.2d 368, 370 (8th Cir. 1988) (no constitutional deprivation unless the state "affirmatively places [plaintiff] in a position of danger the [plaintiff] would not otherwise have been in").* As most recently noted by the First Circuit, the "state-created danger" exception to the *DeShaney* holding is available only where "[a] government employee, in the rare and exceptional case, affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance." *Frances-Colon v. Ramirez, 107 F.3d 62, 64 (1st Cir. 1997) citing Dwares v. City of New York, 985 F.2d 94, 96 (2d Cir. 1993) (due process implicated where complaint under § 1983 alleged that police assured skin-heads that they could attack protestors with impunity, thereby affirmatively increasing threat of harm to protestors) and Ross v. U.S., 910 F.2d 1422, 1429-34 (7th Cir. 1990) (due process interest in life implicated where county officials prevented city officials from rescuing drowning boy, thereby affirmatively restricting source of aid).* However, as the First Circuit caution in *Soto v. Flores, 103 F.3d 1056, 1064 (1st Cir. 1997)* and again in *Rivera*: "in a state creation of risk situation, where the ultimate harm is caused by a third party, 'courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action.'" *Rivera, 402 F.3d at 36 quoting Soto, 103 F.3d at 1064.*

In the area of failed suicide rescue attempts, the Tenth Circuit in *Christiansen v. City of Tulsa, 332 F.3d 1270, 1281 (10th Cir. 2003)* rejected the position that the police could be held liable for due process violation under either the special relationship or the state-created danger exception. In that case, the police received a call by the decedent's wife reporting that decedent had a gun and was threatening to kill himself and his wife. The wife escaped the apartment with

her infant child. When the police arrived, they evacuated the neighboring apartments and began talking to decedent. The police refused to allow the decedent's psychiatrist or family access to him or to grant his request for cigarettes. The officers, however, continually asked decedent to give up his weapons in exchange for the cigarettes and to come out and speak to them. The Court first rejected the family's claim that the officers had created a special relationship by quarantining decedent in the apartment. The Court specifically noted that the officers affirmatively encouraged the decedent to leave his apartment and thus did not restrain him from protecting himself. *Id. at 1280.* The Court also rejected the claim that officers were liable under the "state created danger" exception to *DeShaney*. The Court recognized that "the "danger" in question—[decedent's] exposure to a suicide attempt—existed prior to defendants' intervention. Thus, defendants cannot be liable under § 1983 for having "created [decedent's] predicament." *Id.* *See also Sanford v. Stiles, 456 F.3d 298, 304 n. 4 (3rd Cir. 2006) (holding that a school guidance counselor was not liable to suicide victim under either the special relationship or state created danger exception).*

Defendants submit that the instant case similarly fails to support a finding either that there was a special relationship between the decedent and the officers or that the officers created or enhanced the danger to Patricia. In the first instance, far from having control over Patricia's actions such to render her unable to care for herself and thus amount to a "special relationship", the officers had no control over her actions in the car. "Despite police officers' ability to surround a suicidal person physically, they cannot control him or her." *Adams v. City of Fremont, 68 Cal. App. 4th 243, 278 (CA, 1st Appellate Dist., 1998). Cf. People of the State of New York v. Spina, 713 N.Y.S.2d 394 (2000) (court held that defendant standing at the brink of Niagara Falls and threatening suicide with police around him was not in custody for purposes of*

*Miranda).* The officers' actions were geared towards gaining such control by convincing her to exit the car and give up her gun so that she could not hurt herself. *Id. at 1280 (officers affirmatively encouraging the decedent to leave his apartment negated conclusion that a "special relationship" existed).* In addition, as in *Christiansen*, rather than defendants creating the danger to Patricia, the "danger"—[her] exposure to a suicide attempt—existed prior to defendants' intervention." *Id.* Defendants thus submit in the first instance that summary judgment should enter on plaintiffs' due process claims because the undisputed facts do not fall within either the special relationship or "state-created danger" exceptions.

Of course, even if plaintiff is able to demonstrate a special relationship or that the defendants played a role in the creation of the danger, under the state-created danger theory, "there is a further and onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions must shock the conscience of the court." *Rivera, 402 F.3d 27, 35-36 citing Hasenfus, 175 F.3d at 73 (In a state created danger case, state behavior must be "conscience-shocking or outrageous"); see also Coyne v. Cronin, 386 F.3d 280, 287-288 (1st Cir. 2004) (using "shocks the conscience" as a catch-all term encompassing a range of state actor behavior); Soto, 103 F.3d at 1064 ("Not every negligent, or even willfully reckless, state action that renders a person more vulnerable to danger 'takes on the added character of [a] violation[] of the federal Constitution.'").* In order to meet this standard, "[t]he state action must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* "The Due Process clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property." *Daniels v. Williams, 474 U.S. 327, 328 (1986).* Nor is

the Due Process clause "a guarantee against incorrect or ill-advised [government] decisions,'" *Christiansen, 332 F.3d at 1282 (family challenged police officer's decision to quarantine suicidal individual in his apartment, including their instruction to psychologist not to contact him)*.

In the instant case, defendants submit that even if plaintiffs meet their burden of demonstrating either a special relationship or a state created danger, the defendants' conduct did not "demonstrate a degree of outrageousness . . . that is truly conscience shocking." Rather, while plaintiffs challenge the wisdom of the method used to attempt to save Ms. Ferreira, the officers use of a divisionary devise to distract Ms. Ferreira, break the window and grab her gun is not "truly conscience shocking." *Id.* Consequently, there is no basis to support plaintiff's *§ 1983* claim for the alleged deprivation of decedent's due process rights and summary judgment on Count III of Complaint, C.A. No. 05-75S should enter in favor of defendants.

***3. Defendants Are Nevertheless Entitled to Qualified Immunity from the Instant Suit.***

Defendants further submit that they are nevertheless entitled to qualified immunity from plaintiff's constitutional claims. It is well-settled that "[q]ualified immunity may exist even though in hindsight a court might determine that the action of the official violated the constitution." *Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) citing Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982); Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002) citing Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999) (applying qualified immunity to state law claims ).* Thus, even if it should ultimately be determined that decedent's constitutional right has been violated, the defendants are relieved from liability by the doctrine of qualified immunity.

The doctrine of qualified immunity emanates from the Supreme Court's pronouncements in _Harlow_ where the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." _Harlow,_ *457 U.S. at 818.* The purpose behind granting officials such immunity is to allow them to perform their duties and act in areas where clearly established rights are not implicated "with independence and without fear of consequence." _Id._ *at 819.* Officials, therefore, enjoy "an immunity from suit rather than a mere defense to liability [which] . . . is effectively lost if a case is erroneously permitted to go to trial." _Mitchell v. Forsyth_, *472 U.S. 511, 526 (1985).* "In the end, the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was "apparent" when undertaken." _Limone v. Condon,_ *372 F.3d 39, 44 (1st Cir. 2004).*

The First Circuit has prescribed the following "three-step algorithm" for determining if a party is entitled to qualified immunity:

> [C]onsider (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right. _Id._

As more fully outlined above, plaintiff does not move beyond the first step of the algorithm because, even accepting the allegations as true, the defendants' actions do not amount to a violation of plaintiff's constitutional rights. First, applying the balancing test of weighing "the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference," the defendants submit that the only possible conclusion is that they acted reasonably in stopping

decedent's vehicle and detaining her and thus cannot be found to have seized her in violation of her constitutional rights. King, *990 F.2d at 1560.* In addition, the facts do not support a finding that defendants had a special relationship with decedent or created the danger that led to her suicide. Accordingly, there is no basis to support plaintiff's claim for the deprivation of decedent's due process rights. Thus, because there is no basis to find that decedent suffered a constitutional deprivation, the defendants are entitled to qualified immunity.

Defendants submit that even if defendants' actions, if proven true, could be found to give rise to a constitutional deprivation, they are nevertheless entitled to qualified immunity because the rights claimed by plaintiff were not clearly established as a matter of law. *Smith v. Town of E. Haven, 2005 U.S. Dist. LEXIS 4544 (D. Conn. 2005)("because the undisputed facts show that [plaintiff] did not have a clearly established constitutional right to protection from private violence, the Individual Defendants are entitled to qualified immunity").* This is more fully briefed above.

Finally, even if the Court were to reach the third step of the algorithm, qualified immunity would still protect the officers from the instant suit. The third step involves applying a good faith test that allows questions of qualified immunity to be decided as a matter of law in appropriate cases. *Malachowski v. City of Keene, 787 F.2d 704, 714 (1st Cir. 1986).* This test requires viewing the official's actions from an objectively reasonable standpoint. The decisive question becomes whether another police officer, standing in the shoes of these defendants, would have concluded that their actions violated a clearly established statutory or constitutional right. *See Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992)*. A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." *Cookish v. Powell, 945 F.2d 441, 443 (1st Cir. 1991)*. The First Circuit has

observed that the "qualified immunity standard 'gives ample room for mistaken judgments' by protecting' all but the plainly incompetent or those who knowingly violate the law.'" Rivera v. Murphy, *979 F.2d 259, 263 (1st Cir. 1992) quoting* Hunter v. Bryant, *502 U.S. 224, 229 (1991)*.

In the instant case, defendants submit that it can hardly be said that a reasonable officer standing in these officers' shoes would believe that their actions violated decedent's clearly established constitutional rights. Consequently, even if it could be found that plaintiff's constitutional rights have been violated, defendants are nevertheless entitled to qualified immunity from the instant claims and summary judgment should accordingly be granted.

**C. The State Law Negligence Claim for the Death of Ms. Ferreira.**

In Count I of plaintiff's Complaint, C.A. No. 05-73S, plaintiff seeks to maintain a claim for wrongful death under Rhode Island's Wrongful Death Statute, *R.I.G.L. § 10-7-1 et. seq*. Although plaintiff's Complaint only alleges facts from decedent's barricade in her car to support her wrongful death action, through deposition questions and plaintiffs' Pretrial Memorandum, it has become apparent that plaintiff is also attempting to rely on the officers' alleged negligence in not confiscating decedent's weapons when responding to the domestic call before the suicide attempt. To the extent such a claim is permitted,[2] defendants will address each.

***1. The Domestic Call.***

In the first instance, in order to succeed on a claim for negligence emanating from the officers' alleged negligence in failing to confiscate Ms. Ferriera's weapons, plaintiff must first demonstrate that defendants breached a duty of care owed to decedent. However, in addition to

[2] Defendants would submit that, as more fully outlined in defendants' Motion in Limine, there are two (2) basis for excluding testimony and claims surrounding the officers' response to the domestic call. First, plaintiff does not raise such allegations in his Complaint. Second, a reasonable juror could not conclude that that the failure to confiscate the weapons led decedent to the "uncontrollable impulse", as required under Rhode Island law, to commit suicide. Defendants have filed a separate Motion in Limine seeking to exclude such testimony based on these two (2) grounds and thus defendants rely upon this Memorandum to supplement the instant Motion.

the fact that plaintiff will not be able to show a special duty or egregious conduct such to overcome the public duty doctrine (see below), plaintiff cannot demonstrate the breach of any duty. In particular, it is noteworthy that at the time the officers were allegedly negligent in failing to take the weapons, there was no law or legal basis permitting the police officers to confiscate legally registered weapons. Rather, clear Fourth Amendment protections actually prohibited the police from confiscating weapons absent probable cause that a crime has been or is about to be committed. In the instant case, there is no dispute that decedent lawfully possessed the weapons. At the scene of the domestic dispute, therefore, there was no constitutional basis to seize the weapons. Moreover, even if there were a legal basis for the officers to confiscate the weapons, "[p]olice officers have the authority, but not the "duty" to enforce the law." *Adams v. City of Fremont, 68 Cal. App. 4th 243, 273 n 25 (CA, 1st Appellate Dist., 1998)*.

In their Pretrial Memorandum, rather than rely on constitutional authorization to support the seizure, plaintiffs attempt to rely on the East Providence Police Procedures, in particular General Order 2000-43, section 330.06, as well as R.I.G.L. § 40.1-5-7[3] to support the position that officers should have/could have confiscated Patricia's weapons during the domestic call. *The Suicidal/Mentally Ill Persons policy is attached hereto as Exhibit A*. Defendants submit that as the undisputed facts reflect, as well as a matter of law, neither section trumps the constitutional guarantees such to have created a duty for the officers to confiscate Ms. Ferreira' weapons.

Section 1.3(B)(4) of the East Providence Policy specifically referenced by plaintiff states as follows:

---

[3] As an initial matter, it is noteworthy that this claim based on *R.I.GL. § 40.1-5-*7 was first raised in Mr. Grossi's February 19, 2007 expert report. It is not contained in the Complaint and likewise was not addressed during the discovery phase. In fact, the alleged wrongdoing cited in the Complaint happens after the initial police contact at the home when, presumably, the statute should have been invoked by the police.

> It is a priority for an officer to ascertain if the individual either possesses or otherwise has access to weapons when the officer has determined that the individual is mentally ill, in crisis, or is suicidal.

Section 40.1-5-7 of R.I. General Laws, entitled "Emergency certification," states, in pertinent part, that—

> Any physician, who after examining a person, has reason to believe that the person is in need of immediate care and treatment, and is one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, may apply at a facility for the emergency certification of the person thereto…. **In the event that no physician is available, a qualified mental health professional or police officer who believes the person to be in need of immediate care and treatment, and on whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, may make the application for emergency certification to a facility.** *R.I.G.L. § 40.1-5-7(a)(1) (emphasis added).*

However, as more fully outlined in Defendants' Motion in Limine (which defendants hereby incorporate by reference in support of the instant motion), neither of these provisions is relevant to the instant case. In particular, the Police Department's Policy section is entitled, **"**Suicidal/Mentally Ill Persons.**"** The specific section cited by plaintiffs' expert is section 1.4(d)(3)[4] of General Order 2000-43, section 330.06, which is entitled "Response to a Threat of Suicide." The stated purpose of the policy is "to establish procedures for officers to follow when responding to calls for service regarding suicidal/mentally ill persons." *General Order 2000-43, section 330.06, Section 1.1*. The General Laws, likewise, requires the officer to make the determination that the individual is "in need of immediate care and treatment" because they are in "imminent likelihood of serious harm by reason of mental disability." *R.I.G.L. § 40.1-5-7(a)(1).* Presumptively, plaintiffs are claiming that the statute should have been invoked by the officers at the scene of the domestic call because Ms. Ferreira was an imminent threat to herself.

[4] The expert's report actually cites to "section 1.5(d)(3)". However, there is no such section and the quotation in the report parallels section 1.4(d)(3).

The first problem with plaintiff's reliance on this policy and statute is that at the time the officers were allegedly to have employed this provision and confiscated Ms. Ferreira's weapons, the officers were responding to a domestic call, not to a call of a suicidal/mentally ill person. In this case, there is no dispute that decedent did not threaten suicide while at Mr. Sousa's house. Rather, the threat of suicide came after she had left the residence and met with her brother in front of his house. The section therefore, even if it does require the officers to confiscate weapons, does not apply to the instant case.

In addition, the key phrase in *R.I.G.L. § 40.1-5-7* is "may make". The statute does <u>not</u> require, that is, does not impose a duty on a police officer to make an application for emergency certification to a facility. It gives them the option to make such an application if the facts in their possession warrant the conclusion that the individual possesses an imminent risk to themselves or others. The reason for making it optional is obvious; if it were mandatory, physicians, mental health professionals, and police officers would automatically make application for fear of future liability.

It is further noteworthy that under § 40.1-5-7(b), a police officer is required to submit an application in writing which "shall state that it is based upon a personal observation of the prospective patient by the applicant within the five (5) day period." In this case, other than being upset over yet another breakup with her boyfriend, there were no "personal observations" made by the officers to support an application for emergency certification to a facility. The officers who arrived at the scene specifically testified that they were very familiar with John Sousa and Patricia Ferreira and their rocky history. *Statements of Officer Steven Tiernan, (Exhibit B) and Officer Michael David (Exhibit C).* The officers testified that this incident was in concert with the string of verbal arguments that the couple had engaged in over the years. As with the

couple's past confrontations, on this particular day, there was no sign of a physical struggle. The furniture was not in disarray. The participants did not appear to be crying or have any injuries. In fact, both Ms. Ferreira and Mr. Sousa, in separate conversations with the officers, stated that there had been no physical altercation but that they had verbally argued. Id. The officers therefore did not personally observe anything which would support an application under *§ 40.1-5-7.*

It is most telling that plaintiff's own proposed psychological expert, Dr. Price, does not suggest that the facts immediately available to the officers during the domestic call support the conclusion that Ms. Ferreira posed "imminent harm" to herself or others. *Dr. Price February 28, 2007 Report, Exhibit D.* Rather, Dr. Price, relying upon information not available to the officers at the time of the domestic call, merely concludes that Ms. Ferreira was "in crisis."[5] Being "in crisis" however, is insufficient under either the East Providence Policy or the General Laws without further basis to believe that the individual was likewise suicidal or posed an imminent threat to themselves.

Thus, the police officers did not owe a duty to "deliver" Ms. Ferreira to an appropriate facility or to confiscate her weapons. Plaintiff cannot satisfy the first element to prove the underlying negligence claim.

As with all of plaintiff's claims, in the final analysis, as more fully outlined in defendants' Motion in Limine and below, there is no causal relationship between the officers alleged negligence and plaintiff's injuries. As more fully briefed below, under Rhode Island law, in order to be held liable the defendants' alleged negligent act of failing to seize the weapons, plaintiff must prove that the action brought about decedent's uncontrollable impulse to commit

[5] Dr. Price fails to define what it means to be "in crisis."

suicide. Cases of uncontrollable impulse typically "involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusations, false arrest or torture." Logarta v. Gustafson, *998 F. Supp. 998, 1005 (D. Wis 1998) (citations omitted)*.

In the instant case, there is no allegation that the police officers failing to seize the weapons inflicted physical injury on Ms. Ferreira that led to an uncontrollable impulse. There are likewise no allegations that the police officers intentionally inflicted mental or emotional injury through wrongful accusation, false arrest or torture upon Ms. Ferreira when they did not confiscate her weapons. Accordingly, no reasonable jury could find that the police officers standing by as Ms. Ferreira left the home with her handguns brought about an uncontrollable impulse, delirium or insanity in Ms. Ferreira such to result in their liability for her suicide. Summary judgment on plaintiff's claim, as contained in his Pretrial Memorandum, that the officers were negligent in the failure to seize the weapons, should accordingly enter.

***2. The Suicide Incident.***

Plaintiff also alleges the officers are liable for the wrongful death of Patricia because they were negligent at the scene of her suicide thus causing her death. The plaintiff complains through his expert that the police were negligent at the scene of the suicide for a number of reasons. First, it is alleged that Sergeant Hall and Captain Barlow did not have any formal training as police negotiators or psychologists. Second, plaintiffs allege that the police should have called a trained psychologist or crisis intervention counselor to the scene. Finally, plaintiffs attack the tactical plan involving the use of diversionary devises, as being improper.

Of course, as with any wrongful death claim, plaintiff must establish that the defendants were negligent. To prevail on a claim of negligence under Rhode Island law, "a plaintiff must

establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." *Selwyn v. Ward, 879 A.2d 882, 886 (R.I. 2005) quoting Mills v. State Sales, Inc., 824 A.2d 461, 467-68 (R.I. 2003)*. Plaintiff's Complaint proceeds on the presumption that defendants owed decedent a duty of care. Defendants submit that they did not.

In *Adams v. City of Fremont, 68 Cal. App.4th 243, 80 Cal. Rptr. 2d 196 (CA. 1st Appellate Dist., 1998),* a wrongful death claim was brought against the city and police officer in relation to the defendants handling of the decedent's threatened suicide. After analyzing the requisite elements necessary to find a duty of care under California law, as well as the underlying policy elements, the *Adams* Court held that law enforcement officers responding to a crisis involving a person threatening suicide with a loaded firearm had no legal duty that would have exposed them to liability if their conduct failed to prevent the suicide from happening. *Id. at 276. See also Munoz v. City of Union City, 120 Cal. App. 4th 1077 (CA, 2d Div. 2004).*

The factors analyzed by the *Adams* and *Munoz* Courts include:

> (1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability." *Adams, 68 Cal. App.4th at 268; Munoz, 120 Cal. App. 4th at 1094.*

Although *Adams* found that all of the factors weighed in favor of finding that there was no duty, the Court took specific note of the fourth factor, that is the policy of preventing future harm, extent of burden to appellants and the consequences to the community. In addressing this element, the Court first noted that "police officers providing assistance at the scene of a threatened suicide must concern themselves with more than simply the safety of the suicidal

person. Protection of the physical safety of the police officers and other third parties is paramount." *Id. at 271.* The Court thus concluded that imposing liability for the "negligent handling of a threatened suicide improperly elevates the interest in preserving the life of the person threatening suicide over the interests of public safety and the physical safety of the police officers." *Id. at 272.*

The Court further noted that such liability would also have the effect of making officers more tentative in their response to a suicide crisis and could inhibit them from providing intervention at all thus resulting in the loss of "an important resource in dealing with threatened suicides." *Id. at 272-73.* The Court refused to "impose a duty that requires police officers to choose between refusing to offer assistance at the scene of a threatened suicide or assuming full responsibility for the suicidal individual's welfare. This choice discourages police officers from rendering assistance in these inherently unpredictable situations in which even highly trained mental health professionals cannot guarantee success." *Id. at 273.*

Under Rhode Island law, although "no clear-cut rule exists to determine whether a duty is in fact present in a particular case," the court has specifically adopted the same factors utilized by the California Courts in making a determination of whether such a duty exists under Rhode Island law. *Banks v. Bowen's Landing Corp., 522 A.2d 1222, 1225 (R.I. 1987) citing Thompson v. County of Alameda, 27 Cal.3d 741, 750, 614 P.2d 728, 732-33, 167 Cal.Rptr. 70, 74-75 (1980).* In particular:

> In considering whether a duty exists, among the factors considered are (1) the forseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of [the] connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach. *Carroll v. Yeaw, 850 A.2d 90, 93 (R.I. 2004) quoting Banks v. Bowen's Wharf, 522 A.2d 1222, 1225 (R.I. 1987).*

Defendants thus submit that in light of the Rhode Island Supreme Court's adoption of California's standard, the analysis employed by the *Adams* Court is likewise the same under Rhode Island law. In particular, and, as found by *Adams* and *Munoz*, on balance "the relevant public policy considerations militate against imposing a legal duty on police officers." In addition to elevating the interest of the suicide victim over that of the officers and third parties present, imposing such a duty would likely be detrimental to the officers assisting the suicide victim because such threat of liability could inhibit them from providing intervention at all. Defendant thus submit that similar to the *Adams* and *Munoz* holdings, under Rhode Island law, police officers responding to a crisis involving a person threatening suicide with a loaded firearm had no legal duty that would expose them to liability.

Defendants would alternatively submit that to the extent any duty of care can be found at all that duty is premised on the defendants' duty to the public as a whole. As such, any claim of negligence based on the breach of this public duty is subject to the public duty doctrine. The public duty doctrine recognizes that the duty owed by governmental officials in the performance of their jobs is a duty to the public at large. *Orzechowski v. State, 485 A.2d 545, 549 (R.I. 1984)*. It embodies the recognition that certain governmental activities engaged in by employees and officers "must be free from the threat of potential litigation." *Barratt v. Burlingham, 412 A.2d 1219, 1220 (R.I. 1985)*. This doctrine reflects the General Assembly's intent not "to impose liability upon the state for any and all acts or omissions of its employees and officers which might cause injury to persons." *Calhoun v. City of Providence, 120 R.I. 619, 625, 390 A.2d 350, 353 (1978)*. Rather, as recently identified by the Rhode Island Supreme Court, the governmental entity is liable for injuries to individuals only: "(1) when the governmental entity owes a 'special duty' to the plaintiff, (2) when the alleged act or omission on the part of the governmental entity

was egregious, or (3) when the governmental entity engaged in activities normally undertaken by private individuals or corporations." Schultz v. Foster-Glocester Reg'l Sch. Dist., *755 A.2d 153, 155 (R.I. 2000) (citations omitted).*

The defendants submit that facts of the instant case fail to support any of the exceptions to the public duty doctrine. Of course, there can be no dispute that the officers, in responding to a report of a suicide attempt by a person with a loaded weapon, were engaged in activities not normally undertaken by private individuals or corporations. Rather, they were clearly exercising their police functions. *Cf.* Martinelli v. Hopkins, *787 A.2d 1158, 1167 (R.I. 2001)*. Defendants submit that there is likewise little to no support to find that defendants actions fell under either the egregious conduct or special duty exception.

In attempting to overcome the immunity afforded to a governmental agency under egregious conduct exception to the public duty doctrine, it is not enough for a party to simply claim that the actions of the entity were "egregious." Rather, the Rhode Island Supreme Court has outlined specific standards that must be met. More specifically, a governmental entity engages in "egregious conduct" when it "has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation." Houle v. Galloway School Lines, Inc., *643 A.2d 822, 826 (R.I.1994) quoting* Verity v. Danti, *585 A.2d 65, 67 (R.I.1991).* For the egregious conduct exception to apply, the following elements must be established:

> (1) [T]he state, in undertaking a discretionary action or in maintaining or failing to maintain the product of a discretionary action, created circumstances that forced a reasonably prudent person into a position of extreme peril;
>
> (2) the state, through its employees or agents capable of abating the danger, had actual or constructive knowledge of the perilous circumstances; and

> (3) the state, having been afforded a reasonable amount of time to eliminate the dangerous condition, failed to do so.

*Kashmanian v. Rongione, 712 A.2d 865, 868 (R.I. 1998) quoting Haley v. Town of Lincoln, 611 A.2d 845, 849 (R.I. 1992).*

Looking at each of these elements individually, it becomes clear the defendants' conduct, as a matter of law, did not rise to the level of egregious conduct. First and foremost, there is no basis to support the conclusion that the defendants "created" the circumstances that forced decedent into a position of peril. Decedent herself created the "perilous condition" by threatening suicide with a loaded gun. Moreover, as more fully developed in the Causation section of this Memorandum, there is no basis to conclude that the defendants had a reasonable basis or opportunity to eliminate the dangerous condition. Plaintiff was locked in a car with a loaded weapon on her lap, and at various times, in her mouth. The only way to eliminate the dangerous condition was to get her to give up her gun willingly. Ms. Ferreira repeatedly refused to do so. Plaintiff thus will not be able to succeed on the egregious conduct exception to the public duty doctrine.

Defendants submit that the special duty doctrine likewise fails to offer plaintiff an avenue for redress. Under Rhode Island law, the special duty exception is applicable when there is a special relationship, separate from the duty running to the general public, between the injured party and the governmental entity. As reiterated by the Rhode Island Supreme Court, this standard requires the finding that: "(1) one or more city officials had some form of prior contact with or other knowledge about [the injured] or [his] situation before the alleged negligent act * * * occurred, (2) city officials thereafter took some action directed toward [the injured] or [his] interests or failed to act in some way that was potentially injurious to [the injured's] person or property, and (3) [the] injury * * * was a reasonably foreseeable consequence of the city's action

or inaction." *Schultz, 755 A.2d at 155. See also Kuzniar v. Keach, 709 A.2d 1050, 1054 (1998) and Quality Court Condo. Assoc. v. Quality Hill Dev. Corp., 641 A.2d 746, 750 (R.I. 1994).*

In the first place, it cannot be said in this case that the officer's had prior contact with decedent such to meet the first element of a special duty. Rather, responding to a citizen's call for assistance is "basic to police work and not 'special' to a particular individual." *Adams, 68 Ca. App. 4th at 279.* Although plaintiff may claim that the department's prior contact with decedent over her ongoing struggles with past boyfriends, there is no evidence that such prior contact involved any information about decedent's suicidal intentions. Moreover, it cannot be found that even if the officers had such knowledge, they then took any action potentially injurious to decedent. Rather, their actions in effectuating the plan to obtain entry into the car and retrieve the weapon was intended to prevent such injury. Of course, it finally cannot be said that plaintiff's injury was a reasonable foreseeable consequence of their actions. In this case, it is undisputed that at the time the plan was initiated, Ms. Ferreira had the gun on her lap. In the timeframe it took the officers to initiate the plan and break the car window, Ms. Ferreira had put the gun into her mouth and pulled the trigger.

Thus, even assuming the accuracy of plaintiff's alternative theories of injury—that Ms. Ferreira was startled into squeezing the trigger or that Officer Feeney accidentally discharged the weapon—such theories are nullified by the fact that after the plan went into effect she moved the gun to her mouth.

Even if plaintiff overcomes the hurdles created by the lack of duty and the public duty doctrine, defendants submit that the evidence in any event will not support a finding that defendants breached a standard of care to decedent. In particular, plaintiff will be unable to establish a specific standard of care or set method of dealing with barricade suicide individuals

who the police perceive are moments away from killing themselves. In fact, there is no National standard in this regard and there is certainly no State standard. The reason, of course, is because each situation is different. Breaching a standard of care requires a finding that the officers acted more than unreasonable, but in obvious disregard for plaintiff's safety. In this case, defendants submit that, as a matter of law, defendants' plan of trying to approach her car, distract her with diversionary devices, breach the window of her car and grab her weapon was the most reasonable method of securing her safety and saving her life in this rapidly developing deadly situation. *Cf. Bayer v. City of Simi Valley, 43 Fed. Appx. 36, 38 (9th Cir. 2002) (It is reasonable for police, following four hours of armed standoff and failed negotiations, to use non-lethal force to extricate a subject who has shot at police and refuses to surrender).* Consequently, summary judgment on plaintiff's wrongful death claim should enter in favor of defendants.

Finally, as outlined above, in order to succeed on a negligence claim plaintiff must also demonstrate a causal relationship between the alleged negligent conduct and decedent's injury. *Selwyn, 879 A.2d at 886.* The causal relationship standard, as it relates to suicides is more fully outlined below. Defendants submit that as a matter of law, plaintiff will fail to meet this standard and thus summary judgment in favor of defendants should enter.

**D. Failure To Train and/or Supervise**

Although plaintiff does not specifically state a cause of action for failure to train and/or supervise, in the body of her Complaint, plaintiff alleges that the City and Chief Dias specifically failed to adequately train or supervise the police officers "relative to proper police procedures, practices and/or policies, resulting in the death of the decedent." *Complaint, paragraph 36.* To the extent plaintiff will nevertheless pursue a claim for such alleged inadequate training defendants offer the instant case law. Because plaintiff does not specifically state a cause of

action for the alleged inadequate training and supervision, it is difficult to ascertain whether, if pursuing such a claim, he will seek to rely upon a state law or federal constitutional law claim. However, in plaintiff's Pretrial Memorandum, plaintiff only provides law on a federal claim for failure to train. Defendants thus hereby move for the entry of summary judgment on plaintiff's due process claim for failure to train or supervise.[6]

The Supreme Court has imposed a high burden on parties seeking to recover against a municipality or supervisory personal for an alleged failure to train under *§ 1983*. In fact, in *City of Canton v. Harris*, the United States Supreme Court held that there are only "limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *489 U.S. 378, 387 (1989).*

Of course, in order to maintain a claim against a municipality under *§ 1983,* the plaintiff must demonstrate in the first instance that it was an unlawful, unconstitutional policy, practice or custom that lead to the constitutional deprivation. *Monell vs. City of New York Dept. of Soc. Services, 436 U.S. 658 (1978)*. In *City of Canton v. Harris 489 U.S. 378, 387 (1989),* the Supreme Court clarified the standard and held that the "policy" requirement limiting municipal liability in *§ 1983* cases under *Monell* can be satisfied in municipal "failure to train" cases only (1) where employees of a local government commit a constitutional violation (2) due to a lack of training by municipal policy makers (3) who are "deliberately indifferent" to the need for the training and 4) it was this lack of training that caused the constitutional violation.

This standard thus first requires a constitutional event, *i.e.*, an underlying constitutional violation that the failure to train causes. Bad facts or a single outrageous event is insufficient.

---

[6] To the extent plaintiff is likewise seeking to recover based on the state law claim for failure to train and/or supervise, defendants hereby incorporate by reference their Pretrial Memorandum and move for summary judgment on the state law claim as well.

Some kind of wrong of constitutional dimension must be present. *Monell, 436 U.S. at 690-91.* In the instant case, as more fully outlined above, plaintiff has failed in the first instance to demonstrate a violation of decedent's constitutional rights. Thus, plaintiff's § 1983 claim against the municipality and Chief Dias will likewise fail. *City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"); Evans v. Avery, 100 F.3d 1033, 1039-40 (1st Cir. 1996)(where individual officers did violate plaintiff's constitutional rights in the course of a high speed pursuit, the City likewise could not be held liable for the alleged failure to monitor police pursuits and through its failure to supervise police officers involved in such pursuits).*

Even if plaintiff is successful in establishing a constitutional deprivation, plaintiff must demonstrate that the defendants were deliberately indifferent in the failure to train. In *City of Canton, 489 U.S. 378, 387 (1989),* the plaintiff had alleged that due to the inadequacy of police training, the City of Canton and its officials violated plaintiff's constitutional right to receive medical attention while in police custody. *Id. at 382*. After the jury ruled in the plaintiff's favor, the city made a motion for judgment notwithstanding the verdict, claiming that a municipality can only be found liable under § 1983 where the policy in place is itself unconstitutional. In rejecting the city's narrow interpretation of § 1983, the *Canton* court established the following standard for evaluating valid policies alleged to have been unconstitutionally applied:

> The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police came into contact. . . . Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983 . . . . Only where a failure to train reflects a 'deliberate' or

> 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983. *Id. at 388-89 (emphasis added).*

Thus, for liability to stem from failure to train, the Plaintiff must show an actual policy of inadequate training, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id. at 390*. Plaintiff must also demonstrate that a municipality *deliberately* chose an inadequate training program. *Id. at 389*.

The "deliberate indifference" standard has been broken down into three elements:

> (1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation;
>
> (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and
>
> (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.

*Smith v. Town of E. Haven, 2005 U.S. Dist. LEXIS 4544 (D. Conn. 2005) citing Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003) (citations omitted).*

"Absent any showing of previous harm arising from this training policy, or any evidence of deliberation on the [defendants'] part there is no basis to support the conclusion that a municipality actually chose a policy with deliberate indifference toward the constitutional rights of individuals." *K v. City of S. Portland, 407 F. Supp. 2d 290, 297 (D. Me. 2006).*

Finally, as with all constitutional claims, plaintiff can only succeed on its failure to train claim under *§ 1983* if that failure is the cause or the "moving force" behind the underlying constitutional deprivation. *See City of Canton, 489 U.S. at 388*. A governmental entity "is only liable when it can be fairly said that the city itself is the wrongdoer." *Collins v. City of Harker*

Heights, *503 U.S. 115, 122 (U.S. 1992)*. The Supreme Court has employed an "actual causation" standard in claims against a municipality for the negligent training and supervision of government officials under *42 U.S.C. § 1983*. City of Canton, Ohio, *489 U.S. at 390*. That is, in order to maintain a *§ 1983* claim against a municipality, plaintiff must demonstrate that the claimed deficiency "actually causes injury." Id. The Supreme Court has described this burden as requiring a showing that "the identified deficiency in a city's training program . . . [is] closely related to the ultimate injury. . . Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" Id. *at 391*.

The determination of whether there is a causal link has been characterized as a legal conclusion rather than a function of objective fact. Britton v. Maloney, *901 F.Supp. 444 (D. Mass 1995)*. The Supreme Court has further tutored that in order to determine if a plaintiff has met this "rigorous standard" of causation, the Court should refer to state tort principles. Rodriguez-Cirilo v. Garcia, *C.A. No. 96-1306 (1st Cir., June 2, 1997)*; Soto v. Carrasquillo, *878 F.Supp. 324, 331 (D. Puerto Rico 1995)*. As more fully outline *infra*, the causation standard in suicide cases under Rhode Island law require a finding that the defendants' actions led to the uncontrollable impulse to commit suicide. Clift v. Narragansett Television L.P., *688 A.2d 805, 810 (R.I. 1996)*. Defendants submit that in the instant case, as a matter of law, the alleged failure to train cannot be said to be the result of the City's or Chief's deliberate indifference or that, in any event that such failure to train caused plaintiff to suffer a constitutional deprivation. Consequently, defendants move for the entry of summary judgment on plaintiffs' § 1983 claims regarding defendants' alleged failure to train and/or supervise.

**E. *Defendants Are Nevertheless Entitled to Qualified Immunity from Plaintiff's State Tort Claims.***

Defendants further submit that they are nevertheless entitled to qualified immunity from plaintiff's state tort claims, similar to the qualified immunity afforded officials under *§ 1983*. *See Hatch, 311 F.3d at 90 citing Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999).* As outlined above, qualified immunity essentially allows a good faith defense that protects officials from liability when they take an action that a reasonable officer, standing in the shoes of this officer, would not reasonably believe to be violating the rights of an individual. *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).*

Although the Rhode Island Supreme Court has never specifically afforded officials qualified immunity to protect against state law claims, it has expressed general support for such immunity. In fact, in at least three (3) cases, the Rhode Island Court noted its approval for granting officials immunity from state law claims for their good faith action. For example, in *Johnson v. Palange, 122 R.I. 361, 406 A.2d 360 (R.I. 1979)*, the plaintiffs brought a claim for false arrest and malicious prosecution against a police officer who arrested the plaintiff based upon a local ordinance which made it unlawful for an individual to "quarrel, fight and behave in a disorderly manner . . . to the annoyance and disturbance of a portion of the peaceable inhabitants of the town." *Johnson, 122 R.I. at 364, 406 A.2d at 362.* The plaintiffs maintained that this ordinance was so patently defective and unconstitutional that the officer could not reasonably have relied on it in effectuating plaintiffs' arrests. However, in upholding judgment in favor of the officer on the state law claims, this Court relied favorably on the U.S. Supreme Court's holding that an officer's good faith action based upon a presumptively valid statute

constitutes a valid defense in a damage action under *42 U.S.C. § 1983*. *Id. at 363-64 quoting Pierson v. Ray, 386 U.S. 547, 555 (1967).*

Subsequently, the R.I. Supreme Court was faced with a claim that the Governor violated bank depositors' state and federal statutory rights to privacy by releasing to the media individual account information in support of legislation seeking to provide compensation to the depositors. *Pontbriand, 699 A.2d at 856*. In *Pontbriand,* the Court first concluded that the Governor's actions were beyond the scope of his executive duties under R.I. statutes. However, despite this lack of authority, the Court found that the Governor *may* be protected from suit based upon qualified immunity similar to that afforded under *§ 1983*. In so doing, the Court noted that the federal cases affording qualified immunity for good faith actions, "though not binding on this Court in reviewing a Rhode Island statute, may be of persuasive authority." *Id. at 866.* The Court thus held that "[a]lthough not extensively discussed in our prior cases, it seems beyond doubt that the Governor *may* be entitled to *some* form of common law qualified immunity for his acts performed in good faith." *Id. at 867 (emphasis added) citing Harlow, 457 U.S. at 813-19 (adopting objective test for qualified immunity).*

Shortly thereafter, *Ensey, 727 A.2d at 690* was decided. In *Ensey*, the plaintiff was falsely accused by his girlfriend of kidnapping and rape. The State police obtained an arrest warrant and issued a press release identifying plaintiff, the charges and the facts, despite the existence of facts strongly suggesting plaintiff's innocence. Plaintiff subsequently filed suit under federal and state law. In addressing the defendants' claim to qualified immunity from the state law claims, the Supreme Court noted that it was of "the opinion that, in an appropriate case, the doctrine of qualified immunity might well be applied by this Court." *Id., at 690.* The *Ensey*

Court, however, did not need to reach the issue of qualified immunity because plaintiff had failed to name the individual officers as defendants.

As noted by the First Circuit, "*Pontbriand* and *Ensey* reflect Rhode Island's recognition of a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court in *Harlow*, *457 U.S. at 818,* cited with approval in both Rhode Island decisions, and routinely applied in § 1983 cases." *Hatch, 311 F.3d at 90.* Thus, defendants submit that it is abundantly clear that the qualified immunity defense protects the defendants from plaintiff's state law claims just as it does from plaintiff's federal constitutional claims. More precisely, without using the benefit of twenty/twenty hindsight, *Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998),* the officers' action are viewed from an objective standpoint, in light of the information available to the officers and with recognition that officers must make quick decisions in the heat of stressful situations.

In this case, viewing the undisputed evidence from the position of the officers at the scene, including the fact that Ms. Ferreira blessed herself and had taken steps to cover the seat cushion and protect the American flag, the only logical conclusion is that they acted in good faith in their attempt to save her from suicide. Even though plaintiff, using hindsight, may challenge various decisions—noticeably without demonstrating alternatives—such challenges do not negate the underlying good faith in the attempt or render the officers liable for their attempts. More precisely, an officer standing in the shoes of these defendant officers would not have believed that attempting to distract Ms. Ferreira with diversionary devices, break the window and grab the gun, violated Ms. Ferreira's rights. Accordingly, defendants submit that even if there is any basis to support plaintiff's state law claims, defendants are nevertheless entitled to qualified immunity and thus, summary judgment should enter in their favor.

### F. Plaintiff, in Any Event, Will Fail To Prove That Defendants' Actions Were the Proximate or Actual Cause of Patricia's Death.

Underscoring this entire case—both the constitutional claims and state law negligence claims—is the total lack of causal relationship between the defendants' actions and plaintiff's claimed injury. The plaintiff pulled the trigger that ended her life. While there is some reference in the plaintiff's expert report that this is a factual question, other than his inadmissible opinion in this regard, there is no factual support for the same. Goebel v. Denver & Rio Grande Western R.R. Co., *215 F.3d 1083, 1088 (10th Cir. 2000) ("it is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate").* In fact, the autopsy report specifically concludes that Patricia died from a self-inflicted gun shot wound.

It is first noteworthy that "[i]nquiries into causation in section 1983 claims should refer to state law tort principles." *Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989) citing Springer v. Seaman, 821 F.2d 871, 876-79 (1st Cir. 1987) ("inquiries into causation under § 1983 are cabined within common law tort principles") and Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305-06 (1986) (noting that common-law principles control the issuance of damages under § 1983). See also Soto v. Carrasquillo, 878 F. Supp. 324, 331 (D.P.R. 1995).* Thus, the determination of whether the defendants' actions caused plaintiff's damages under *§ 1983* would employ the same standard as that employed in determining if the defendants' alleged negligence is the proximate and actual cause of plaintiff's injuries.

Under R.I. law, it is well-settled that "no liability can attach unless defendant's negligence was proximate rather than a remote cause, of plaintiff's injury." *Mullaney v. Goldman, 398 A.2d 1133, 1136 (R.I. 1979).* Thus, in addition to establishing that defendants breached the duty of care, the plaintiff must also provide proof that defendants' breach of their

duty was the actual and proximate cause of plaintiffs' injuries. Id.; Welsh Mfg., Div. of Textron v. Pinkerton's Inc., *474 A.2d 436, 440 (R.I. 1984).*

Causation is typically established by competent proof that but for the negligence of defendant, harm to plaintiff would not have occurred. Mullaney, *398 A.2d at 1136.* However, cases in which the claimed damage is the death of the individual by suicide involve a stricter standard. The reason is that suicide, historically a felony, was deemed to be a criminal act that terminated any causal connection between a defendant's negligence and the injury. Clift, *688 A.2d at 810*. That is due in part to the fact that "[a]n act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of death that immediately ensues. Id. *(citations omitted).* However, over time, that view changed and courts "came to recognize a right of recovery in certain limited factual instances." Id. These limited instances however embrace a higher standard in order to give due credence to the independent intervening act by the suicidal person.

This higher standard, embodied in the Restatement (Second) Torts § 455 (1965) and embraced by the Rhode Island Supreme Court, recognizes liability for negligent conduct that—

> "(1) brings about delirium or insanity in another and (2) if, while that condition of delirium or insanity continue[d] to exist, it prevent[ed] the affected person from realizing the nature of his or her condition or [made] it impossible for him or her to resist the suicidal impulse by depriving that person of the capacity to reasonably control his or her conduct and not carry out the suicidal impulse." Id. *See also, Restatement (Second) Torts § 455 (1965).*

As outlined by the R.I. Supreme Court, the typical cases of uncontrollable impulse "involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusations, false arrest or torture." Id. *(citations omitted)*. The theory behind this uncontrollable impulse rule—

> is that suicide breaks the chain of causation only if it was intentional; suicide resulting from delirium or an uncontrollable impulse created by the defendant's wrongful act preserves the chain of "direct causation". The flip side is that where suicide results from "a moderately intelligent power of choice, even though the choice is determined by a disordered mind", or by a "morbid" mind "unable to tolerate the pain, inconvenience and humiliation" of its particular condition, the suicide is 'a new and independent, efficient cause of the death that immediately ensues. *Logarta, 998 F. Supp. at 1005 (citations omitted).*

Of course, because assessing the cause link between defendants' conduct and plaintiff's suicide is beyond the capacity of an average juror and would amount to speculation, plaintiff must present expert testimony in support of this causal connection. *Estate of Joshua T. v. New Hampshire, 840 A.2d 768, 772 (N.H. 2003); In the Matter of the Claim of Nancy Musa, 276 A.D.2d 851, 852, 714 NYS 2d 545, 547 (NY 2000).* Defendants submit that plaintiff's proposed expert will fail to provide such testimony. In fact, noticeably, plaintiff's expert, Dr. Price, never once mentioned the term "uncontrollable impulse" in his report. *Report of Dr. Price, Exhibit D.* According to his report, Dr. Price will not testify to a reasonable degree of medical certainty that the actions of the police (either at the domestic call or in response to Patricia's suicide threat) brought about an uncontrollable impulse to commit suicide. All Dr. Price proposes to testify is that:

1. Patricia was "in crisis" at the time of the domestic call;
2. Had Patricia been given crisis intervention services it was probable that she would not have died;
3. Had the officers taken her guns at time of domestic call it was probable that she would not have died;
4. The police conduct during the barricade situation was a "substantial contributing cause to Ms. Ferreira's death."

There is nothing in this Report discussing whether Patricia was suffering from delirium or insanity at the time of her suicide, or, more importantly, that it was defendants' actions that caused such delirium or insanity (uncontrollable impulse) that led to her suicide. Rather, Dr. Price offers alternative conclusions that "had the police removed Ms. Ferreira's handguns, it is probable that she would not have died"[7] and that the "police conduct during the barricade situation was a substantial contributing cause to Mr. Ferreira's death." Dr. Price does not propose to testify that the police, in allowing Ms. Ferreira to retain handguns, brought about an uncontrollable impulse to commit suicide. Rather, all Dr. Price offers is the conclusion that it was "probable" she wouldn't have died.

A glaring omission from Dr. Price's report are allegations that the police officers physically injured Ms. Ferreira or intentionally inflicted mental or emotional injury through wrongful accusation, false arrest or torture upon Ms. Ferreira that led to an uncontrollable impulse. *Logarta, 998 F. Supp. at 1005 (citations omitted).* Dr. Price's conclusions, as a matter of law, are not sufficient to support the causation standard required to hold defendants' liable for plaintiff's suicide. *See Christiansen, 332 F.3d at 1283 (The psychiatrist's "statements regarding what might have happened had he been allowed to intervene are pure speculation").*

In *Logarta*, the court found that plaintiff had failed to prove an uncontrollable impulse because—

> [t]here are no allegations that [defendants] conduct or actions * * * inflicted upon Ronald severe physical injury, or the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture. There are no allegations that Ronald succumbed to an uncontrollable impulse, or a frenzy or delirium, which deprived him of his ability to recognize the nature and likely result of his actions. To the contrary,

[7] In fact, Dr. Price appears to intimate that he cannot state to a reasonable degree of medical certainty that Patricia died as a result of an uncontrollable impulse to commit suicide that was caused by defendants because he cannot even state that she died from a suicide. If Dr. Price cannot affirmatively state that Patricia did or did not die as a result of suicide or if it was by accident, he clearly cannot offer an opinion as to whether the defendants' actions created the uncontrollable impulse to commit suicide.

> the complaint portrays a young man who calmly asked for a gun, proceeded to make his suicidal intentions known, selected a location, and then carried those intentions out to their tragic end after being reminded to "think about" what he was doing. There is simply nothing in the complaint from which the Court could conclude that the suicide resulted from anything other than "a moderately intelligent power of choice". *Logarta, 998 F. Supp. at 1005-1006.*

Likewise, in the instant case, defendants submit that plaintiff will not be able to meet his burden of demonstrating a causal relationship between the defendants' alleged negligent/unconstitutional conduct and Patricia's death. Accordingly, even if it should ultimately be determined that the previously cited legal reasons are insufficient to support summary judgment in favor of defendants, in the final analysis, plaintiff will not be able to establish a causal connection between the alleged negligent and/or unconstitutional conduct and plaintiff's injury. Defendants are thus entitled to summary judgment.

**G. The False Arrest and Excessive Force Claims of Anthony Ferreira**

In his Complaint, C.A. No. 05-75S, Plaintiff Anthony Ferreira seeks to maintain his own independent claims for the officers' alleged mistreatment of him on the day of his sister's suicide. Plaintiff specifically cites causes of action for false arrest, assault and battery, and excessive force under both state law and in violation of his constitutional rights. The facts giving rise to plaintiff's individual claims began when plaintiff, after calling the police and reporting his sister's suicide threat and the fact that she had a weapon, draped himself over sister's vehicle when the police arrived. It is undisputed that plaintiff then refused to move when ordered by the officers to do so. The officers thus forcefully removed plaintiff and restrained him while they attempted to assist his sister. Defendants submit that they are likewise entitled to summary judgment on Anthony Ferreira's claims. In summary, his actions of interfering with the officers and his subsequent struggle with the officers gave them sufficient basis to detain him as well as justify the degree of force used to effectuate his detainment.

### *1. False Arrest Pursuant to 42 U.S.C. 1983 and State Law*

In Counts IV, V and VI of Complaint, C.A. No. 05-75S, plaintiff alleges that he was falsely arrested by the police officers on the scene and thus defendants are liable under both state law and for the alleged deprivation of plaintiff's federal and state constitutional right to be free from unreasonable seizure. First, it is well settled that "police officers who suspect criminal activity [can] make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers, 452 U.S. 692, 698 (1981).* Thus, an officer who possesses reasonable, articulable suspicion of criminal activity is justified in detaining an individual to confirm or dispel this suspicion. *U.S. v. Young, 105 F.3d 1, 6 (1st Cir. 1997). Rivera v. Murphy, 979 F.2d 259, 264 (1st Cir. 1992).* Whether a reasonable suspicion exists is treated as an objective inquiry: "the actual motive or thought process of the officer is not plumbed." *Whren v. United States, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996).* So the only pertinent "facts" are the information available to the officer at the time of the detainment. *Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004).*

While defendants submit that they need only establish reasonable suspicion to justify plaintiff's detention, defendants alternatively submit that there was nevertheless sufficient basis to support a finding of probable cause.[8] In order to succeed on his claim of a Fourth Amendment, false arrest violation, plaintiff must demonstrate that it was clear at the time of the arrest that there was no probable cause for such arrest. *Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003) citing Beck v. Ohio, 379 U.S. 89, 91 (1964) (the Fourth Amendment requires that arrests be based on probable cause).* Similarly, the elements of a state law false arrest claim require the plaintiff to show "more than (1) the defendant intended to confine him, (2) the

plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Rhode Island also requires a showing that the detention was "without legal justification." _Dyson v. Pawtucket, et al_., *670 A.2d 233, 239 (R.I. 1996), cert. denied, 517 U.S. 1192 (1996).* If an officer has probable cause to effectuate an arrest, there is legal justification for the arrest and plaintiff cannot succeed on a false arrest claim. _Winn v. Collins_, *723 A.2d 798, 799 (R.I. 1998), citing* _Dyson,_ *670 A.2d at 239.*

"[P]robable cause exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution and prudence in the belief that the defendant is committing or has committed a crime." _Floyd v. Farrell_, *765 F.2d 1, 5 (1st Cir. 1985)*. _See_ _also_ _Beck_, *379 U.S. at 96.* This standard encompasses a "non-technical" analysis that requires examination of "the totality of the circumstances" known to the officer. _Rodriques v. Furtado_, *950 F.2d 805, 816 n.7 (1st Cir. 1991) citing* _Illinois v. Gates_, *462 U.S. 213, 230-31 (1983).* "[T]he Supreme Court has told us that probable cause means more than "bare suspicion" but less that what would be needed to "justify ... conviction." _Valente_, *332 F.3d at 32 quoting* _Brinegar v. U.S._, *338 U.S. 160, 175 (1949).* Therefore, "probable cause need not be tantamount to proof beyond a reasonable doubt.... Probability is the touchstone." _U.S. v. Grant_, *218 F.3d 72, 75 (1st Cir. 2000) quoting* _U.S. v. Khounsavanh_, *113 F.3d 279, 283 (1st Cir. 1997).* "The probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." _U.S. v. Winchenbach_, *197 F.3d 548, 556 (1st Cir. 1999).*

[8] In the instant case, the police made the discretionary decision not to charge plaintiff with a crime. This discretionary decision has no impact on whether there was nevertheless sufficient probable cause to support such a charge.

In the instant case, as noted, it is undisputed that when the police arrived at the scene, plaintiff draped himself over the front of his sister's car blocking the officer's view of Patricia. Knowing that Patricia was reported to have a weapon, the officers ordered plaintiff to get off the vehicle and back away. Plaintiff refused the officers commands. Plaintiff's actions placed everyone, including himself, his sister and the officers in harm's way. More specifically, knowing Ms. Ferreira possessed a weapon, Mr. Ferreira prevented the officers from seeing into the vehicle to monitor her actions. Under these circumstances, the officers certainly had probable cause to remove Mr. Ferreira from the scene, for his personal safety, for the safety of the officers, and in an attempt to save his sister. *Cf. Andrews v. Wilkins, 934 F.2d 1267, 1271 (D.C. Cir. 1991) (concluding that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort"); Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003)(manifestly reasonable to restrain suicide victim's family from entering the apartment and thus potentially being put in harms way); Compare City of Simi Valley v. Superior Court of Ventura County, 111 Cal. App. 4th 1077, 1085, 4 Cal. Rptr. 3d 468, 474 (CA 2003).*

Accordingly, defendants submit that they are entitled to summary judgment on plaintiff's state and federal claims for false arrest and violation of his constitutional rights.

***2. Excessive Force and Assault and Battery.***

Defendants further submit that plaintiff's violent struggle with the officers nullifies his claim for assault and battery and excessive force. Rhode Island law states that battery is "an act that was intended to cause, and does cause, and offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault." *Fenwick v. Oberman, 847 A.2d 852, 855 (R.I. 2004) quoting Profitt v. Ricci, 463 A.2d*

*514, 517 (R.I. 1983)*. Meanwhile, there is a three-part test for excessive force claims under *§ 1983*. The plaintiff must show: (1) a significant injury; (2) resulting directly and only from the use of force that was clearly excessive to the need, and (3) the excessiveness of the force was objectively unreasonable. *Reese v. Anderson, 926 F.2d 494, 500 (5th Cir. 1991).* Plaintiff's claim that the officers used excessive force in the course of making an arrest is subject to the objective reasonableness standard governing the Fourth Amendment. *Graham v. Connor, 490 U.S. 386, 388 (1989)*.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight. When judging reasonableness, it must be factored in that "police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation." *Id. at 396*. In addition, this standard allows for evidence of what is known to the police officer at the time the force is applied. The knowledge of the police officer forms part of the "facts and circumstances attendant to the decision to use the particular degree of force." *See Senra v. Cunningham, 9 F.3d 168 (1st Cir. 1993)*.

To show that the police used excessive force in violation of the Fourth Amendment, plaintiff "must demonstrate that the police defendant[s'] actions were not objectively reasonable, viewed in light of the facts and circumstances confronting [them] without regard to [their] underlying intent or motivation." *Bastien v. Goddard, 279 F.3d 10, 14 (1st Cir. 2002)*. "The relevant circumstances include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id. quoting Graham v. Connor, 490 U.S. 386, 396 (1989)*. The objective reasonableness of the force used is also to be considered in light of the

officers' obligation to "to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly-changing circumstances." *Gaudreault v. Salem, 923 F.2d 203, 205 (1st Cir. 1990).*

In the instant case, it is undisputed that Mr. Ferreira's refused to comply with the officer's commands, thus exacerbated the threat posed by Ms. Ferreira. The officers arriving on the scene were responding to the report of an individual with a gun threatening suicide. They immediately confront an individual who jumps on the hood of a car and refuses to get off. Mr. Ferreira's actions justified the officers use of pepper spray and handcuffs to control him and take him into custody. *Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 352 (1st Cir. 1995) ("In the Fourth Amendment setting, a viable excessive force claim must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation."); Graham v. Connor, 490 U.S. 386 (1989) (With the right to arrest comes the right to use a reasonable degree of force to effect that arrest).*

Moreover, as found by the Tenth Circuit, an officer is more than justified in restraining an individual who may be put at risk by a third party's actions. *Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003)*. In Christiansen, the husband and sister of a suicide victim brought a § 1983 claim against police officers based, *inter alia*, on the officers restraining them from entering an apartment after hearing a gunshot. In outright rejecting the survivors' excessive force claims as being "wholly without merit", the Court concluded that it was manifestly reasonable to restrain them from entering the apartment and thus potentially being put in harms way. *Id. citing Andrews v. Wilkins, 934 F.2d 1267, 1271 (D.C. Cir. 1991) (concluding*

*that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort").*

Defendants thus submit that they are entitled to summary judgment on plaintiff's claim of excessive force, false arrest, and assault and battery.

***3. Qualified Immunity.***

Defendants will also rely on the defense of qualified immunity, as more fully briefed *infra*, in defense of plaintiff's false arrest and excessive force claims.[9] In the first instance, even if it is ultimately determined that the officers lacked reasonable basis or probable cause to remove plaintiff from the hood of the car, it was not clearly established that such an action violated plaintiff's constitutional right. *Id.; Andrews, 934 F.2d at 1271.* Moreover, under the state of the law, i.e. cases finding that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort", id., a reasonable officer would have believed that the decision to order plaintiff to move and attempting to effectuate his removal violated plaintiff's constitutional rights.

Qualified immunity also protects the officers from plaintiff's excessive force claim. It is well established a police officer has "the right to use some degree of physical coercion or threat thereof to" effectuate an arrest." *Jennings v. Jones, 2007 U.S. App. LEXIS 5268 (1st Cir. 2007).* "[T]he use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." *Id. quoting Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002).* The distinction between excessive force and permissible force turns on whether the level of force used was reasonable and the test is whether, under the

[9] This qualified immunity defense applies with equal force to plaintiff's state and federal claims. *Hatch v. Town of Middletown, 311 F.3d 83, 89 (1st Cir. 2002) (Rhode Island's high court has "left little doubt that the [qualified immunity] defense exists for state officers under certain circumstances").*

circumstances confronting the defendant at the time that he acted, "no objectively reasonable officer would have used" the same degree of force. *Isom v. Town of Warren, 360 F.3d 7, 12 (1st Cir. 2004); Napier v. Town of Windham, 187 F.3d 177, 183 (1st Cir. 1999) ("'The relevant inquiry [in excessive force cases] is whether no reasonable officer could have made the same choice under the circumstances.'" (internal quotation omitted)).*

Defendant submits that not only is the law on the use of pepper spray not clearly established, *see i.e. Marier v. Town of Allenstown, 2003 DNH 172 (D.N.H. 2003) (citing cases),* but in any event a reasonable officer faced with plaintiff's violent struggle would nevertheless not believe that the level of force used to subdue plaintiff was in violation of plaintiff's constitutional rights. Accordingly, even if it is determined that the officers used excessive force in subduing plaintiff, the defendants are nevertheless entitled to qualified immunity for their actions and summary judgment in their favor should accordingly enter.

## V. CONCLUSION

For the reasons cited herein, as well as those that may be raised at hearing, defendants respectfully request that summary judgment on all counts enter in favor of defendants.

Defendants,
By their attorney,

*/s/ Marc DeSisto*

Marc DeSisto, Esq. (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax: (401) 272-9937
Email: marc@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that the within document has been electronically filed with the Court on this 22nd day of March, 2007, and is available for viewing and downloading from the ECF system.

*/s/ Marc DeSisto*

Marc DeSisto