**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ANTHONY J. FERREIRA, in both his capacity as Administrator of the Estate of Patricia J. Ferreira and as guardian of the estate and person of Ryan C. Ferreira,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **C.A. No. 05-73S (consolidated)** |
| **CITY OF EAST PROVIDENCE, by and through its Treasurer, KEVIN J. FITZGERALD, et al.,** | : | |
| **Defendants** | : | |
| **ANTHONY J. FERREIRA,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| **CITY OF EAST PROVIDENCE, by and through its Treasurer, KEVIN J. FITZGERALD, et al.,** | : | |
| **Defendants** | : | |

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff and does hereby object to Defendants' Motion for Summary Judgment and as grounds therefor and in support thereof relies on his Memorandum of Law filed simultaneously herewith.

**WHEREFORE**, the Plaintiff respectfully prays that Defendants' Motion for Summary Judgment be denied.

PLAINTIFF,
By his Attorneys,
SINAPI FORMISANO & COMPANY, LTD.

/s/ V. Edward Formisano
/s/ Michael D. Pushee __
V. Edward Formisano (5512)
Michael D. Pushee (6948)
100 Midway Place, Suite 1
Cranston, Rhode Island 02920-5707
(401) 944-9690
(401) 943-9040 (facsimile)

**CERTIFICATION**

TO: Marc DeSisto, Esq.
211 Angell Street
P.O. Box 2563
Providence, RI 02906

I hereby certify that on the 22nd day of May, 2007, I caused the within to be electronically filed with the Clerk of the U.S. District Court for the District of Rhode Island using the CM/ECF System. I also certify that the above counsel of record has received the within.

/s/ V. Edward Formisano

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ANTHONY J. FERREIRA, in both his capacity as Administrator of the Estate of Patricia J. Ferreira and as guardian of the estate and person of Ryan C. Ferreira,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **C.A. No. 05-73S (consolidated)** |
| **CITY OF EAST PROVIDENCE, by and through its Treasurer, KEVIN J. FITZGERALD, et al.,** | : | |
| **Defendants** | : | |
| **ANTHONY J. FERREIRA,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| **CITY OF EAST PROVIDENCE, by and through its Treasurer, KEVIN J. FITZGERALD, et al.,** | : | |
| **Defendants** | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The within cause of action is a consolidated case. The Plaintiff[1] filed the first action in his capacity as Administrator of the Estate of Patricia J. Ferreira and as the Guardian of the Estate of Ryan Ferreira and alleged that Defendants' acts and/or omissions caused the death of Patricia J. Ferreira in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, actionable pursuant to 42 U.S.C. §1983, Article I, §6 of the Rhode Island Constitution, and common law. The other action was brought by the Plaintiff in his individual capacity where he is seeking relief for injuries he suffered as a result of acts and/or omissions committed by Defendants in violation of the

[1] Anthony Ferreira will be referred to as "Plaintiff" throughout this Memorandum.

Fourth and Fourteenth Amendments to the U.S. Constitution, actionable pursuant to 42 U.S.C. §1983, Article I, §6 of the Rhode Island Constitution, and common law.

## II. DESCRIPTION OF MOTION

Defendants have moved for summary judgment on the grounds that Defendants' actions did not amount to an unlawful seizure under the Fourth Amendment, that Defendants did not deprive Ms. Ferreira of life without due process of law, that Plaintiff's 42 U.S.C. §1983 claims against Defendants should be dismissed on the grounds of qualified immunity or the absence of a constitutional violation, that the Plaintiff has failed to establish a valid negligence claim against Defendants, that the Plaintiff's claim of improper training, instruction, and supervision is unsupported by any evidence, that Plaintiff's state tort claims should be dismissed due to the application of qualified immunity, and that Plaintiff has failed to demonstrate that Defendants' acts an/or omissions were the proximate or actual cause of Ms. Ferreira's death.

## III. FACTS

### A. 64 Brightridge Avenue

On the afternoon of October 10, 2001, Ms. Ferreira and John Sousa ("Sousa"), Ms. Ferreira's boyfriend, had a heated argument at Sousa's home located at 64 Brightridge Avenue, East Providence, Rhode Island. Due to her concern for her son, Ryan Ferreira's, well-being, Ms. Ferreira directed Ryan to go to his grandmother's house a short distance away at 44 Brightridge Avenue. When Ryan arrived at Beverly Ferreira's ("Mrs. Ferreira") home, he told her that his mother was engaged in a heated argument and that Ms. Ferreira had told him to leave the house for his safety.

At approximately 4:45 p.m., Mrs. Ferreira and the Plaintiff, traveled to the East Providence Police Department ("Department") with Ryan to meet with Defendant Barlow to discuss their concerns regarding Ms. Ferreira and Sousa. Defendant Barlow was advised that a heated argument

had occurred with items being thrown inside the house, resulting in Ryan leaving the home due to safety concerns, that Sousa had thrown Ryan's clothes onto the lawn, that Ryan and Ms. Ferreira were ordered to move out by Sousa, and that Ms. Ferreira was receiving counseling and on medication for a psychological disorder. Defendant Barlow then met alone with Ryan. Due to his discussion with the Ferreiras, Defendant Barlow advised them that he was concerned for Ryan's well-being and would contact the Department of Children, Youth and Families ("DCYF"), and, would also have officers report to Sousa's home to investigate whether a domestic violence incident had occurred. According to Mr. Ferreira, Defendant Barlow then advised the responding officers—Defendants Tiernan and David—that if there was evidence of a crime an arrest was to be made, "because both of them or one of them is going to jail tonight."

Defendants Tiernan and David then responded to Sousa's home. Over a forty (40) minute period, Defendants David and Tiernan spoke with Sousa and Ms. Ferreira and determined that no grounds for an arrest existed. During this time period, the officers learned that Ms. Ferreira and Sousa were terminating their relationship and that Ms. Ferreira and Ryan were being forced to vacate Sousa's home.

Defendant David described both parties as being "upset" and "angry." He also testified that Sousa and Ms. Ferreira had a "volatile" relationship. Although, Defendant Tiernan described both parties as "calm," he acknowledged Ms. Ferreira appeared "emotionally distraught." While Defendants David and Tiernan were on scene, Defendant Rush responded to Sousa's home to oversee the investigation. Rush testified that both parties were "angry." Ms. Ferreira, in Rush's presence stated that "her life was a mess." Defendant Rush cleared the scene within minutes of arriving, leaving Defendants Tiernan and David.

Defendants David, Tiernan and Rush testified that Barlow did not report to them that Ryan had stated that Sousa and Ms. Ferreira had been throwing items during the confrontation, or that

Ryan was directed to leave Sousa's home for his safety, or that Ms. Ferreira was receiving psychological treatment,[2] or that Defendant Barlow was contacting DCYF due to his concerns for Ryan's safety.

Ms. Ferreira spent time in the presence of the officers placing clothes for her and Ryan in bags to take with her. According to Defendants Tiernan and David, she also stated in their presence that she wanted to take her guns—a .38 caliber revolver and a 9mm handgun—with her.[3] Sousa and another party who was present, Sousa's ex-wife, Irene Sousa a/k/a Alexandra Walmskey, both testified at their depositions that they informed the officers that Ms. Ferreira was mentally unstable and that they should not let her leave with her firearms.[4]

**B. Birchard Street**

At approximately 6:00 p.m., within minutes after leaving Sousa's home, Ms. Ferreira arrived at her mother's home[5] at the corner of Brightridge Avenue and Birchard Street in East Providence to leave the clothes for Ryan. As she approached her mother's home, the Plaintiff was standing outside the house alongside Birchard Street. Ms. Ferreira stated to him that "DCYF was coming" and that she and Sousa were in "trouble" and going to "jail." In response, the Plaintiff assured her that everything would be alright. Ms. Walmskey then arrived and handed Ms. Ferreira a note with her address and telephone number. Ms. Ferreira then suddenly stated that she was going to "kill herself." The Plaintiff again assured his sister that everything would be fine. The Plaintiff then took the .38 caliber gun from Ms. Ferreira and placed it in a basket alongside his house. Ms. Ferreira then slowly drove up Birchard towards Fenmoor Street before stopping her vehicle.

[2] Defendant Tiernan testified that he had heard "rumors" that Ms. Ferreira was on medication due to mental health issues.

[3] Defendants Rush, David, Tiernan and Barlow as well as other members of the Department were aware before October 10th that Ms. Ferreira possessed deadly weapons.

[4] Parties to this litigation, have testified that if Defendant Barlow had shared with them the information he had learned from the Plaintiff, Mrs. Ferreira and Ryan, they would have taken the guns for safekeeping.

[5] Darlene Anctil (Ms. Ferreira's sister) and the Plaintiff also lived at this address.

The Plaintiff then asked his other sister, Ms. Anctil, to give him a telephone to call 911. The Plaintiff advised a Department dispatcher that his sister was suicidal and that he had seized one of her guns. In response, dispatch broadcast a Code 1 (lights and sirens) regarding a threat of suicide on Birchard Street.

Before the police arrived, the Plaintiff approached Ms. Ferreira's vehicle and assured her that she and Ryan would be fine and that he would provide assistance to her.

Defendants Rush, Hall, Tiernan, David, Feeney as well as other Department members then arrived and immediately established a perimeter around Ms. Ferreira's motor vehicle and took positions of cover while the Plaintiff was standing alongside the driver's side of his sister's vehicle and she remained in the vehicle.

With a number of officers aiming their weapons at Ms. Ferreira's vehicle, the Plaintiff was ordered to step away from the vehicle or he "would be shot." Ms. Ferreira then placed her hands on the steering wheel. Due to his fear for his sister's safety, the Plaintiff then leaned onto the windshield. Defendant Hall then ordered the Plaintiff to get away from the vehicle and as he did, the Plaintiff was sprayed with pepper spray by Defendant Hall before he was physically assaulted (kicked and punched) by Defendants Hall and David. While he was restrained, the Plaintiff also alleges that he was repeatedly sprayed with pepper spray, each time he mentioned that Ms. Ferreira had another gun in her vehicle.

At this juncture, Feeney attempted to enter Ms. Ferreira's vehicle, but the doors were locked. Sousa then arrived at the scene, broke through the perimeter and attempted to open Ms. Ferreira's car door. Sousa and several officers then had a physical confrontation before Sousa was taken into custody.

Defendant Hall then attempted to break the windows of Ms. Ferreira's vehicle as she drove through the perimeter. His efforts failed. Ms. Ferreira, followed by the police, then drove from

Fenmoor to Warren Avenue, to Pawtucket Avenue, to Intervale, before stopping at the intersection of Intervale and Brightridge due to a roadblock established by the Department.

**C. <u>Brightridge and Intervale</u>**

Again, the Department established a perimeter with a number of officers in positions of cover surrounding Ms. Ferreira's motor vehicle. Defendant Rush was initially responsible for directing the evacuation of nearby homes, controlling traffic and keeping onlookers away from the scene. He then ordered Defendant Feeney to bring the Special Response Team ("SRT") van to the scene to access equipment as needed.

Defendants Hall and Barlow then engaged in conversation with Ms. Ferreira over the course of the next 90 minutes wherein they asked her to put the gun down and exit her vehicle.

Defendant McGregor, head of the SRT unit, devised a plan that called for SWAT tactics to remove Ms. Ferreira by force if attempts to convince her to exit the car continued to be unsuccessful. The plan called for two (2) officers from the SRT, Defendants Rush and McGregor, to throw flash bang devices at the car—one towards the driver's side front wheel and the other would be thrown at the front passenger window, which would break from the force of impact from the flash bang. With Defendants Rush and David behind a bunker on either side of the vehicle's front doors after the flash bangs detonated, Defendant Feeney (also a member of the SRT) would apply a Haligan breaching tool to the driver's side window, and after breaking the window, he would reach in to seize the gun from Ms. Ferreira. At the same time, Defendant David would reach in from the passenger side front door and attempt to seize either Ms. Ferreira or the gun.

At Defendant Barlow's signal, the flash bangs were thrown at the car. The device Defendant Rush threw landed where planned; Defendant McGregor's bounced off the window and detonated away from the car. Just after or as the flash bangs detonated, the team stormed Ms. Ferreira's vehicle. Defendant McGregor then attempted to break the passenger side window with

the butt of his service weapon while Defendant David observed Ms. Ferreira in a state of "shock" and "fear." At the same time, Defendant Feeney swung the Haligan tool at the driver's side window several times before it broke. He testified that he then reached into the car, and had his hands around Ms. Ferreira's head when her 9mm discharged, mortally wounding her.[6] As the gun fired, Defendant Feeney fell back to the ground, believing that he had been shot. Ms. Ferreira was then transported to Rhode Island Hospital where she was pronounced dead.

On October 10, 2001, the Plaintiff was transported from Rhode Island Hospital, where he had been treated for injuries related to his seizure, to the Department to be processed for charges of obstruction of an officer in execution of duty and resisting arrest. Once at the Department, Enos informed the Plaintiff that the charges would be dropped. Enos then requested that the Plaintiff surrender to the Department, for a period of 60 days, any firearms that he owned. The Plaintiff complied with the request.

## IV. STANDARD OF REVIEW

Summary judgment is a drastic remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. International Ins. Co. v. Metro. St. Louis Sewer Dist., 938 F.Supp. 568 (E.D.Mo. 1996). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Grubb v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996); Fed.R.Civ.P. 56(c). The trial court may search for the existence of factual issues, but may not determine them, Steinberg v. State, 427 A.2d 338 (R.I. 1981); nor may the trial court assess the weight or the credibility of the evidence. Doyle v. State,

[6] As discussed in Plaintiff's Statement of Disputed Facts, a number of the parties to this litigation have testified that the firearm discharged immediately after the flash bangs were detonated and before Defendant Feeney entered Ms. Ferreira's vehicle.

411 A.2d 907 (1980). In reviewing a motion for summary judgment, a court is obliged to view the facts in a light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. Fennell v. First Step Designs, Ltd., 83 F.3d 526, 534 (1st Cir. 1996); National Credit Union Admin. Bd. v. Regine, 795 F.Supp. 39, 62 (D.R.I. 1992). At the summary judgment stage, a court should ask itself whether the plaintiff could prevail if a jury or judge believed the plaintiff's version of the facts and disbelieved the defendant's version. Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 929 (1st Cir. 1983). Accordingly, summary judgment will not lie if the dispute about a material fact is "genuine," that is, the evidence is such that a reasonable jury could return a verdict for the non-moving party when construing all evidence in the record and inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 247, 248 (1986).

## V. ARGUMENT

### A. Because Genuine Issues of Material Fact Exist as to the Manner in which Defendants Attempted to Effectuate Ms. Ferreira's Seizure or Civil Arrest, Defendants' Motion as to Counts II & IV Should be Denied.

In their Memorandum, Defendants aver that they acted reasonably, pursuant to the Fourth Amendment, in stopping Ms. Ferreira's vehicle and detaining her.[7] Defendants' interpretation of the basis of this claim is erroneous. The Plaintiff has not alleged that the stop of Ms. Ferreira's vehicle was somehow constitutionally unsound, nor has Plaintiff alleged that Defendants lacked a basis to detain the Plaintiff. Accordingly, the Plaintiff agrees that the basis for the stop was aligned with the "community caretaking" function of police officers and therefore does not pin his constitutional claim on this aspect of this tragic event. Defendants' Memorandum at 12. Rather, the Plaintiff alleges that the methods and force used by Defendants in effectuating the seizure or civil arrest of Ms. Ferreira was excessive and therefore in violation of the Fourth Amendment.

[7] The analysis here will be limited to the Fourth Amendment. Jones v. Rhode Island, 724 F.Supp. 25 (D.R.I. 1989).

In "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. 386, 396 (1989) quoting United States v. Place, 462 U.S. 696, 703 (1983). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application…however, its' proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979); see also Garner, 471 U.S. 1, 8-9 (1985)(the question is "whether the totality of the circumstances justifie[s] a particular sort of…seizure"). Moreover, the "'reasonableness' inquiry is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Graham, 490 U.S. at 397.

In the present case, Ms. Ferreira was seized when the police blockade prevented her from moving her vehicle. The analysis for the purposes of the Fourth Amendment is limited to whether the force and tactics used to effectuate the arrest of Ms. Ferreira, e.g., deployment of flash bang devices[8], breaching tools and SWAT procedures, was reasonable. The Plaintiff maintains that a genuine issue of material fact exists as to whether this force was reasonable.[9] One of the Plaintiff's

---

[8] These devices were used to achieve Ms. Ferreira's civil arrest.

[9] In a variety of contexts, this type of force has been called into stark question. See, e.g., Ramona Africa v. City of Philadelphia, 938 F.Supp. 1278 (E.D.Pa. 1996); Jenkins v. Wood, 81 F.3d 988, 996-998 (10th Cir. 1996)(dissenting opinion); Molina v. Cooper, 325 F.3d 963, 973 & n. 6, 7("we in no way suggest that use of flash bang devices is appropriate in every case (or even in most cases)… .); U.S. v. Jones, 214 F.3d 836, 838 (7th Cir. 2000)(the use of flash bang device "created a risk that people close to the detonation point would be injured"); Schade v. Marquis, 2006WL782 *3 (N.D.Ohio 2006)(Slip Copy)("police regulations specify that officers are to deploy device [flash bang] no closer than 5 feet to any individual'); Taylor v. City of Middletown, 436 F.Supp.2d 377 (D.Ct. 2006); Boyd v. Benton County, 374 F.3d 773, 773 (9th Cir. 2004)("we have previously emphasized our concern with the unconstrained use of similar less-than-lethal devices [not flash bang] in situations where no warning is given"); Robbins v. Chronister, 156 F.Supp.2d 1211, 1216 (use of baton to break plaintiff's car window objectively unreasonable); Mumm v. Mornson, 708 N.W. 475, 487 (Minn. 2006)(court holds that "because the law

experts, has termed the use of force inappropriate and a violation of established law enforcement procedures and protocol. See Report of David M. Grossi ("Grossi Report II") at 5-10. Mr. Grossi states, that "the deployment of distraction devices (flash bangs) in an effort to rescue a woman from herself who was seen holding a firearm to her mouth…fell well below the nationally accepted standard of care for tactical response." Id. at 7. He further states that the improper use of the flash bang devices contributed to Ms. Ferreira's heightened and distraught emotional state and caused or contributed to the "startle effect,"[10] which may have caused her death. Id. at 6-7. Mr. Grossi also opines that Defendants inappropriately implemented a "hasty" tactical plan to extricate Ms. Ferreira from her motor vehicle without rehearsal, which is itself a violation of law enforcement protocol.[11] Id. at 8-10.

Viewing all facts in the light most favorable to the Plaintiff, and applying the Graham analysis, it is plainly evident that material factual issues exist pertaining to whether Defendants' actions in effectuating the seizure or civil arrest of Ms. Ferreira were objectively reasonable and therefore the Motion as to Counts II and IV of C.A. 05-73S should be denied.

**B. Material Factual Issues Exist as to Whether Defendants Violated Ms. Ferreira's Fourteenth Amendment Due Process Right to Life.**

With respect to Count III of C.A. 05-73S, Defendants make the bold claim that there is no factual issue related to Plaintiff's due process claim under 42 U.S.C. §1983 due to the purported absence of a constitutionally protected right. In support of this contention, Defendants argue that Ms. Ferreira did not have a constitutional right, pursuant to the Fourteenth Amendment, to be

---

requires that [the plaintiff] pose a significant threat to the police or to others in order to justify the use of deadly force, the mere risk of suicide does not justify the use of deadly force" and that "a suicidal person's risk of injury to self does not support the use of deadly force as authorized in Garner").

[10] In his report, Mr. Grossi defines the "startle effect" as a sudden appearance of an object or a loud noise causing a sympathetic muscle reaction resulting in an involuntary or unintentional discharge of a firearm.

[11] The plan called for numerous police officers to storm Ms. Ferreira's motor vehicle, armed with ballistic shields and Haligan Tools, while two (2) loud, distraction devices were simultaneously thrown at the vehicle. The plan then required the officers to break the window glass of the vehicle, while Ms. Ferreira was inside with a loaded gun pointed at her mouth.

protected from the grave injuries she sustained. Because Defendants' entire contention as to this claim is based on the contested premise that Ms. Ferreira committed suicide, the Motion as to Count III must be denied.[12]

In order to establish a Fourteenth Amendment substantive due process claim, the Plaintiff must show: (1) a deprivation of a protected interest in life, liberty, or property, and (2) that the deprivation of this protected right was caused by governmental conduct. Rivera v. Rhode Island, 402 F.3d 27 (1st Cir. 2005); Mairoana v. MacDonald, 596 F.2d 1072 (1st Cir. 1979). The first prong can be met if an individual dies. Rivera, 402 F.3d at 34 ("The complaint alleges that [the decedent] was caused to be deprived of her life, a protected interest."); Stanbridge v. City of Seaside, 545 F. Supp. 1195, 1198 (N.D.Cal., 1982)("It is beyond dispute that one killed by a … police officer is deprived of his Fourteenth Amendment right to life."). The second prong "is easily met when a government actor causes the injury, such as when police officers act under color of law." Rivera, 402 F.3d at 34. The Plaintiff must also prove that the conduct of the government officials "reflect[ed] a reckless or callous indifference to an individual's rights," Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st Cir.1989); Landol-Rivera v. Cruz Cosme, 906 F.2d 791 (1st Cir. 1990), or, stated differently, "shocks the conscience." Rivera, 402 F.3d at 27. "In situations where government actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to shock the conscience." Id.

As a general rule, under the due process clause, the state has no affirmative obligation to protect its citizens from violent acts. DeShaney v. Winnebago Co. Dep't of Soc. Serv., 489 U.S.

---

[12] The premise relative to suicide is drawn into question by the following material factual issues: 1) that Defendants caused Ms. Ferreira's death by deploying flash bang devices which in turn caused an involuntary or unintentional discharge of her firearm; 2) that Defendant Feeney caused Ms. Ferreira's firearm to discharge by making contact with her hands and/or the firearm while reaching for her head; 3) that Defendants increased the risk of harm to Ms. Ferreira in violation of a special duty owed to Ms. Ferreira.

189, 197 (1989). Two exceptions to this general rule exist— the special relationship exception and the state-created danger exception. The "special relationship" exception exists where "the State takes a person into its custody and holds him there against his will" thereby limiting that person's "freedom to act on his own behalf" and "render[ing] him unable to care for himself." Id. at 199-200; U.S. v. Ventura, 85 F.3d 708 (1st Cir.1996)(an individual is "in custody" if there is a "restraint of freedom of movement"). Under such circumstances, the Constitution imposes a "duty to assume some responsibility for his safety and general well-being." Id. at 200; Rivera v. Rhode Island, 312 F.Supp.2d. 175 (D.R.I. 2004)("Indeed, even before DeShaney, the 'vast majority' of cases finding the existence of a 'special relationship' were cases in which the plaintiff was injured while in state custody.") The second exception to the general rule—the "state created danger" exception—exists in cases where the injury results from a danger that the State, itself, created or exacerbated. DeShaney, 489 U.S. at 201; see also Monfils v. Taylor, 165 F.3d 511 (7th Cir.1998); Kneipp v. Tedder, 95 F.3d 1199 (3rd Cir.1996). The state-created danger theory exists if the state actor's "acts or omissions…placed the plaintiff in a dangerous position that was foreseeable." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 915 (3rd Cir. 1997); Kneipp, 95 F.3d at 1208. In applying the "state-created danger" theory in the context of a summary judgment proceeding, federal courts have stated that in order "[t]o survive summary judgment, plaintiffs must produce evidence from which a jury could conclude that the officers 'used their authority to create an opportunity that otherwise would not have existed.'" Kneipp, 95 F.3d at 1208; Hansell v. City of Atlantic City, 152 F. Supp.2d 589, 605 (D.N.J 2001).

In the present case, Defendants assert that a special relationship did not exist between Defendants and Ms. Ferreira at the time of her death, and thus the special relationship exception

does not apply.[13] The Plaintiff disagrees. During all relevant time periods, it is plainly evident that Ms. Ferreira was in Defendants custody after the blockade was established, with a number of officers in positions of cover, surrounding her motor vehicle and forcing her to stop the vehicle. At that point, Ms. Ferreira was obviously unable to voluntarily leave the scene. Therefore, Defendants had an affirmative duty to protect her safety and well-being. Accordingly, insofar as Ms. Ferreira sustained grave injuries while in Defendants' custody, a material factual issue exists as to whether Defendants violated Ms. Ferreira's due process rights.[14]

Under the "state created danger" exception, Defendants engaged in affirmative acts that created or increased the risk of injury to Ms. Ferreira. First, Defendants failed to seize Ms. Ferreira's firearms while at 64 Brightridge Avenue. According to Lloyd F. Price, M.D., a forensic psychiatrist retained by the Plaintiff, had Defendants seized the guns it "would have thwarted Ms. Ferreira's contemplated plan for suicide." Report of Lloyd F. Price, M.D.("Price Report") at 6. Second, Defendants failed to obtain medical treatment for Ms. Ferreira while at 64 Brightridge Avenue. Again, according to Dr. Price, "had Ms. Ferreira been provided crisis intervention services…it is probable that she would not have died." Id. at 4. Third, Defendants increased the danger to Ms. Ferreira while she was barricaded in her motor vehicle. As stated above, Defendants improperly used the flash bang devices and inappropriately implemented a "hasty" tactical plan to extricate Ms. Ferreira from her motor vehicle. In addition, Defendant Barlow violated established standards of hostage negotiation protocol. As Mr. Grossi states in his report, Defendant Barlow used "emotionally charged dialogue" when speaking with Ms. Ferreira, while she had a gun pointed

---

[13] Defendants characterize the incident as a "failed suicide rescue attempt." Defendants' Memorandum at 16-17. As referenced previously, this is a deliberate effort by Defendants to mischaracterize the disputed facts as well as the essence of the Plaintiff's theories of liability.

[14] Defendants make the argument that no special relationship existed because they had "no control over her actions in the car." This statement is inaccurate. The facts establish that after the enactment of the "hasty plan" Ms. Ferreira could not control her actions resulting in her death.

at her mouth.[15] Grossi Report II at 11. Defendant Barlow also had a past personal and professional relationship with Ms. Ferreira, which prevented him from being "detached and objective" during the negotiations and also lacked proper crisis negotiation training. Id. at 11-12. Mr. Grossi also states that Defendant Barlow "rushed to terminate negotiations and instead opted for a tactical resolution too quickly." Id. at 12. Mr. Grossi opines that had a trained, independent crisis negotiator been used in this situation, Ms. Ferreira would have responded in a more rational manner. Id. at 13. Dr. Price also states that as a result of Defendants' actions Ms. Ferreira's mental state deteriorated and "significantly increased her risk of death." Price Report at 6-7. Finally, Defendant Feeney made contact with Ms. Ferreira's upper body while the gun was in her mouth. Mr. Grossi states in his report that Defendant Feeney's actions inadvertently caused the discharge of Ms. Ferreira's weapon. Grossi Report II at 21.

Based on the foregoing and viewing the facts in a light most favorable to the Plaintiff and drawing all reasonable inferences from the facts in the Plaintiff's favor, it is clear that a jury could find that Defendants, through their individual and concerted actions and/or omissions, exacerbated or created a risk of harm to Ms. Ferreira, that did not otherwise exist, and thus placed Ms. Ferreira in a position of danger that was foreseeable and in so doing, violated Ms. Ferreira's protected due process right to life.

Defendants also submit that a viable due process claim does not exist because their actions do not "shock the conscience." Rivera, 402. F.3d at 27. As stated above, as part of a Fourteenth Amendment substantive due process claim, a plaintiff must also prove that the conduct of the government officials "reflect[ed] a reckless or callous indifference to an individual's rights," Gutierrez-Rodriguez, 882 F.2d at 559, or, stated differently, "shocks the conscience." Rivera, 402

[15] During his deposition, the Plaintiff testified that he heard Defendant Barlow yelling and swearing at Ms. Ferreira during the negotiations. The Plaintiff also testified that the relationship between Defendant Barlow and Ms. Ferreira had deteriorated over the years.

F.3d at 27. "In situations where government actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to shock the conscience." Id. In assessing the particular governmental conduct at issue, "a court cannot view that conduct in abstracto. It is important that all the facts and circumstances of the situation be considered." Christensen v. County of Boone, IL 2007 WL 841097, *11 (7th Cir., March 21, 2007); see Evans v. Avery, 100 F.3d 1033, 1038 (1st Cir. 1996)(court considered "the totality of the circumstances" in shock the conscience analysis).

In the present case, Defendants had ample opportunity to "reflect and make reasoned and rational decisions" relative to what actions to take in order to prevent Ms. Ferreira from committing suicide. As described in detail herein, although Defendants were afforded considerable time (1.5 hours) to reflect and reason, Defendants still failed and/or refused to adhere to established police procedure and protocol during the course of the incident, and, in so doing, exhibited callous or reckless indifference to Ms. Ferreira's due process right to life. Indeed, starting with the initial contact with Ms. Ferreira at Sousa's home, Defendants violated Department policy by failing to seize, or, take for safekeeping, Ms. Ferreira's guns, and by failing to obtain psychiatric treatment for her. In the third stage of this tragedy, Defendants engaged in improper negotiation tactics and devised a "hasty" plan to breach Ms. Ferreira's vehicle using tactics that Mr. Grossi has characterized as "wholly improper." When viewed in the "totality of the circumstances," the Plaintiff submits that Defendants' actions in responding to this incident were not only deplorable, but also "conscience shocking."

For all of the aforementioned reasons, Defendants' Motion should be denied as to Count III of C.A. 05-73S.

**C. Plaintiff's Constitutional Claims are not Barred by Qualified Immunity.**

Defendants also argue that even if Ms. Ferreira's constitutional rights were violated, they are entitled to qualified immunity.

The First Circuit has established a three (3) pronged qualified immunity analysis: first, the court must determine "whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a violation of a constitutional right." Whitfield v. Melendez-Rivera, 431 F.3d 1, 6 (1st Cir. 2005)(citing Saucier v. Katz, 533 U.S. 194, 201, (2001)). Second, the court must "ask whether that constitutional right was clearly established at the time of the alleged violation. Id. Third, the court must decide "whether a reasonable officer, similarly situated, would understand that his or her conduct violated that clearly established right. Id.

First, for the reasons discussed previously, viewing the facts in a light most favorable to the Plaintiff, material factual issues exist as to whether Ms. Ferreira's constitutional rights under the Fourth and Fourteenth Amendments were violated and therefore Defendants claim to qualified immunity should be denied.[16]

Second, Plaintiff's constitutional right not to be unlawfully seized, or, deprived of life, was clearly established at the time of the incident.[17] Still, Defendants make the incredible assertion that, because these constitutional rights were not clearly established at the time of the incident, they should be granted immunity. The Plaintiff disagrees. On October 10, 2001, these rights were well-established and known and understood by Defendants.

The Supreme Court has held that, in the "obvious case," the generalized holdings in Garner and Graham alone will provide sufficient notice to a police officer that what he/she is doing violates an established right. Brosseau v. Hagen, 543 U.S. 194 (2004); Hope v. Pelzer, 536 U.S. 730, 741

---

[16] Here, again, Defendants erroneously focus on the stop of Ms. Ferreira's vehicle and her detention rather than the tactics and methods used to effectuate her seizure or civil arrest.

[17] The Plaintiff maintains that by failing to adhere to established police practices in executing the seizure or civil arrest of Ms. Ferreira, Defendants caused her unlawful seizure and death.

(2002))(quoting Anderson v. Creighton, 483 U.S. 635, 640, (1987)("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning [to police officers], and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful'"); see United States v. Lanier, 520 U.S. 259 (1997). In Lanier, the Supreme Court expressly rejected a requirement that previous cases be "fundamentally similar" to demonstrate that the law is clearly established. In fact, the Lanier Court stated that although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. Lanier, 520 U.S. 261; see also Hope, 536 U.S. at 741.

As to the third prong of the qualified immunity test, the Plaintiff submits that any similarly situated officer would have plainly understood that the actions undertaken by the Defendants in response to this incident ran afoul of clearly established rights under the Constitution. In support of this averment, the Plaintiff maintains that a reasonable police officer would not have ignored Department policy and law enforcement protocol by ignoring or dismissing obvious signs of mental distress at Sousa's home and by allowing Ms. Ferreira to leave with deadly weapons, would not have devised a tactical plan that increased the risk of harm to Ms. Ferreira and to the police officers, and would not have permitted Defendants Barlow and Hall to negotiate with Ms. Ferreira because of past history or lack of training.

Based on the foregoing, Defendants' contention that they are entitled to qualified immunity from Plaintiff's constitutional claims is meritless and the Motion as to Ms. Ferreira's constitutional claims should be denied.

**D. Plaintiff Has Alleged Facts Sufficient to Establish Genuine Issues of Material Fact as to Whether Defendants' Negligent Actions and/or Omissions Caused Ms. Ferreira's Death.**

1. Defendants acted negligently by failing to confiscate Ms. Ferreira's weapons and by failing to escort Ms. Ferreira to an appropriate facility for psychiatric assistance.

Defendants submit that the Plaintiff has failed to establish a breach of duty as required in a negligence claim, and therefore are entitled to summary judgment. In support of this contention, Defendants allege they did not have a legal right to seize Ms. Ferreira's guns and did not have an obligation to escort Ms. Ferreira to a healthcare facility. These arguments are without merit.

First, Defendants allege that they were prohibited from seizing Ms. Ferreira's weapons at 64 Brightridge Avenue under the Fourth Amendment absent probable cause that a crime had been or was about to be committed.[18] However, in contradiction of this alleged basis for seizure of weapons, members of the Defendant Department confiscated guns lawfully owned and possessed by the Plaintiff and Sousa following Ms. Ferreira's suicide. Defendants did not have probable cause that the Plaintiff or Sousa committed a crime or were about to commit a crime. Defendants simply demanded that the Plaintiff and Sousa surrender their weapons. Had Defendants followed the same procedure with Ms. Ferreira, she would not have had access to the firearm that caused her death. Accordingly, Defendants breached a duty of care owed to Ms. Ferreira by failing to seize her weapons in the same manner utilized to seize the firearms owned by the Plaintiff and Sousa.

Second, and, more importantly, given the circumstances Defendants encountered at Sousa's home on October 10, 2001, Defendants were indeed permitted to seize Ms. Ferreira's firearms in accordance with the Department's own policies.

General Order #2000-43, entitled "Suicidal/Mentally Ill Persons," states, in pertinent part:

> Often times, police officers, due to the dynamic nature of their role, may be called to intervene in suicide or **mental illness/crisis situations.** Since these situations can be volatile, escalate, and erupt into grave circumstances, interaction with individuals in such a state require a tactful and sensitive

[18] Defendants complain that this claim should be disallowed because it was not alleged in the complaint. Pursuant to Fed.R.Civ.Pro. 8(a), the Plaintiff had no obligation to present each and every factual allegation supporting the various claims.

> approach. The main goal is to get psychiatric assistance for the subject, if needed, and in the safest manner possible. General Order #2000-43, 1.2 (emphasis added).

Further, General Order #2000-43, 1.3(B) states, in pertinent part:

> When possible, an officer should gather as much data on the individual as h/she can obtain…**It is a priority for an officer to ascertain if the individual either possesses or otherwise has access to weapons when the officer has determined that the individual is mentally ill, in crisis, or is suicidal.** General Order #2000-43, 1.3(B)(4).

The policy continues, under section 1.5(D)(3), "Officers shall talk the subject into compliance and seize the subject's weapon." (emphasis added)

These policies require and/or authorize Department members to seize an individual's weapons once it is determined that the individual is "in crisis." In his expert report, based upon the deposition testimony of Defendants Tiernan, David, Rush, and Barlow, Mr. Grossi opined that "it is obvious Ms. Ferreira was in a crisis situation and that suicide may be a possibility." Grossi Report II at 14. Similarly, based upon his review of deposition testimony, Dr. Price stated in his expert report that "Ms. Ferreira clearly met the definition of an individual in crisis, at the time of the initial police visit to her residence." Price Report at 2. Insofar as the Plaintiff has established, through expert testimony, that Ms. Ferreira was "in crisis" at the time of the domestic response call, an issue of material fact exists as to whether Defendants Tiernan, Rush and David were, not only legally justified, but were also required by Department policy to ascertain whether Ms. Ferreira possessed any weapons and seize same.

Third, Defendants claim that General Order #2000-43 did not require Defendant police officers to escort Ms. Ferreira to a healthcare facility, and therefore they were not negligent. However, General Order #2000-43, section 1.2, explicitly states that police officers should "get psychiatric assistance for [a person in crisis]." This policy creates a duty of care owed from police officers to persons "in crisis." In the present case, as stated above, the Plaintiff's experts have both

opined that Ms. Ferreira was "in crisis" while Defendants Tiernan, David, and Rush spoke with her at 64 Brightridge Avenue. Therefore, by failing to escort Ms. Ferreira to a healthcare facility, Defendants breached a duty of care owed to Ms. Ferreira.

Defendants also argue that General Order #2000-43 is inapplicable to this case because Defendants Rush, David and Tiernan responded to a domestic call as opposed to a suicidal/mentally ill persons call. This contention lacks any substance. <u>No</u> evidence has been presented by Defendants that Department police officers were restricted from enforcing certain Department policies because the original response call did not relate to such policy. To suggest that because the initial call was for a domestic disturbance and that the Department was therefore restricted or immunized from adhering to or enforcing other non-domestic call laws, regulations, or policies, or adhering to the duty of care owed to the citizenry, is an incredible assertion and does not warrant any analysis.

Finally, the Plaintiff maintains that Defendants were negligent pursuant to R.I.G.L. §40.1-5-7, <u>Emergency Certification</u>, by failing to escort Ms. Ferreira to an appropriate healthcare facility insofar as she was "in crisis" and required medical care and treatment.

R.I.G.L. §40.1-5-7(a)(1), states, in pertinent part:

> Any physician, who after examining a person, has reason to believe that the person is in need of immediate care and treatment, and is one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, may apply at a facility for the emergency certification of the person thereto…If an examination is not possible because of the emergency nature of the case…the applicant on the basis of his or her observation may determine…that emergency certification is necessary. <u>In the event that no physician is available…a police officer who believes the person to be in need of immediate care and treatment…may make the application for emergency certification to a facility.</u> (emphasis added)

The Rhode Island Superior Court analyzed R.I.G.L. §40.1-5-7 in a suicide scenario in <u>Frizzel v. Town of Little Compton</u>, 2000 WL 33159170 *2 (Jan. 28, 2000 R.I. Sup. Ct.). In <u>Frizzel</u>,

the decedent committed suicide. Prior to the suicide, the decedent's parents notified the Little Compton Police Department that their son was "severely depressed and acting irrationally" insofar as his girlfriend advised him she was seeing someone else. Id. The decedent's parents also called the University of Rhode Island ("URI") campus security and informed them that their son was "distraught and could possibly be suicidal" and may end up at the URI campus. Id. Approximately thirty-seven (37) hours after the decedent's parents contacted the authorities, the decedent was stopped by two (2) members of URI's campus security force. The defendant security officers questioned the decedent and then released him because "there was nothing in [decedent's] demeanor that concerned [them] or indicated that he was a danger to himself." Id. Immediately thereafter, the decedent shot himself.

The decedent's parents brought a negligence action against numerous defendants alleging that URI's employees and/or agents failed to act in accordance with R.I.G.L. §40.1-5-7. More particularly, the plaintiffs argued "that defendants failed to act reasonably when they neither detained [decedent] nor consulted a mental health professional regarding his possible suicide ideation." Id. at *4. In ruling on defendant's motion for summary judgment, the court stated that R.I.G.L. §40.1-5-7 "does delineate a standard of care requiring that persons who are in need of treatment and are in imminent danger due to mental instability be considered for emergency certification by police officers." Id. Accordingly, the court denied defendants' motion for summary judgment and held that "defendants' duty and any breach thereof [under R.I.G.L. §40.1-5-7] will be determined at trial." Id.

In the present case, a factual dispute exists as to whether Ms. Ferreira should have been certified for a consultation with a mental health professional due to her demeanor.[19] As stated

[19] While Defendants claim that "the officers did not personally observe anything which would support an application for certification," Sousa and Walmskey testified that they told the officers that Ms. Ferreira was mentally unstable.

above, Plaintiff's experts have both opined that Ms. Ferreira was "in crisis" while Defendants Tiernan, Rush and David spoke with her at 64 Brightridge Avenue. As such, she should have been considered for emergency certification in accordance with R.I.G.L. §40.1-5-7, i.e., escorted to an appropriate healthcare facility. The Plaintiff maintains that the failure of Defendants Tiernan and David to make the emergency certification constitutes a breach of the standard of care enunciated in Frizzel. The Plaintiff also maintains that the existence of a duty under R.I.G.L. §40.1-5-7 and any breach thereof should not be resolved at the summary judgment stage—both are questions of fact to be determined at trial.[20] Id. Accordingly, Defendants' motion should be denied.

2. Defendants acted negligently while Ms. Ferreira was barricaded in her motor vehicle.

Defendants aver that they were not negligent at the Brightridge/Intervale scene because a legal duty of care did not exist.[21] Defendants also submit that the claim must fail due to the application of the public duty doctrine.

---

[20] In their Memorandum, Defendants focus on the language of R.I.G.L. §40.1-5-7, in particular that officers "may make an application for emergency certification to a facility." Defendants claim that this language does not impose a duty upon officers to make an emergency certification, but allows the responding officers to decide, based on the facts and circumstances of a specific situation, if an emergency certification shall be made. Although this interpretation of R.I.G.L. §40.1-5-7 may be accurate, Rhode Island courts have expressly stated that the question of whether a police officer should have made the emergency certification is a question of fact that should not be decided on summary judgment. Frizzel, 2000 33159170 *4.

Defendants also assert that Defendants Tiernan, David and Rush could not have made an emergency certification because they did not make any "personal observations" of Ms. Ferreira to support an application for emergency certification to a facility pursuant to R.I.G.L. §40.1-5-7(b). However, Defendants Tiernan, David and Rush stated in their deposition testimony that Ms. Ferreira appeared distressed at 64 Brightridge Avenue. Defendant David described both Ms. Ferreira as being "upset" and "angry." He also testified that Sousa and Ms. Ferreira had a "volatile" relationship. Although Defendant Tiernan described both parties as "calm," he acknowledged Ms. Ferreira appeared "emotionally distraught." Defendant Rush testified that both Ms. Ferreira and Sousa were "angry." Furthermore, Rush testified that Ms. Ferreira, in his presence, stated that "her life was a mess." Sousa and Walmskey testified that they told the officers that Ms. Ferreira was mentally unstable. Based on the foregoing, ample evidence existed, through Defendants' "personal observation[s]," to support an application under R.I.G.L. §40.1-5-7. Nonetheless, whether Defendants Tiernan, David and Rush's personal observations supported an application for emergency certification is a question of fact to be determined at trial. Frizzel, 2000 33159170 *4.

[21] Defendants also assert that, even if a duty of care did exist, Defendants did not breach a standard of care. In particular, Defendants claim that a "specific standard of care or set method of dealing with barricade suicide individuals who the police perceive are moments away from killing themselves" does not exist. Defendants' Memorandum at 33-4. Plaintiff disagrees. As in any negligence claim, a standard of care can be established

**a. Duty of Care.**

Relying on Adams v. City of Freemont, 68 Cal. App.4th 243 (Cal. 1st Appellate Dist., 1998), Defendants aver that they did not owe Ms. Ferreira a duty of care while she was in her vehicle surrounded by numerous Department police officers. In Adams, a California appellate court outlined a factor-based analysis under California law used to determine whether a police officer owes a duty of care to a person threatening suicide.[22] Defendants' reliance on Adams is misplaced.

Defendants grasp on Adams is flawed for several reasons, First, Adams is a California state appellate court case and is not controlling in this jurisdiction. Second, the Adams court analysis was based on the premise that the decedent in Adams committed suicide. See Id. at 255. In the present case, the Plaintiff has presented evidence that demonstrates that Ms. Ferreira's death was not a suicidal act, but rather caused by Defendants' own actions and/or omissions. As stated in detail above, while Ms. Ferreira was seated in her motor vehicle, Defendant Feeney reached through the window and made contact with Ms. Ferreira's upper body while the firearm was in her mouth. Mr. Grossi states in his report that Defendant Feeney's actions inadvertently caused the discharge of Ms. Ferreira's weapon.[23] Grossi Report II at 21. The Plaintiff has also presented evidence, through Mr.

---

through expert testimony, "unless the lack of care is so obvious as to be within the layman's common knowledge." Richardson v. Fuchs, 523 A.2d 445, 448 (R.I.1987; see Riley v. Stone, 900 A.2d 1087, 1095 (R.I. 2006). In the present case, the Plaintiff has established appropriate standards of care through his experts, Mr. Grossi and Dr. Price, and, that evidence exists establishing that Defendants deviated from those standards. See Grossi Report I & II and Price Report. Nonetheless, the Plaintiff believes that Defendants' actions were so reprehensible that a lay juror could conclude that Defendants breached a standard of care.

[22] The following factors were analyzed by the Adams Court in determining whether a duty of care exists: (1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered, (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm, (6) the extent of the burden to the defendant; (7) the consequences to the community of imposing a duty to exercise care with resulting potential liability. Adams v. City of Fremont, 68 Cal.App.4th 243, 267-268, (Cal. App. 1 Dist.,1998)

[23] Mr. Grossi opinion is supported by the fact that after it discharged, the firearm was found in a state of stoppage know as a "failure to eject." Stated differently, the spent casing from the fired round did not fully eject form the weapons ejection port. In Mr. Grossi's expert opinion, it is "highly probable" that Defendant Feeney's made contact with Ms. Ferreira's hands and/or the firearm and thereby blocked the ejection port and caused the

Grossi, that Defendants' use of the flash bang devices may have caused Ms. Ferreira to experience a "sympathetic muscle contraction," which produced an involuntary and unintentional discharge of her firearm—"startle effect." Id. at 6-7. Therefore, insofar as Ms. Ferreira' death may not have been a suicide, the Adams analysis is not applicable to the present case. Finally, Defendants cite Adams for the proposition that "police officers responding to a crisis involving a person threatening suicide with a loaded firearm had no legal duty that would expose them to liability." Defendants' Memorandum at 30. This proposition lacks foundation and should be dismissed as nonsensical. If police officers were not accountable for their negligent actions in a suicide scenario, regardless of the nature of their conduct, police officers' actions would go unchecked.[24] If police responding to a suicide threat exhibited conduct that was either callous, reckless, intentional, or negligent, and would escape liability due to the nature of the call, the conduct would reoccur, and, the victims of such conduct would have no recourse merely because of the nature of the call.

Contrary to Defendants' claim, a legal duty was owed to Ms. Ferreira. The existence of a legal duty is a question of law to be determined by the Court. Martin v. Marciano, 871 A.2d 911, 915 (R.I. 2005) (citing Volpe v. Gallagher, 821 A.2d 699, 705 (R.I. 2003)). "The Court must make the determination on a case-by-case basis, considering 'all relevant factors, including the relationship between the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and the foreseeability of harm to the plaintiff.'" Caseau v. Belisle, 2005 WL 2354135, *2 (Sept. 26, 2005, R.I. Super.).

---

failure to eject stoppage. (Plaintiff notes that Defendants' own expert, Ron McCarthy, acknowledges that "something impeded the weapon from cycling," thereby preventing it from ejecting the spent casing of the round that killed Ms. Ferreira.)

[24] In Adams, the court supported its holding that officers should not be held liable in tort for negligence when responding unreasonably to a threatened suicide because there is redress for such conduct via a 42 U.S.C. §1983 action or through a internal departmental complaint. Adams, 68 Cal.App.4th at 274. The court's reasoning is flawed insofar as a §1983 action requires a plaintiff to meet a higher standard and a departmental complaint does not permit a plaintiff to recover damages.

In considering the "relevant factors" in this case, it is a clear a legal duty exists. First, Plaintiff has addressed above the public policy considerations if this Court were to hold that a legal duty did not exist between Defendants and Ms. Ferreira. Second, a special relationship existed between Defendants and Ms. Ferreira establishing a legal duty. Defendants established a perimeter, with a number of officers in positions of cover, surrounding her motor vehicle. She was not free to move and was therefore seized. Third, the harm to Ms. Ferreira was foreseeable. A reasonable officer would have foreseen, among other things, that by failing to bring in a trained, experienced negotiator or psychologist, by allowing an improperly trained officer, with a past personal and professional relationship with Ms. Ferreira, to conduct the crisis negotiation, by implementing a "hastily" prepared tactical plan, by improperly utilizing flash bang devices and a Haligan breaching tool, and touching Ms. Ferreira's upper body while she had a gun in her mouth, would have caused Ms. Ferreira harm. Finally, the scope and burden of the obligation to be imposed upon the Defendants was not onerous. As Mr. Grossi states in his May 26, 2005 expert report, proper police tactical procedures for handling threats of suicide existed at the time the within incident occurred and should have been implemented by Defendants. See Report of David M. Grossi, dated May 26, 2005 ("Grossi Report I") at 11. These procedures included the following:

> 1) subject containment and isolation…2) initial assignment of an uninvolved, trained police officer to begin a dialogue with Ms. Ferreira, or in the absence of such an officer being immediately available, a second option is to bring in a trained crisis intervention counselor, negotiator, or psychologist to advise the contact officer on what type of defusing dialogue to engage in. And if matters reach a critical point, that trained counselor or negotiator should continue the dialogue with Ms. Ferreira, 3) officers should establish a command post manned by knowledgeable supervisory personnel to ensure tactical discipline of all on-scene officers, 4) notify EMS or Rescue personnel to stand-by, and finally 5) wait out Ms. Ferreira in an effort to de-escalate her emotional state. Id.

In attempting to shift the focus from the violations of established police practice and protocol in responding to this incident, Defendants take the position that no duty can be imposed

because it would create a Hobson's choice for officers—refuse assistance, or, assist and face the risk of liability. Defendants' predicament is of their own making due to their failure to adhere to Department policy and law enforcement protocol.

It is also evident that the nature of the intervention by the Defendants while Ms. Ferreira was barricaded in her vehicle gave rise to a duty to exercise care not to leave the object of the rescue—Ms. Ferreira—in a worse condition than if the intervention had not been attempted.[25] Adams, supra; Restatement (Second) of Torts, §323. In the present case, Defendants did not "merely respond to a call for assistance and take some inconsequential action." Adams, 68 Cal.App 4th at 302. As described in detail above, Defendants took complete control of the situation and "initiated extreme measures…all of which were employed in a particularly aggressive manner."[26] Id. Defendants' conduct, therefore, gave rise to a duty to exercise reasonable care and not increase the risk of harm to Ms. Ferreira.

Based on the foregoing, Defendants owed Ms. Ferreira a duty of care. As such, Plaintiff's negligence claim in his capacity as administrator and guardian is viable and should not be summarily dismissed.

**b. Public Duty Doctrine**

Defendants also aver that Plaintiff's negligence claims are barred due to the public duty doctrine, because at the time Ms. Ferreira died, Defendants were performing "discretionary public functions." R.I.G.L. §9-31-1.

---

[25] "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Thames Shipyard and Repair v. U.S., 350 F.3d 247, 260 (1st Cir. 2003)(citing Restatement (Second) of Torts §323 (1965)); Losinski v. County of Trempealeau, 946 F.2d 544 (7th Cir. 1992).

[26] The reference to "extreme measures" includes the hostile negotiations conducted by Defendant Barlow and the tactical plan that called for a SWAT-type of assault by four (4) officers on Ms. Ferreira's vehicle.

The State's waiver of sovereign immunity in R.I.G.L. §9-31-1 "allows a plaintiff to recover damages in tort if he or she is able to prove negligence on the part of the state." Haley v. Town of Lincoln, 611 A.2d 845, 848 (R.I. 1992). To maintain a negligence action, a plaintiff "must demonstrate that he or she is owed a legal duty by the state, the breach of which serves as the basis of liability." Id. The Plaintiff maintains that Defendants' contention here is flawed because he has alleged sufficient facts to establish that Defendants owed Ms. Ferreira a special duty and that Defendants' conduct was egregious. Morales v. Town of Johnston, 895 A.2d 721, 731 (R.I. 2006) Schultz v. Foster-Glocester Regional School District, 755 A.2d 153, 155 (R.I. 2000)(The public duty doctrine is applicable to governmental functions, except: "(1) when the governmental entity owes a 'special duty' to the plaintiff, (2) when the alleged act or omission on the part of the governmental entity was egregious, or (3) when the governmental entity engaged in activities normally undertaken by private individuals or corporations").

The existence of a special duty, as an exception to the public duty doctrine, "can be established when a plaintiff has had prior contact with state or municipal officials who then knowingly embark on a course of conduct that endangers the plaintiff, or when a plaintiff has otherwise specifically come within the knowledge of the officials so that the injury to that particularly identified plaintiff can be or should have been foreseen." Knudson v. Hall, 490 A.2d 976, 978 (R.I. 1985); see Gagnon v. State, 570 A.2d 656 (R.I. 1990).

In the present case, Ms. Ferreira had "come within the knowledge of" Defendants, thereby making her death foreseeable. Defendants Tiernan, David, and Rush had specialized knowledge of Ms. Ferreira's unstable mental condition at 64 Brightridge Avenue. As stated above, in his deposition testimony, Defendant David described Ms. Ferreira as "upset" and "angry." He also testified that Sousa and Ms. Ferreira had a "volatile" relationship. Defendant Rush testified that Ms. Ferreira was "angry." Ms. Ferreira, in Rush's presence, stated that "her life was a mess."

Walmskey and Sousa told these same officers that Ms. Ferreira was mentally and emotionally unstable and should not be permitted to leave with deadly weapons.

Defendants Tiernan, David, and Rush had knowledge that Ms. Ferreira possessed firearms. In fact, according to Defendants Tiernan and David, Ms. Ferreira stated in their presence that she wanted to take her guns—a .38 caliber revolver and a 9mm handgun—with her. Sousa and Walmskey both testified at their depositions that they informed the officers that Ms. Ferreira was mentally unstable and that they should not let her leave with her firearms.[27] Also, as stated above, the Plaintiff's experts, Dr. Price and Mr. Grossi, both stated in their expert reports that allowing Ms. Ferreira to leave 64 Brightridge with her firearms, while "in crisis," increased the risk of suicide.

Based on Ms. Ferreira's compromised mental state and the fact that she was "in crisis," Defendants should have been aware that by launching an assault on her vehicle, it was foreseeable that Ms. Ferreira would then intentionally or involuntarily discharge her firearm, thereby creating a special duty. In their Memorandum, however, Defendants assert that Ms. Ferreira's death was not a reasonably foreseeable consequence of their actions. In taking this position, Defendants argue that "it is undisputed that at the time the [tactical] plan was initiated, Ms. Ferreira had the gun in her lap" and "that after the plan went into effect she moved the gun to her mouth." Defendants' Memorandum at 29. Defendants' appear to argue that because the tactical plan was deployed while Ms. Ferreira had the gun in her lap, it was not foreseeable that she would lift the gun to her mouth and pull the trigger. Such an assertion is illogical. A reasonable officer could have foreseen that by storming a vehicle using SWAT tactics, while a person contemplating suicide is inside the vehicle with a loaded weapon, would cause such an individual to shoot herself or himself or even others—whether intentionally or involuntarily. In addition, Defendants' allegation that it is "undisputed"

[27] It is undisputed that neither Defendants Rush, David or Tiernan made any inquiry following these statements.

that the gun was in Ms. Ferreira's lap when the tactical plan was initiated is false. Defendant Barlow testified at his deposition that at the time the first flash bang was detonated Ms. Ferreira "had her head on the gun." Deposition of Walter Barlow at 103. However, Defendant Hall, who was standing immediately beside Defendant Barlow, testified at his deposition that he was unable to see whether the gun was in Ms. Ferreira's mouth at the time the flash bangs were detonated.[28] Deposition of Stephen J. Hall at 80-82. Accordingly, this Court cannot rule, as a matter of law, that Ms. Ferreira's death was not a foreseeable consequence of Defendants' actions and that therefore the public duty doctrine is inapplicable. Tedesco v. Connors, 871 A.2d 920, 925 (R.I.2005)("when a plaintiff brings suit against a governmental entity based on the special duty exception, deciding that issue as a matter of law is only appropriate when no genuine issue of fact exists concerning each element of the special duty exception.")

Defendants Tiernan, David, and Rush also owed Ms. Ferreira a special duty pursuant to R.I.G.L. §40.1-5-7. As described above, the foregoing statute imposes a particular or special duty upon police officers to get individuals immediate mental health care in certain situations. As stated above, Defendants Tiernan, David, and Rush acknowledged that Ms. Ferreira was "upset" and "angry," and Plaintiff's experts have opinioned that she was "in crisis." As such, Defendants Tiernan, David, and Rush had a special relationship with Ms. Ferreira under the aforementioned statute.

East Providence Police Department, General Order #2000-43 also created a special relationship between Defendants Tiernan, David, and Rush and Ms. Ferreira. As stated above, the Order permits police officers "to get psychiatric assistance for [a person in crisis]," requires officers to take a "tactful and sensitive approach" when interacting with such persons, and to seize the weapons of those individuals in crisis. The Plaintiff avers that Ms. Ferreira was "in crisis" while

[28] A dispute of a fact therefore plainly exists as to this critical issue even amongst Defendants.

she was at 64 Brightridge Avenue, and that Defendants Tiernan, David, and Rush had specialized knowledge of Ms. Ferreira's mental state based upon their testimony. Therefore, Defendants Tiernan, David, and Rush owed Ms. Ferreira a special duty of care under General Order #2000-43.

In addition, the Rhode Island Domestic Violence Prevention Act, R.I.G.L. §12-29-1, et seq., established a special relationship between Defendants Tiernan, David, and Rush and Ms. Ferreira. R.I.G.L. §12-29-3(a) states, "The primary duty of law enforcement officers when responding to a domestic violence situation is to…protect the victim." Insofar as Defendants allege that Defendants Tiernan, David, and Rush were responding to a domestic call, Defendants Tiernan, David, and Rush had a duty to protect Ms. Ferreira. This duty clearly established a special relationship between Ms. Ferreira and Defendants Tiernan, David, and Rush.

Moreover, as described in detail above, a special relationship existed between Ms. Ferreira and Defendants based on the fact that Defendants had an affirmative duty to protect Ms. Ferreira from physical harm under the special relationship and state-created danger exceptions as discussed in DeShaney, supra.

For the foregoing reasons, Defendants owed Ms. Ferreira a special duty of care and as such, the special relationship exception to the public duty doctrine applies.

The public duty doctrine is also not applicable because Defendants' conduct was egregious. To determine whether a governmental entity's conduct is egregious pursuant to the public duty doctrine, "a court will consider: (1) whether that entity created or allowed for the persistence of 'circumstances that forced a reasonably prudent person into a position of extreme peril;' (2) whether that entity had 'actual or constructive knowledge of the perilous circumstances;' and (3) whether that entity 'having been afforded a reasonable amount of time to eliminate the dangerous condition, failed to do so." Haley v. Town of Lincoln, 611 A.2d 845, 849 (R.I. 1992). "A determination of the egregious conduct exception is a mixed question of law and fact and, therefore, a trial justice must

allow a jury to find the predicate or duty-triggering facts, provided any exist, in making such a determination." Tedesco, 871 A.2d at 926.

Based upon the elements listed above, the Plaintiff submits that Defendants' actions were egregious. First, the Plaintiff has alleged sufficient facts establishing that Defendants created or allowed for the persistence of the circumstances that led to Ms. Ferreira's extreme peril—her death—by, among other acts or omissions, 1) failing to seize Ms. Ferreira's gun or escort her to a healthcare facility while at 64 Brightridge Avenue, 2) failing to bring in a trained, experienced negotiator or psychologist at the Intervale/Brightridge stage of the incident, 3) allowing an improperly trained officer, with a past personal and professional relationship with Ms. Ferreira, to conduct the crisis negotiation, 4) engaging in hostile negotiations with an individual in a compromised mental and emotional state 5) implementing a "hastily" prepared tactical plan, 6) improperly utilizing flash bang devices, 7) attempting to break Ms. Ferreira's car window with a Haligan breaching tool, and 8) touching Ms. Ferreira's upper body while she had a gun in her mouth. Second, Defendants had "actual or constructive knowledge of the perilous circumstances" through their mere presence at 64 Brightridge Avenue and the scene of Ms. Ferreira's death. Third, Defendants failed to eliminate the dangerous condition facing Ms. Ferreira. In fact, as described above and as substantiated by Plaintiff's expert testimony, Defendants' actions and/or omissions throughout the within incident not only failed to eliminate a dangerous condition, but substantially increased the risk of harm to Ms. Ferreira.[29] Therefore, because material facts are in dispute as to whether Defendants' acts and/or omissions rise to the level of egregious conduct, this Court cannot rule, as a matter of law, that the public duty doctrine is applicable.

---

[29] In Dr. Price's expert opinion, Ms. Ferreira's emotional state deteriorated due to the police conduct ("the failure to listen in a calm, detached and non judgmental manner, the conveying of admonishments and demands instead of empathetic listening … and the use of emotionally charged dialogue such as loud and profane speech… .") during the third stage of the incident and said conduct "substantially" contributed to her death. Price report at 6-7.

**E. Plaintiff Has Alleged Facts Sufficient to Establish that Defendants City and Dias Failed to Properly Train, Instruct, and/or Supervise the Individual Defendant Police Officers.**

The Defendants have also moved for summary judgment relative to Plaintiff's federal and state law claims for failure to train or supervise.[30]

In order to establish a claim against a municipality under §1983 for failure to adequately train police officers, a plaintiff must prove: (1) that the training program at issue is inadequate to the tasks that officers must perform; (2) that the inadequacy is the result of the city's deliberate indifference; and, (3) that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. Harris, supra. Furthermore, a training program must be adequate in both content and duration. See Russo v. City of Cincinnati, 935 F.2d 1036, 1047 (6th Cir. 1992)("…we find the fact that the City offered a seven hour course entitled 'Disturbed-Distress Persons' insufficient in and of itself to shield the City from liability").

In the present case, substantial evidence exists establishing that Defendants City and Dias were deficient in properly training their police officers relative to General Order No, 2000-43, R.I.G.L. §40.1-5-7, handling of domestic violence response situations, the use of flash bang devices, crisis intervention protocol, and the preparation and implementation of SWAT or SRT tactical plans.[31] Mr. Grossi will testify that the inadequate training establishes deliberate indifference on the part of the City towards Ms. Ferreira and that there is causal connection between the constitutional deprivation at issue and the inadequate training. Monell v. Department of Social Services, 436 U.S. 658 (1978); Harris, 489 U.S. at 387(inadequate police training will support liability under section 1983 where such failure "amounts to deliberate indifference to the rights of persons with whom they police come into contact"); Board of County Com'rs v. Brown, 520 U.S. 397 (1997); Young v.

[30] Plaintiff also objects to Defendants' Motion as to the State law claim for the same reasons cited herein as well as in Welsh Mfg., Div. Of Textron, Inc. v. Pinkerton's Inc., 474 A.2d 436, 440 (R.I. 1984).

[31] Deficiencies in the training as to General Order #2000-43 are evidenced in the various interpretations of

City of Providence, 404 F.3d 4 (1st Cir. 2005); Allen v. Muskogee, Oklahoma, 119 F.3d 837, 842 (10th Cir. 1997)("evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability"); Russo, 935 F.2d at 1047; Jenkins, 81 F.3d. at 994, citing Harris, 489 U.S. at 390 ("if the inaction theory rests on alleged failure to train, the plaintiff must prove 'need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifference to the need' for additional training.").

Due to the existence of material factual issues as to the failure to train claims, Defendants Motion as to this claim should be denied.

**F. Plaintiff's State Tort Claims are not Barred by Qualified Immunity.**

Defendants aver that the Plaintiff's state tort claim must fail due to the application of qualified immunity. For the reasons cited above, the Plaintiff maintains that Defendants' Motion must be denied.

**G. Because Genuine Issues of Material Fact Exist Relative to Whether Defendants' Conduct Was the Proximate or Actual Cause of Ms. Ferreira's Death, Defendants' Motion Should Be Denied.**

Defendants submit that the Plaintiff will not be able to establish a causal connection between the Defendants' unlawful conduct and the injuries suffered by Ms. Ferreira resulting in her death. In support of this proposition, Defendants rely on the "uncontrollable impulse" rule as described in Clift v. Narragansett Television, L.P., 688 A.2d 805 (R.I. 1996), as the causation standard in suicide

the Order found in Plaintiff's Statement of Disputed Facts at §II, 5-16.

cases. The Plaintiff submits that Defendants' reliance on Clift and the "uncontrollable impulse" rule is erroneous and that the ordinary duty of care standard should apply in this case.[32]

1. "Uncontrollable Impulse" Rule

In Clift, the Supreme Court applied the "uncontrollable impulse" rule to the facts of the case. The Court stated:

> With regard to civil claims alleging, as a basis for liability, the negligence of a defendant as being the proximate cause of a decedent's suicide, the majority rule that has evolved is that unless a special relationship existed between the defendant and the deceased that created an increased or higher duty of care to protect a potentially suicidal person from foreseeable injury, the Restatement (Second) Torts §455 (1965) rule [referred to as the "uncontrollable impulse" rule] is the most favored and applied. Id. at 810 (emphasis added).

The Court further stated that the "uncontrollable impulse" rule "recognizes liability for negligent conduct (1) that brings about delirium or insanity in another and (2) if while that condition of delirium or insanity continues to exist, it prevents the affected person from realizing the nature of his or her condition or makes it impossible for him or her to resist the suicidal impulse by depriving that person of the capacity to reasonably control his or her conduct and not carry out the suicidal impulse." Id. However, as stated above, the "uncontrollable impulse" rule is not applicable when a "special relationship" exists between defendant and the decedent. Id. The existence of a "special relationship" is a question of fact. Frizzel v. Town of Little Compton, 2000 WL 33159170 *2 (Jan. 28, 2000 R.I. Sup. Ct.)("Whether this [special relationship] test is satisfied is one of factual determination more appropriate for a trier of fact").

2. The uncontrollable impulse rule is inapplicable insofar as a factual dispute exists as to whether a suicide occurred.

[32] The causation standard for Plaintiff's constitutional claims and state tort claims are the same. Johnson v. Mahoney 424 F.3d 83, 89 (1st Cir. 2005); see Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st Cir.1987) ("Section 1983 imposes a causation requirement similar to that of ordinary tort law.")

The "uncontrollable impulse" rule was developed to permit liability for negligent conduct in lawsuits involving suicide. In the present case, however, the Plaintiff has presented sufficient facts suggesting that Ms. Ferreira did not commit suicide. First, Mr. Grossi states in his expert report that "it is highly probable that Officer Kevin Feeney inadvertently caused the discharge of Ms. Ferreira's pistol" when he reached into Ms. Ferreira's motor vehicle. See Grossi Report II at 21. Second, Plaintiff has proffered evidence, through Mr. Grossi's report, that Defendants' use of the flash bangs caused a "startle effect" or "sympathetic muscle contractions" that may have caused Ms. Ferreira to involuntarily pull the trigger of the gun in her mouth. See Grossi Report II at 6-7.

Accordingly, since facts are in dispute as to whether a suicide did occur, the uncontrollable impulse rule is inapplicable. Therefore, the ordinary duty of care standard should apply.

3. The uncontrollable impulse rule is inapplicable to this matter due to special relationship between Defendants and Ms. Ferreira.

As described in detail above, a special relationship existed between Defendants and Ms. Ferreira based on the following: 1) because Ms. Ferreira's death was clearly foreseeable by Defendants, 2) pursuant to R.I.G.L. §40.1-5-7, General Order #2000-43, and the Rhode Island Domestic Violence Prevention Act, R.I.G.L. §12-29-1, et seq., and 3) based on the fact that Defendants had an affirmative duty to protect Ms. Ferreira from physical harm under the special relationship and state-created danger exceptions as discussed in DeShaney, supra.

Therefore, insofar as a special relationship existed in this case, the uncontrollable impulse standard, as described in Clift, does not apply.

**H. Individual Claims of Anthony J. Ferreira**

Defendants submit that the individual claims of Anthony J. Ferreira should be dismissed because it is "undisputed" that he refused to move after being ordered to do so and thus the officers actions in removing and restraining him were justified. Defendants' Memorandum at 46.

Defendants also argue that even if there actions lacked probable cause, they are entitled to qualified immunity.

Defendants contention as to probable cause and qualified immunity is fatally flawed due to the characterization of the facts, that are indeed in dispute, which preceded Plaintiff's seizure.

The Plaintiff has testified that after he was ordered to back away from Ms. Ferreira's vehicle, he complied with the order, and that as he was doing so, he was assaulted by Defendants David and Hall, who repeatedly kicked and punched him. Deposition of Anthony J. Ferreira at 59-64. Accordingly, contrary to Defendants' assertion, the Plaintiff disputes that he refused to move from Ms. Ferreira's vehicle.

Due to the existence of a material factual dispute between the Plaintiff and Defendants' account of the events that preceded the Plaintiff being seized, Defendants are not entitled to summary judgment or qualified immunity.

## VI. CONCLUSION

**WHEREFORE,** for the foregoing reasons, the Plaintiff respectfully prays that Defendants' Motion for Summary Judgment be denied.

PLAINTIFF,
By his Attorneys,
SINAPI FORMISANO & COMPANY, LTD.

/s/ V. Edward Formisano
/s/ Michael D. Pushee __

V. Edward Formisano (5512)
Michael D. Pushee (6948)
100 Midway Place, Suite 1
Cranston, Rhode Island 02920-5707
(401) 944-9690
(401) 943-9040 (facsimile)

**CERTIFICATION**

TO: Marc DeSisto, Esq.
211 Angell Street
P.O. Box 2563
Providence, RI 02906

I hereby certify that on the 22nd day of May, 2007, I caused the within to be electronically filed with the Clerk of the U.S. District Court for the District of Rhode Island using the CM/ECF System. I also certify that the above counsel of record has received the within.

/s/ V. Edward Formisano