UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANTHONY J. FERREIRA, As Administrator of the Estate of Patricia J. Ferreira, and as Guardian of the Estate and Person of Ryan C. Ferreira, Plaintiff, v. CITY OF EAST PROVIDENCE, et al., Defendants. | C.A. No. 05-73 S |
| ANTHONY J. FERREIRA, individually, Plaintiff, v. CITY OF EAST PROVIDENCE, et al., Defendants. | C.A. No. 05-75 S |

**OPINION AND ORDER**

William E. Smith, United States District Judge.

The City of East Providence and various members of its police force ("Defendants")[1] seek summary judgment on claims brought against them by Anthony Ferreira ("Ferreira"), both individually and in his capacity as administrator of the estate of his sister,

---

[1] Namely, Kevin J. Fitzgerald, in his official capacity as Treasurer of the City of East Providence, Kevin M. Feeney, Stephen J. Hall, Stephen E. Tiernan, and Michael A. David, Walter H. Barlow, Jr., Thomas J. Rush, and Gary Dias.

Patricia Ferreira ("Patricia"), stemming from Patricia's tragic suicide and the events immediately preceding her death. For the reasons set forth below, summary judgment in favor of Defendants on all counts is granted.

I. Facts and Background

The following facts are undisputed, or if not, are taken in the light most favorable to Ferreira. On October 10, 2001, twenty-eight year old Patricia died of a self-inflicted gunshot wound while barricaded in her car on Brightridge Avenue in East Providence. Earlier that day, after learning that Patricia and her boyfriend were arguing, Anthony Ferreira and his mother appeared at the East Providence Police Station with Patricia's eight year-old son. The Police were familiar with Patricia and her boyfriend, John Sousa, because of their frequent altercations. Anticipating that the police ultimately would be called to Sousa's home, where Patricia had been living, Ferreira and his mother informed Captain Walter Barlow of the fight, and that they would be taking Patricia's son to their home. After speaking with Patricia's son, Barlow dispatched a patrol car to Sousa's residence.

Officers Steven Tiernan and Michael David arrived first at Sousa's residence, followed shortly after by Sergeant Rush. Officer Tiernan spoke with Patricia and another individual who

identified herself as Sousa's ex-wife. Officer David spoke with Sousa, who revealed that he had made alternate living arrangements for Patricia, though they were not yet available. Agreeing that she should not remain in the home with Sousa, Patricia arranged to stay with Sousa's ex-wife for the next few weeks. At that point, as Officers Tiernan and David remained to supervise the situation, Patricia began to remove her belongings from Sousa's home. Sousa then alerted the officers that Patricia had firearms in the home. Although both officers testified in a deposition that Sousa wanted Ms. Ferreira to remove her weapons because he was afraid she would accuse him of stealing them, Sousa maintains that he repeatedly told the officers not to allow Patricia to take her guns with her.

Shortly before 6:00 that same evening, Anthony Ferreira returned home. Patricia arrived there moments later with some of her belongings. Apparently upset about the possibility of getting into trouble with the police and DCYF, Patricia announced her intention to kill herself. She then walked to the rear of her car, retrieved two guns from the trunk, and got into the driver's seat. Seeing his sister with a handgun pointed at her chest, and another next to her lap, Ferreira reached into the car and took one of the guns away from her. Patricia then began to drive away, declaring that she would "just use my other gun." Ferreira then called 911

and reported that his sister was threatening to commit suicide. He told the operator that she had a gun.

Ferreira pursued his sister up the street, where she stopped her vehicle. As the police arrived at the scene and established a perimeter around the car, Ferreira remained close to Patricia. One of the officers, Sergeant Hall, ordered Ferreira to back away, but Ferreira refused, instead instructing the officers to leave the scene. Despite continued police orders that he move away from the vehicle, Ferreira draped his body across the windshield of Patricia's car, blocking the officers' view of her. The officers testified that Ferreira resisted their attempts to remove him from the windshield, whereas Ferreira claims that he eventually got off of the car voluntarily, and followed the officers' commands. Regardless, it is undisputed that a struggle ensued, and that the officers ultimately resorted to the use of pepper spray to subdue him. Ferreira was handcuffed and placed in a police cruiser,[2] as was Sousa, who arrived at the scene around the same time and who likewise attempted to approach the vehicle, despite police warnings to stay away. Another confrontation ensued, resulting in Sousa being taken into custody as well.

---

[2] Although Ferreira was brought to the East Providence Police Department, the charges against him were dropped, and he agreed to surrender his firearms for a period of sixty days.

At this point, despite the presence of multiple police cruisers and officers surrounding the car, Patricia began to move her vehicle slowly up the street. Followed by the police, Patricia slowly drove several blocks until she reached Brightridge Avenue, where, because her path was blocked by a police van, she came to a final stop. Police cruisers then surrounded her vehicle. Sergeant Rush then took a position close to the car and could see Patricia in the driver's seat holding a handgun with the barrel in her mouth.

Sargent Hall arrived shortly thereafter and attempted to engage Patricia. Although he kept his distance and attempted to seek cover from a nearby truck, Hall was close enough to Patricia's vehicle that he could communicate with her. From a short distance away, Hall told Patricia to put the gun down on the dashboard and exit the vehicle. Captain Barlow, who knew Patricia through her past dealings with the police, also arrived on scene and began to converse with her in an attempt to get her to put down her weapon and exit the vehicle. As Hall and Barlow attempted to coax Patricia out of the vehicle, Sergeant Rush began to secure the perimeter and organize the other officers in case the situation escalated. At the same time, neighborhood residents began exiting their houses and coming to the scene.

At Sergeant Hall's instruction, Officer Kevin Feeney called the Special Response Team ("SRT") van to the scene. Lieutenant Alister McGregor (now deceased), who was in charge of the SRT, arrived shortly thereafter. The SRT determined that a "hasty rescue" plan should be in place, referring to an alternate plan which could be implemented if circumstances did not allow for execution of the primary, slower negotiation approach. This hasty rescue was to be executed only if it was determined that Patricia was seconds away from committing suicide and nothing else could be done. The plan called for two, two-man teams to approach the car from both sides. One team would consist of Feeney and Sgt. Rush with Sgt. Rush deploying a "flashbang" diversionary device on the driver side of Patricia's car. Feeney and Sgt. Rush would then make a speedy approach to the driver's door using a ballistic shield. The second team would consist of Lieutenant McGregor and Officer Michael David, who were to approach her on the passenger side of the vehicle, using a ballistic shield and a flashbang diversionary device. When they reached the passenger side, McGregor would throw the diversionary device through the passenger side front window. Simultaneously, Officer Feeney would break the driver side window and grab the firearm from Patricia.

As the plan was being put into place, Sgt. Hall and Captain Barlow continued their efforts to talk to Patricia. She told the officers that "the world is all screwed up," and began to talk about her personal problems. Captain Barlow and Sergeant Hall attempted to calm and reassure her. Despite this, Patricia indicated that she would rather die than be placed in a "mental institution." All during this time, she alternately would place the gun in her mouth or at her chest. Captain Barlow requested that Patricia look at him, and urged her not to do anything. After approximately one hour of discussions, Patricia reached into the backseat area and retrieved a cloth which she placed on the back cushion of her seat and headrest. She then opened her window, threw an American flag onto the hood of the car, indicating that she did not want to get blood on it, and told Captain Barlow and Sergeant Hall to return to their vehicles. Patricia then turned up the radio, blessed herself with the Sign of the Cross and closed her eyes.

At this point, Captain Barlow concluded it was the last and best opportunity for the police to try to save Patricia's life. He signaled to Lieutenant McGregor to initiate the hasty rescue plan. In accordance with the plan, the two, two-man teams approached the vehicle from either side. Sergeant Rush threw his flashbang device

and it exploded in front of the driver side front wheel. Lieutenant McGregor threw his flashbang toward the right front passenger window, but the window did not break as intended; instead, the device exploded just to the right of the car. Officer Feeney immediately ran to the driver's side window, swung at the window until it broke, and reached into the car. Unfortunately, as Officer Feeney reached his hands into the car, the gun fired and he fell to the ground. Feeney immediately stood up and retrieved the handgun which was still in Patricia's hand and on her lap. In spite of the officers' efforts, Ms. Ferreira's aim was true, and she was pronounced dead at the scene.

Anthony Ferreira brought two separate suits, which have since been consolidated, against the City of East Providence and several members of the city's police force, both individually and in their official capacities. In his personal suit, Ferreira advances the following claims: negligence, assault and battery,[3] and false arrest and unreasonable seizure. In his role as administrator of Patricia's estate and as the guardian of the estate of her son,

---

[3] Although the Complaint in this matter does not expressly set forth a claim for excessive force, Defendants have construed the facts and allegations pled as giving rise to such a claim. Likewise, this Court will consider Ferreira's claims as setting forth a general claim of excessive force together with the allegations of assault and battery.

Plaintiff claims: negligence and wrongful death, Section 1983 claims for unlawful seizure under the Fourth Amendment, violation of Patricia's due process rights, and failure to train or supervise, as well as nearly identical claims under the Rhode Island Constitution.

II. Standard of Review

Summary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it has the "potential to affect the outcome of the suit." Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 15 (1st Cir. 2007) (citations omitted). Once the movant has made the requisite showing, the nonmoving party "may not rely merely on allegations or denials of its own pleading; [but] . . . must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 46 (1st Cir. 2008).

## III. Analysis

### A. Claims Unique to Anthony Ferreira

Ferreira alleges that he was subject to false arrest in violation of his right to be free from unlawful seizure, and that the Defendants mistreated him in the course of his arrest. Ferreira claims that he complied with police orders, but nonetheless was arrested and physically battered by Defendants. Defendants assert that they were authorized and justified when they forcibly removed and restrained Ferreira. Although certain specific facts surrounding Ferreira's behavior at the scene are disputed, it is undisputed that upon responding to Ferreira's 911 call alerting them to Patricia's suicidal intentions and possession of a loaded weapon, officers arrived at the scene to find Ferreira actively engaged with Patricia, and that he proceeded to interfere with their duties. It is likewise undisputed that once the officers attempted to effectuate an arrest of Ferreira, a struggle ensued, and Ferreira ultimately was handcuffed and placed in the back of a police cruiser.

Ferreira asserts, under both Rhode Island law and the United States Constitution through 42 U.S.C. § 1983, that Defendants violated his constitutional right to be free from unreasonable seizure by subjecting him to false arrest. These claims are

inextricably related to one another and stand or fall together. The Fourth Amendment "guarantees individuals 'the right to be secure in their persons . . . against unreasonable . . . seizures of the person,'" and likewise extends its protections to unjustified arrest and detention. Pena-Borrero v. Estremeda, 365 F.3d 7, 12-13 n.8 (1st Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)). Under Rhode Island law, false arrest is defined as "the restraint of another person without legal justification or without any color or legal authority." Henshaw v. Doherty, 881 A.2d 909, 919 (R.I. 2005) (citations omitted). The viability of claims of false arrest and unreasonable seizure hinges on the same question: was there probable cause to arrest and seize Ferreira? Where probable cause is present, both causes of action must fail. See id.; Vigeant v. United States, 462 F. Supp. 2d 221, 227 (D.R.I. 2006).

Probable cause exists "when the facts and circumstances within the officer's knowledge at the time of arrest, and of which he has reasonably trustworthy information, would warrant a reasonably prudent person's belief that a crime has been committed and that the suspect committed the crime." Winn v. Collins, 723 A.2d 798, 799 (R.I. 1998); United States v. McFarlane, 491 F.3d 53, 56 (1st Cir. 2007). The inquiry takes into consideration the totality of

the circumstances and focuses on what the officers knew at the time of the arrest. McFarlane, 491 F.3d at 56. A subsequent decision to drop the charges stemming from an arrest does not ipso facto establish lack of probable cause at the time of the arrest. See Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985).

Ferreira summarily asserts that summary judgment should be denied because there is a factual dispute as to how the events unfolded. However, even taking as true Ferreira's assertions, Defendants' actions were reasonable, justified, and supported by probable cause. At the time police arrived at the scene, Patricia was barricaded in her car, with a loaded weapon, in the middle of a residential neighborhood. Rather than allow the police to handle the dangerous situation, Ferreira initially refused to move away from the vehicle, thereby preventing police from performing their duties. He then threw himself across the windshield of the car, obscuring Defendants' view of Patricia and her loaded weapon, further interfering with the police, and heightening the danger to himself and those surrounding the car.

Irrespective of the factual disagreements regarding the details of how events unfolded, without question, the police were well within their authority to preventively seize and arrest Ferreira, both for his obstructive actions and to prevent further

interference and increased danger. Defendants were justified - indeed obligated - to remove Ferreira from the immediate vicinity of the car. See City of Simi Valley v. Superior Court, 4 Cal. Rptr. 3d 468, 474 (Cal. Ct. App. 2003); Christiansen v. City of Tulsa, 332 F.3d 1270, 1281-82 (10th Cir. 2003). To do otherwise would have exposed Ferreira, the police officers, Patricia, and neighborhood bystanders, to needless risk and would have placed Ferreira, who was in a stressed and upset state, effectively in charge of the situation.

Ferreira also claims that he was subject to excessive force at the hands of Defendants, and has brought claims of negligence, and assault and battery against them. It is apparent that Ferreira resisted arrest and that a struggle ensued when Defendants attempted to handcuff him. Ferreira alleges that in the course of his arrest, he was punched, kicked, and pepper sprayed. Defendants deny that excessive force was used, and instead maintain that because Ferreira physically fought their efforts to move him away from the vehicle in which his suicidal sister was brandishing a loaded weapon, they resorted to pepper spray to subdue him. They contend that any physical force used against Ferreira was exerted during their struggle with him in their efforts to bring him to the ground and handcuff him.

In this case, crediting Ferreira's version to the extent there is a dispute about what transpired, the question is whether the acts of the Defendant officers, undertaken in the midst of a standoff with a suicidal woman, rise above the level of ordinary force necessary under the circumstances. It is well understood that "the nature of a police officer's work may require the use of 'some force' from time to time when dealing with recalcitrant arrestees and others who attempt to interfere physically with the police while they are doing their job." Cruz v. Town of N. Providence, 833 A.2d 1237, 1240 (R.I. 2003). Furthermore, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). Thus, the standard for establishing excessive force is a rigorous one, requiring that a plaintiff show "(1) significant injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." Reese v. Anderson, 926 F.2d 494, 500 (5th Cir. 1991). Applying this test, Ferreira has presented no evidence that he suffered injury, let alone that the injury was significant. While Ferreira did receive some minor medical

attention following his arrest, this falls far short of meeting his burden. Moreover, even if Ferreira's injury was significant, his claim also fails because he cannot show that the force used was "clearly excessive" and "objectively unreasonable." Id.

The reasonableness inquiry boils down to whether Defendants' actions "are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; see also Pena-Borrero v. Estremeda, 365 F.3d 7, 13 (1st Cir. 2004). The inquiry focuses on the facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." See Graham, 490 U.S. at 396. The Court must keep in mind as well that "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Id. at 397. Thus the Court must evaluate the situation from the standpoint of what officers were facing at the scene and not with the arm-chair confidence of 20/20 hindsight.

Ferreira presents no evidence suggesting that Defendants' actions were unreasonable under the circumstances. There is no question that Ferreira actively was disrupting an already tense and dangerous situation, and that he was interfering with police activities. He admits to his refusal to heed Defendants' commands when initially ordered to step away from the vehicle in which his sister was brandishing a loaded weapon. He further admits to placing himself on the windshield or hood of his sister's car, blocking the Defendants' line of sight to Patricia, and placing himself, his sister, the surrounding public, and the officers themselves in jeopardy. The use of pepper spray by the officers as they tried to subdue and handcuff Ferreira, particularly given the situation unfolding nearby, does not amount to excessive force. See Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) ("pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee," particularly when the subject is resisting arrest and there is a threat of harm to the officers or anyone else). Likewise, Ferreira's allegation of kicks and punches inflicted during the struggle with police is not enough for this Court, in hindsight, to conclude that these actions, assuming they occurred, were unreasonable under the circumstances. See Pena-Borrero, 365 F.3d at 12 ("Not every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment.") (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). Based on the undisputed facts, it cannot be said that Defendants were unjustified in using force to subdue and remove Ferreira from the critical area, or that the force used was excessive and unreasonable.

Finally, Ferreira alleges that the actions of the Defendant officers amounted to assault and battery. Under Rhode Island law, battery is "an act that was intended to cause, and does cause, an offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault." Fenwick v. Oberman, 847 A.2d 852, 855 (R.I. 2004). However, in their roles as police officers, Defendants were privileged to use as much force as necessary to effectuate Ferreira's arrest. See State v. Ramsdell, 285 A.2d 399, 404 (R.I. 1971); R.I. Gen. Laws § 12-7-8. Because this privilege protects the officers unless and until their actions rise to the level of excessive or unjustified force, id., the officers' conduct cannot give rise to viable tort claims. See Rose v. Town of Concord, 971 F. Supp. 47, 51 (D. Mass. 1997); see also 6 Am. Jur. 2d Assault and Battery § 118 (2008) ("Police officers are privileged to commit a battery pursuant to a lawful arrest, but the

privilege is negated by the use of excessive force."); 6A C.J.S Assault § 34 (2008) ("[A] public officer acting under authority of law and without malice is not liable for assault and battery, provided he or she uses no more force than is reasonably necessary under the circumstances."). Because the force used was not excessive for the reasons discussed above, it cannot support the assault and battery claim.

B. Claims of Patricia Ferreira brought by and through Plaintiff as Administrator of the Estate and Guardian of the Minor Child.

Ferreira is also the administrator of Patricia Ferreira's estate and guardian of Patricia's son. In this capacity he claims that Defendants' acts and/or omissions caused Patricia's death. Specifically, Ferreira brings claims for failure to train or supervise officers, unlawful seizure, and violation of due process, all via Section 1983 (and partially the Rhode Island Constitution);[4] further, he brings a state-law claim for negligence

---

[4] Because the protections afforded by the Rhode Island Constitution and the United States Constitution are coterminous with each other on issues of due process and unlawful seizure, Ferreira's claims do not require separate analyses under the state and federal schemes. See Brousseau by & through Brousseau v. Town of Westerly by & through Perri, 11 F. Supp. 2d 177, 183 (D.R.I. 1998) (citing Duquette v. Godbout, 471 A.2d 1359, 1361 (R.I. 1984) ("With minor exceptions not applicable here, Art. 1, § 6 of the Rhode Island Constitution is co-extensive with the Fourth Amendment of the United States Constitution.")); Pawtucket Transfer Operations, LLC v. City of Pawtucket, 539 F. Supp. 2d 513, 517 n.4

and wrongful death. For the reasons fully explained below, Ferreira's claims on these issues fail.

1. Unlawful Seizure

Ferreira alleges that Defendants unlawfully seized Patricia in violation of her rights under the Fourth Amendment to the United States Constitution and Art. 1, § 6 of the Rhode Island Constitution when they blockaded her vehicle and used force and other tactics to effectuate her surrender. Only unreasonable seizures are forbidden by protections of the Fourth Amendment. Ahern v. O'Donnell, 109 F.3d 809, 816 (1st Cir. 1997); United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1993). The reasonableness inquiry is twofold: "[f]irst, the officer's action must be 'justified at its inception'"; and second, the seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place." King, 990 F.2d at 1557 (quoting Terry v. State of Ohio, 392 U.S. 1, 20 (1968)).

Given the facts of this case, Defendants' seizure of Patricia was justified and reasonable. The law allows that under certain circumstances, "a police officer may have occasion to seize a

---

(D.R.I. 2008) ("the drafters of the Rhode Island Constitution intended that document's Due Process Clause to parallel the Due Process Clause of the Fourteenth Amendment"); Jones v. Rhode Island, 724 F. Supp. 25, 35 (D.R.I. 1989).

person . . . in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." King, 990 F.2d at 1560. The reasonableness of such a seizure depends on the specific facts and the balance between the "community caretaking function" of the officer and "the individual's interest in being free from arbitrary government interference." Id. At the time they acted to seize Patricia, the officers were specifically aware that she was armed, suicidal, mentally unstable, and potentially dangerous to everyone present, including herself, the officers and the gathering bystanders. Despite requests from the police to put the gun down and exit the car voluntarily, Patricia remained in her vehicle, sometimes placing the barrel of the gun in her mouth. Given these facts, "'[i]t would have been poor police work indeed,' for the police to have left the scene," and Defendants were "entitled, if not obliged," to defuse the situation by stopping Patricia's vehicle and attempting to convince her to give up her weapon. United States v. Wallace, 889 F.2d 580, 582 (5th Cir. 1989). Because of the volatile nature of the situation and the danger posed by and to Patricia, Defendants' actions were not unreasonable nor do they amount to unlawful seizure in violation of the Fourth Amendment or the Rhode Island Constitution.

2. Due Process

Next, Ferreira alleges that Defendants deprived Patricia of life without due process. "The due process guarantees of the Fourteenth Amendment forbid the State itself from depriving a person of life, liberty, or property, without due process of laws." Rivera v. Rhode Island, 402 F.3d 27, 33 (1st Cir. 2005). To establish a substantive due process claim, one must first show a deprivation of a protected interest, and second, that the deprivation was caused by government conduct which "reflect[ed] a reckless or callous indifference to an individual's rights." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st Cir. 1989).

Because Due Process "acts as a check on the government, not on actions by private individuals," Rivera, 402 F.3d at 34, state actors generally may be held liable only for their own actions and not the actions of private parties. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1279 (10th Cir. 2003). Likewise, the protections afforded by the Due Process Clause relate only to the State's power to act - they do not guarantee minimum levels of safety and security. DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 195 (1989). Consequently, mere negligence or inaction on the part of the state actors is generally not actionable under the Due Process Clause. See Frances-Colon v.

Ramirez, 107 F.3d 62, 64 (1st Cir. 1997); see also Evans v. Avery, 100 F.3d 1033, 1038 (1st Cir. 1996).

There are two distinct exceptions to this general rule. First, "in situations in which there is a 'special relationship,' an affirmative, constitutional duty to protect may arise when the state 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs.'" Rivera, 402 F.3d at 34 (quoting DeShaney, 489 U.S. at 200). Second is the "state-created danger exception," wherein "the state 'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'" Monfils v. Taylor, 165 F.3d 511, 516 (7th Cir. 1998) (quoting Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993)). Applying this exception, "[w]here a state official acts so as to create or even markedly increase a risk, due process constraints may exist, even if inaction alone would raise no constitutional concern." Hasenfus v. LaJeunesse, 175 F.3d 68, 73 (1st Cir. 1999).

In this case, Ferreira claims that both exceptions apply.[5] The special relationship exception is a limited one. Under the framework established in DeShaney, a special relationship exists only "when the State takes a person into its custody and holds him

---

[5] Ferreira also advances an alternate theory which alleges that Patricia did not commit suicide. Rather, he maintains that there is sufficient factual dispute as to the cause of Patricia's death to warrant outright denial of Defendants' motion on the Due Process claims. Ferreira's theory suggests two alternate scenarios - first, that Defendants' use of a flashbang device caused an involuntary or unintentional discharge of the weapon. In support, Ferreira offers the testimony of his expert, David Grossi, a self-proclaimed law enforcement "trainer and consultant" and firearms instructor who states in his report that "the use of . . . (flashbangs) may have caused an involuntary and unintentional discharge of the firearm held by Ms. Ferreira." Grossi cites only a "well known" theory that "unintentional discharges of semiautomatic pistols can result from several sources." This factually unsupported and purely speculative declaration is insufficient to support a theory that the Defendant officers directly caused Patricia's death. See Hernandez Loring v. Universidad Metropolitana,186 F. Supp. 2d 81, 89 (D.P.R. 2002) (at the summary judgment level, "a Court has an obligation to weed out claims which rely on 'conclusory allegations, improbable inferences, and unsupported speculation'") (quoting Medina Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). Second, Ferreira alternately maintains that Officer Feeney inadvertently caused the weapon to fire when he reached into the vehicle at the moment when Patricia, with the gun in her mouth, appeared ready to pull the trigger. Like the first theory, this fails for lack of factual support and amounts to no more than rank speculation. Because neither scenario of the accidental death theory is supported by sufficient evidence, they cannot stave off summary judgment. To put it bluntly, these "theories" are just guesses as to what might have happened in the final seconds of Patricia's life. The most likely scenario, however, is that Patricia pulled the trigger. In any event, the legal analysis of Ferreira's claim is the same and the law bars recovery.

there against his will," such that "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199-200. The relationship typically exists "when [an] individual is incarcerated or is involuntarily committed to the custody of the state." Rivera, 402 F.3d at 34; see also Monfils, 165 F.3d at 517. Even where a special relationship exists, however, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Rivera, 402 F.3d at 34 (quoting DeShaney, 489 U.S. at 200).

No custodial relationship as envisioned by DeShaney was created here. The officers were never in control of Patricia's actions, nor was she placed in the situation against her will. See Adams v. City of Fremont, 68 Cal. App. 4th 243, 278 (Cal. Ct. App. 1998) ("[L]aw enforcement personnel render assistance to suicidal individuals at the scene, virtually always in response to emergency calls. They must take the individual and their environment as they find them."). Patricia's suicidal plans were well under way before the officers arrived at the scene. While Defendants were able to surround Patricia's vehicle and prevent her passage, they were not

in control of her. Id. While the officers may have limited Patricia's ability to travel freely, they did not restrain her. See Christiansen, 332 F.3d at 1280. Where officers neither restrained Patricia against her will nor limited her freedom to act on her own behalf, no special relationship was created and the officers had no affirmative duty to protect Patricia from herself.

Similarly, the rarely applicable, so-called "state created danger" exception does not apply here. Frances-Colon, 107 F.3d at 64. Under this exception, Due Process protections are available only where a "government employee . . . affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance." Id. Ferreira argues that each of the following suffice to establish a state created danger: the Defendant officers' failure to seize Patricia's guns from her at Sousa's home, the failure to provide better crisis intervention services, and the use of a hasty tactical plan that involved flashbang devices. Because Patricia ultimately caused her own death, however, none of these constitute affirmative actions on the officers' part sufficient to trigger the exception. See id. (even a "proximate causal link" between government action and personal injury is not affirmative conduct sufficient to invoke the protections of due process).

Here, the officers' failure to confiscate Patricia's guns (her property) without cause, and the alleged failure to design a better crisis intervention plan both fall far short of the affirmative action contemplated by the case law. Lombardi v. Whitman, 485 F.3d 73, 79 (2nd Cir. 2007) ("It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger."); Christiansen, 332 F.3d at 1281. Likewise, the officers' rescue attempt was not a deliberate effort to place Patricia in harm's way, but rather to remove her from the danger that she herself created. Because "[t]he Due Process Clause is not a guarantee against incorrect or ill-advised [government] decisions," Ferreira's claims as to the adequacy of Defendant officers' tactics are misplaced. Christiansen, 332 F.3d at 1282 (internal quotations and citations omitted).

Moreover, even if the Court assumes that Defendants' actions somehow created a special relationship or amounted to a state created danger, they simply do not rise to the level of conscience-shocking or outrageous conduct. Rivera, 402 F.3d at 35; Evans v. Avery, 100 F.3d at 1038. Under both exceptions, a constitutional violation cannot be established, and liability may not attach, until the plaintiff meets the "further and onerous requirement" of

proving that the state actions "shock the conscience of the court." Rivera, 402 F.3d at 35. In this case, there is no evidence on the record that Defendants' conduct was "intended to injure in some way unjustifiable by any government interest." Id. at 36. Although Defendants were unsuccessful in their rescue attempt, there have been no facts introduced to prove any "extreme or intrusive physical contact," Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995), or otherwise "manifestly outrageous" actions on their part. Lockhart-Bembery v. Sauro, 498 F.3d 69, 77 (1st Cir. 2007).

3. Failure to Train[6]

Whether or not the training afforded was sufficient "it is only when a governmental unit's employee inflicts a constitutional injury that the governmental unit can be held liable under section 1983." Calvi v. Knox County, 470 F.3d 422, 429 (1st Cir. 2006). Thus, "[i]t follows that the inadequate training of a police officer cannot be a basis for municipal liability under section 1983 unless a constitutional injury has been inflicted by the officer or officers whose training was allegedly inferior." Id.

---

[6] Although neither Complaint advances specifically a failure to train claim, the facts alleged appear to give rise to one. In each, the fact section alleges that Defendants "failed to properly select, train, instruct, supervise, and discipline officers in the City Police Department . . . ." The conclusion reached applies to the failure to train allegations made in Ferreira's individual suit and that brought on behalf of Patricia's estate.

(citing Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25-26 (1st Cir. 2005)). Because Ferreira has failed to establish a trialworthy issue on any of his asserted constitutional claims, the failure to train allegation is without merit.

4. State Law Claims

Ferreira maintains that Defendants are liable in negligence for the wrongful death of Patricia. Specifically, he alleges that Defendants were negligent in failing to identify Patricia as a person in crisis earlier in the day (before she threatened suicide or brandished a weapon) and that they should have seized her weapons and escorted her to a healthcare facility. Ferreira also alleges that the officers acted negligently in their rescue attempts while Patricia was barricaded in her car. But for any of these negligent acts, Ferreira claims, Patricia's suicide would not have occurred.

a. The Events Preceding the 911 Call

As to Ferreira's claims that the Defendants were negligent in their failure to confiscate Patricia's weapons and escort her to an appropriate health care facility, Defendants rightly point out that the Complaint in this matter does not contain any facts or allegations relating to the events of the afternoon of October 10, 2001. Rather, the Complaint sets forth facts beginning with the

911 call alerting the East Providence police of Patricia's suicide threat. Even assuming adequate pleading however, these claims fail.

To begin, Ferreira maintains that officers should have seized Patricia and her weapons and forced her to submit to a psychological evaluation, ostensibly to prevent her from hurting herself. In support, he suggests that Rhode Island law and the regulations of the East Providence Police Department create a specific duty on the part of the officers where none would generally exist. Ferreira cites Sections 1.4 and 1.5 of General Order 2000-43 of the East Providence Police Department General Orders, which respectively provide, in pertinent part:

> Procedures for Contact with Mentally Ill Person:
>
> Often times, police officers, due to the dynamic nature of their role, may be called to intervene in suicide or mental illness crisis situations. . . . The main goal is to get psychiatric assistance, if needed, and in the safest manner possible.
>
> . . . .
>
> It is a priority for an officer to ascertain if the individual either possesses or otherwise has access to weapons when the officer has determined that the individual is mentally ill, in crisis, or is suicidal.

And

> Procedures for Response to Suicides and Attempted/Threatened Suicides:

> Officers shall talk the subject into compliance and seize the subject's weapon.

Ferreira has not cited any authority for the proposition that Police Department guidelines or regulations create any legal duties on the part of the officers. Furthermore, Section 1.4 does not speak in mandatory terms, but instead provides guidance as to how officers should handle mentally unstable persons. As to both sections, there is no evidence to suggest that police should have been aware that Patricia was suicidal or having a mental health crisis during the brief period the officers were at Sousa's residence.[7]

---

[7] In support of his assertion that Patricia was in crisis, Ferreira submits the report of his expert Lloyd Franklin Price, M.D., who opines that Patricia "clearly met the definition of an individual in crisis, at the time of the initial police visit to her residence." However, in formulating his opinion, Dr. Price relies not only on facts about which the officers might have been aware that afternoon (i.e., the domestic disturbance and resulting breakup, her housing situation, the potential for DCYF involvement, and her general agitated state) but also on her psychological and prescription history and other symptoms and manifestations of depression, none of which the officers were privy to or aware of. Without any glaring indication of Patricia's instability, it would be both unrealistic and unfair to impose upon the officers a duty to diagnose and investigate Patricia's mental health status on that afternoon. Furthermore, Dr. Price's opinion that Patricia might not have died had she been provided with crisis intervention services does not suffice to defeat Defendant's motion for summary judgment. See Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994) (noting that "a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently").

Ferreira's assertion that Section 40.1-5-7[8] of the Rhode Island General Laws created a duty on the part of the officers to identify Patricia as being "in crisis" and then escort her to an appropriate healthcare facility, is likewise inapt. The statute is couched in discretionary terms. That a police officer "may make the application for emergency certification to a [mental health or other appropriate] facility," does not require or mandate such action, and thus does not create a legal duty on the part of the officer. § 40.1-5-7 (a)(1) (emphasis added); Andrade v. Perry, 863 A.2d 1272, 1277 (R.I. 2004) ("may" is not synonymous with "must" or

---

[8] Rhode Island General Laws § 40.1-5-7 entitled "Emergency certification," provides in pertinent part

> (a) Applicants. (1) Any physician, who after examining a person, has reason to believe that the person is in need of immediate care and treatment, and is one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, may apply at a facility for the emergency certification of the person therto . . . . In the event that no physician is available, a qualified mental health professional or police officer who believes the person to be in need of immediate care and treatment . . . may make the application for emergency certification to a facility.

§ 40.1-5-7(a)(1).

"shall" - "It is precatory, not mandatory language.").[9] Even were the Court to agree, for the sake of argument, that Section 40.1-5-7 creates a duty on an officers' part, that duty would not arise until the point when the officer believed the person to be in need of immediate care and treatment. Here, there are no facts indicating that at the time Defendant officers observed Patricia, her behavior was in any way suggestive of her being in imminent danger to herself or others. Thus, Section 50.1-5-7 is inapplicable.

Defendants were operating within a legal system that does not permit "random or baseless detention of citizens for psychological evaluations." Gooden v. Howard County, Maryland, 954 F.2d 960, 968 (4th Cir. 1992). Rather, the protections of the Fourth Amendment "require[] an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." Fisher v. Harden, 398 F.3d 837, 846 (6th Cir. 2005) (quoting Monday v. Oullette, 118 F.3d

[9] This Court's analysis may be at odds with that of the Rhode Island Superior Court in Frizzell v. Town of Little Compton, No. 98-0252, 2000 WL 33159170, at *4 (R.I. Super. Ct. Jan. 28, 2000) which, when discussing § 40.1-5-7, noted "this Court agrees with plaintiffs' contention that it does delineate a standard of care requiring that persons who are in need of treatment and are in imminent danger due to mental instability be considered for emergency certification by police officers."

1099, 1102 (6th Cir. 1997)). Likewise, in order to seize a person's lawfully held weapon there must be a valid basis to do so under the Fourth Amendment. See Mora v. City of Gaithersburg, Maryland, 519 F.3d 216, 227 (4th Cir. 2008). There have been no facts alleged to suggest that Patricia was so visibly agitated or unwell that probable cause existed to seize her or her property. Thus inasmuch as Ferreira has alleged negligence on the part of the Defendant officers for what they did not do on the afternoon of October 10, 2001, his claim fails.

b. The Suicide Attempt

Ferreira also alleges that Defendant officers were negligent at the scene of Patricia's suicide because of insufficient training, the failure to involve a psychologist or crisis intervention counselor at the scene, and the impropriety of their tactical plan. As in any case alleging negligence, to prevail "a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." Selwyn v. Ward, 879 A.2d 882, 886 (R.I. 2005) (internal quotation marks and citation omitted). "If no such duty exists, then plaintiff's claim must fail, as a matter of law."

Id. At issue here is whether the officers owed any duty to protect Patricia from herself.

Ferreira's primary allegation is that Defendants owed to Patricia a duty of care in the exercise of the rescue attempt. To determine whether a duty of care exists, "it is necessary to examine the nature of the activity that gave rise to the plaintiff's claim." Houle v. Galloway Sch. Lines, Inc., 643 A.2d 822, 825 (R.I. 1994). Under Rhode Island law, there is no clear cut rule for establishing when an officer owes a duty of care to a citizen. See Banks v. Bowen's Landing Corp., 522 A.2d 1222, 1225 (R.I. 1987). When conducting such an analysis, however, some Rhode Island courts have adopted a multi-part test used by the California Supreme Court to aid in that determination. Id. The factors to be considered include "(1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach." Id.

In a case similar to this one, the California Court of Appeals assessed whether a duty of care existed where the family of a

suicide victim brought a wrongful death action against the city and police officers in relation to their handling of the decedent's suicide threats. See Adams, 68 Cal. App. 4th at 268. There, the Adams court held that law enforcement officers responding to a situation involving a person threatening suicide with a loaded weapon have no legal duty of care that would expose them to liability if their conduct fails to prevent the suicide from being carried out. Id. at 276. Applying this test, the Adams court found that all factors weighed against a finding of duty. The court placed special emphasis on the policy and community implications of a finding of duty, holding that the imposition of liability "for the negligent handling of a threatened suicide improperly elevates the interests in preserving the life of the person threatening suicide over the interests of public safety and the physical safety of police officers." Id. at 272.

The Adams court well stated this critical point:

> imposition of a tort duty on public safety officers engaged in disarming suicidal persons is certainly likely to result in a more tentative police response to such crises. A suicide crisis involving a loaded firearm is an unstable situation in which the police must be free to make split-second decisions based on the immediacy of the moment. Knowledge that any unsuccessful attempt at intervention will be subjected to second-guessing by experts with the 20/20 vision on hindsight years following the crisis is likely to deter the police from taking decisive action to protect themselves and third parties.

Id. These same policy considerations are at play here, and this Court adopts the thorough and well-reasoned analysis of the Adams decision.

Ferreira alternately alleges that the municipal Defendants may be held liable for their failure to protect Patricia because they owed to her a special duty and their actions towards her were egregious. Typically, state and municipal governmental entities are immune from tort liability "arising out of their discretionary governmental actions that by their nature are not ordinarily performed by private persons." Kashmanian v. Rongione, 712 A.2d 865, 867 (R.I. 1998) (quoting Quality Court Condo. Ass'n v. Quality Hill Dev. Corp., 641 A.2d 746, 750 (R.I. 1994)). However, liability may exist under two specific situations - when a special duty has been assumed "owing to a specific identifiable individual," or where the municipality has "engaged in egregious conduct such that it has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation." Kashmanian, 712 A.2d at 867 (citations and quotations omitted).

The burden of establishing a special duty is an onerous one - it requires that the plaintiff "demonstrate a breach of a duty owed by the state to the plaintiff in his or her individual capacity and

'not merely a breach of some obligation owed the general public.'" Haley v. Town of Lincoln, 611 A.2d 845, 849 (R.I. 1992) (quoting Ryan v. State Dept. of Transp., 420 A.2d 841, 843 (R.I. 1980)). Generally, a special duty exists either where "the plaintiffs have had prior contact with state or municipal officials who then knowingly embarked on a course of conduct that endangered the plaintiffs, or they have otherwise specifically come within the knowledge of the officials so that the injury to that particularly identified plaintiff can be or should have been foreseen." Id. (internal citation omitted); see also Schultz v. Foster-Glocester Reg'l Sch. Dist., 755 A.2d 153, 155 (R.I. 2000).

The officers' limited interaction with Patricia in the afternoon hours preceding her death was insufficient to establish a special duty on their part to protect her from her own suicidal actions. The Rhode Island Supreme Court spoke on this very issue in Barratt v. Burlingham, 492 A.2d 1219, 1222 (R.I. 1985): "A police officer's observation of a citizen's conduct that might foreseeably create a risk of harm to others, or the officer's temporary detention of the citizen is not sufficient in itself to create a 'special relationship' that imposes on the officer such a special duty." Id. Moreover, as outlined above, there is no

factual support for the claim of egregious conduct by the Defendants.[10]

The long and short of it is this: however tragic, the peril that Patricia faced was of her own making. Therefore, because the Defendants actions created neither circumstances that forced Patricia into a dangerous position nor the danger itself, the analysis need go no further. With no grounds for asserting that the Defendants owed Patricia any duty - namely no duty of care, no special duty, and no duty based on Defendants' own egregious

---

[10]A state actor may be subject to liability "when the state has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation." Haley v. Town of Lincoln, 611 A.2d 845, 849 (R.I. 1992) (quoting Verity v. Danti, 585 A.2d 65, 67 (R.I. 1991)). The following elements must be established before conduct may be considered egregious: "(1) the state, in undertaking a discretionary action or in maintaining or failing to maintain the product of a discretionary action, created circumstances that forced a reasonably prudent person into a position of extreme peril; (2) the state, through its employees or agents capable of abating the danger, had actual or constructive knowledge of the perilous circumstances; and (3) the state, having been afforded a reasonable amount of time to eliminate the dangerous condition, failed to do so." Id. (quoting Verity, 585 A.2d at 67); see also Tedesco v. Connors, 871 A.2d 920, 924 (R.I. 2005). If a plaintiff fails to "offer a legally sufficient evidentiary basis that would allow a reasonable juror to find for him or her on each of the three elements of egregious conduct, then the trial justice should determine that conduct is not egregious as a matter of law and dismiss the plaintiff's action." Id. at 926. Applying this standard, the requisite elements are not met on the facts of this case.

conduct, there can be no liability in negligence for Defendants' actions on the day of Patricia's suicide. As such, summary judgment is granted as to all negligence claims.

IV. Conclusion

Despite the tragic circumstances of this case, Ferreira has failed to establish any genuine issue of material fact as to his individual claims and those stemming from his role as administrator of Patricia's estate and guardian of her child. For this reason, summary judgment is granted on all counts.

It is so Ordered.

WESmith

William E. Smith
United States District Judge
Date: 7/22/08